# Exhibit B

1

```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW HAMPSHIRE
```

JEANICE FARLEY, individually and
on behalf of MICHAEL FARLEY, an
incompetent adult; GEORGE FARLEY;
JAMES FARLEY; and KIMBERLY—RAE FARLEY,
            Plaintiffs,
    vs.                                 NO. 1:13—CV—261
UNITED STATES OF AMERICA,
            Defendant.


**APPEARANCES:**

**JAMAL ALSAFFAR, ESQ.**
(Appearing by Videoteleconference)
Whitehurst, Harkins, Brees,
Cheng, Alsaffar & Higginbothan
5113 Southwest Pky, Ste. 150    FOR THE PLAINTIFFS
Austin, TX  78735
512.476.4346

**DAVID PLOURDE, ESQ.**
Assistant U.S. Attorney
53 Pleasant St., 4th Floor      FOR THE DEFENDANT
Concord, N.H.  03301
603.230.2531

ALSO PRESENT: Shawn Budd,
              Budd Legal Video


     TRIAL TESTIMONY OF **ANTHONY F. MILANO, MD,** called
as a witness by and on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure,
before Paula E. Hogan, Notary Public in and for the
Commonwealth of Massachusetts; taken at Doubletree
Inn, 287 Route 28, Hyannis, MA, on Thursday,
September 18, 2014, commencing at 9:15 a.m.

_____
                *CAPE COD COURT REPORTING*
            *11 Elliot Way    Harwich, MA  02645*
            *508.430.7331      508.432.7384—fax*
              *paula@capereporting.com*
                *www.capereporting.com*

2

1                              I N D E X

2                    DEPONENT:  ANTHONY F. MILANO, MD
3       Direct Examination by Mr. Plourde:        3
4       Cross Examination by Mr. Alsaffar:     99
5       Redirect Examination by Mr. Plourde:        162


6


7                        E X H I B I T S

8       NO.    IDENTIFICATION                        PAGE
9        1     Professional Profile (CV); Milano      26
10
11       2     Medical Risk Appraisal & Life Expectancy   27
12             Report for Michael Farley; Milano
13
14       3     Reference Article; Drs. Lew & Gajewski     52
15
16       4     USDOJ Vendor Contract for Expert Witness   151
17
18       6     National Vital Statistics Reports;      120
19             Vol. 61, No. 4; Final Data for 2010
20
21       7     National Vital Statistics Reports;      117
22             Vol. 58, No. 19; Final Data for 2007
23
24       8     Mortality and Complications of the      144
25             Locked—in Syndrome
26
27       9     Long—Term Survival, Prognosis, and Life—   146
28             Care Planning for 29 Patients with
29             Chronic Locked—In Syndrome
30
31      10     Impairment, Activity, Participation, Life   147
32             Satisfaction, and Survival in Persons
33             with Locked—In Syndrome For Over a Decade
34
35      16     Deposition Transcript; Milano, 8—29—14;    137
36             (Not attached as an exhibit.)
37
38      19     Medical Malpractice; July, 2009; Vol. 57   106

39

Anthony F. Milano, MD

3

| | |
|---|---|
| 1 | STIPULATION |
| 2 | IT IS HEREBY STIPULATED AND AGREED by and |
| 3 | between counsel for the respective parties that the |
| 4 | deposition is being taken pursuant to the Federal |
| 5 | Rules of Civil Procedure, to be used for Trial |
| 6 | purposes. |
| 7 | The deponent produced a Massachusetts |
| 8 | license for purposes of identification. |
| 9 | The deponent will read and sign the |
| 10 | deposition, waiving the presence of a Notary.  If the |
| 11 | deposition is not signed within 30 days of receipt, |
| 12 | pursuant to Massachusetts Civil Practice, Section |
| 13 | 460, the privilege will be deemed waived. |
| 14 | ********************************** |
| 15 | ANTHONY F. MILANO, MD, |
| 16 | having been first duly sworn, was examined |
| 17 | and testified as follows: |
| 18 | DIRECT EXAMINATION |
| 19 | BY MR. PLOURDE: |
| 20 | Q.   Doctor, would you state your name for the |
| 21 | record, please? |
| 22 | A.   My name is Anthony Milano. |
| 23 | Q.   Doctor, you have agreed to appear today |
| 24 | for a deposition that will be submitted at trial in |

Anthony F. Milano, MD

32

1   and calculate a life expectancy.  And each of the

2   illnesses in a person's category of illnesses carry

3   their own extra mortality burden.  And for instance,

4   at age 60, in the United States Decennial Tables, the

5   average life expectancy for a group of white males is

6   19.9 years, additional years of life.

7          On the other hand, a person with the

8   identical mathematical risk burden gone from very

9   major impairments or disabilities or risk factors

10  would have far more, certainly more deaths per

11  thousand than 12.1 deaths per thousand, which is the

12  normal standard for a group of white males at age 60

13  in the United States Decennial Tables.

14      Q.   Do I understand you correctly, and don't

15  let me put words in your mouth, as I understand it,

16  what you're saying is that the general life tables

17  established for a person of the age of 60, which was

18  Mr. Farley's age at the time this incident occurred,

19  American white males at the age of 60 under the

20  general tables will have a general life expectancy of

21  approximately 19.9 years?

22      A.   In the United States Decennial Tables,

23  based on the census that was taken from 1999 to 2001,

24  basically the 2000 census, you are correct.  There

Anthony F. Milano, MD

33

1    are about 12.1 deaths per thousand in the white,

2    American male population.

3        Q.    So, when you examine the medical records,

4    you're trying to identify specific health risks or

5    conditions that a particular individual has that

6    might somehow affect the general life expectancy

7    level, is that correct?

8        A.    Yes.

9        Q.    All right.  I didn't mean to —— can you

10   continue to explain exactly what your methodology is?

11       A.    Well, then simply put, we sum —— the

12   convention in the insurance industry by and large is

13   to sum the extra mortality for each of the illnesses

14   and risk factors and come up, determine a total extra

15   mortality burden mathematically for a group of

16   people, in this case with the identical risk factors

17   that Mr. Farley contained, and compare that extra

18   mortality burden with the mortality in a group of

19   60—year—old white males in the general population who

20   obviously don't have this mortality burden.  There's

21   only 12.1 deaths per thousand in age 61 in those 1990

22   United States Decennial Tables.  And we do a simple

23   comparison.  And that's basically the theme of the

24   work that we do, is to do a comparison of a group of

Anthony F. Milano, MD

46

1    rate sum of 253 deaths per thousand, starting at age

2    60.  And you can see right away looking at the United

3    States Decennial Tables, that is a huge, enormous

4    mortality compared to a group compared by age, sex

5    and race, starting at age 60 that would only have 12

6    deaths a thousand in the United States Decennial

7    Tables.

8        Q.   All right.  Before we get into more detail

9    with respect to your analysis of Mr. Farley's

10   specific circumstances, I'm still trying to get a

11   picture of the process that you're following.  So,

12   you come up with the excessive death rate.  What do

13   you do once you have that amount?

14       A.   Once I have a medical risk profile

15   completed, I am then ready to insert into a computer

16   program that looks almost precisely the same that

17   will construct a life table that looks almost

18   precisely the same as a life table that is published

19   by the United States Department of Health and Human

20   Services.  These are called the United States

21   Decennial Tables.

22            The most recent Decennial Tables for the

23   2000 census was not published until August 5, 2008,

24   because it takes quite a few years to collate all the

Anthony F. Milano, MD

71

1    tracheostomy or indeed had ventilatory support.

2         Q.    All right.  So, can you briefly describe

3    what it is you did with each of these health risk

4    factors?

5         A.    After I determined the extra mortality

6    burden of each of the major risk factors, in table 1

7    of his multiple risk factor profile, I then inserted

8    the summed excess death rate, the EDR decimal values

9    into a life table for the calculation of life

10   expectancy.

11        Q.    And can you tell us what you relied on in

12   coming up with the excess death rate with respect to

13   each of these impairments?

14        A.    Yes.  For his first impairment, I relied

15   on the report from the National Institutes of Health

16   and the Framingham study and Boston University, which

17   outlined the excess death rate outcomes and made up

18   by sex in males and females and by age and by health

19   status and by duration of disease.  So, I used that,

20   those data from the National Institutes of Health

21   because it came closest and was more accurate than

22   any other data that I could find.

23             Indeed in the most recent paper that I

24   read in the Journal of American Heart Association

Anthony F. Milano, MD

95

1    A.    Well, let's see.  Oh, at the time I

2  received this case, his current age or age near his

3  birthday was 60 years old.  And so, I calculated ——

4  and this is on page 1 of my report.

5    Q.    So, your life expectancy analysis is based

6  on Mr. Farley currently being 60 years of age,

7  essentially at the time this report was prepared?

8    A.    Yes.

9    Q.    Doctor, you mentioned that you issue

10 these, your opinions regarding the reduction in Mr.

11 Farley's life expectancy as being based on reasonable

12 medical probability.  As I understand the process

13 that you followed, in addition to identifying the

14 risk factors, you had to mathematically calculate or

15 convert the excess mortality rates so that they could

16 be compared with the general Decennial Tables

17 regarding regular life expectancy, is that correct?

18    A.    Yes.

19    Q.    I assume that there's not a hundred

20 percent efficiency in those calculations —— well,

21 strike that.  I assume that your conclusion regarding

22 Mr. Farley's life expectancy of being 3.32 years ——

23    A.    3.22.

24    Q.    —— 3.22 years from the age of 60, is that

1   a definitive statement of how much longer he has to

2   live?

3       A.    No.   That is an average.   Remember the

4   definition of life expectancy.   Life expectancy again

5   is defined as the average number of years.   The word,

6   and I'll go on in a moment, but the word average is a

7   word that is a measure of central tendency of a group

8   of numbers; like the median and the mode and the

9   average are all measures of central tendency; what do

10  these numbers tend to focus on.

11          So, again, life expectancy is the average

12  number of years lived by a group of people starting

13  from some attained age —— in this case age 60 for

14  Mr. Farley —— until all, and that is the operative

15  word, have died.   So, it is an average.   But on each

16  side of the average, people die.

17          And if we were to notice on table 2 —— I

18  don't know if you can tell from this, but let me see.

19  Well, that's his average life expectancy.   We all

20  hope —— let me answer your question this way.   We all

21  hope that Mr. Farley would live let us say to be, to

22  a long, much longer life span.   I like to say live to

23  a hundred years old.   But not —— it's very, very

24  doubtful, this is a probability that he's not going

Anthony F. Milano, MD

1    to come anywhere near that.  But some people die

2    before the average age and some people die after the

3    average age.

4              But, nevertheless, in this statistical

5    analysis, based on the data given, we have a 95

6    percent confidence interval of probability that this

7    will happen 95 percent of the time to men, white

8    males, with the exact mortality burden mathematically

9    expressed as excess death rates summed as Mr. Farley.

10   So, it's a good probability, but he may live a few

11   years longer.  And I'm sure that we all hope he does.

12             Even Dr. Singer called it an estimated ——

13   in his very last paper —— an estimated probability.

14   Because indeed that's all that it was ever meant to

15   be.

16       Q.   Is it fair to say that as a result of your

17   analysis, even if the reduction that you calculated

18   in his life expectancy is essentially, is an

19   estimate?

20       A.   It's an estimated probability.  You must

21   use those two words.

22       Q.   Okay.

23       A.   It's an estimated probability.  And the

24   reason you must use two words, the word probability,

Anthony F. Milano, MD

1   and he will be able to do that.  Okay?

2        A.    Yes, sir.

3        Q.    Okay.  Dr. Milano, let's start at the very

4   beginning, and that's your experience as an expert

5   witness.

6                  MR. PLOURDE:  You're breaking up.

7        Q.    Dr. Milano, it's true that every —— can

8   you hear me okay?

9                  MR. PLOURDE:  With difficulty.

10  You're breaking up.  But go ahead.

11                 MR. ALSAFFAR:  Really?  Okay.  Let me

12  try it again.  Can you hear me, Dr. Milano?

13                 THE WITNESS:  Yes, but you do break

14  up though.

15       Q.    Dr. Milano, every time that you had

16  testified as an expert witness on life expectancy,

17  it's been exclusively for the defendant, correct?

18       A.    Yes.

19       Q.    And it's a fair statement that in all

20  those times you've testified exclusively as a

21  defendant expert witness that you were testifying

22  that the plaintiff had a life expectancy less than

23  what was shown by the United States Decennial Life

24  Tables, is that true?

Anthony F. Milano, MD

102

1        A.    Yes.

2        Q.    And it's also true and in cases in which

3    you've testified as a life expectancy expert, not

4    only have they all been for the defendant, but a vast

5    majority of those have been for the United States of

6    America as a defendant witness, is that correct?

7        A.    Yes.

8        Q.    Okay.  In the work that you have done as a

9    retained expert witness in legal cases, in addition

10   to being exclusively an expert for the defense and

11   almost exclusively an expert for the United States,

12   you've only served as a testifying expert witness in

13   medical malpractice defense cases, is that correct?

14       A.    Yes.

15       Q.    Okay.

16       A.    Sometimes they call medical malpractice by

17   other names, like negligence or wrongful death.  But

18   I think they were basically malpractice cases.

19       Q.    Okay.  Now, you have also opened your life

20   expectancy expert witness service business — and for

21   the record, I don't think Mr. Plourde asked you this

22   so I want to make sure the court understands.  In

23   about 2000 or 2001, you opened this business for the

24   purpose of serving as an expert in life expectancy,

Anthony F. Milano, MD

103

1    is that right?

2         A.    I was asked to provide expert opinions,

3    but I did not have a personal business until I left

4    the, I think, Aviva Life Company, which would have

5    been around 2007 or 2008; 2008, I think.  I did not

6    incorporate myself until around then.

7         Q.    And when did you incorporate the business

8    that's entitled Milano Life Expectancy Services,

9    Inc.?

10        A.    Sometime between 2005 and 2008, but I

11   don't exactly recall.

12        Q.    And you have been in business, that's the

13   business you use that's exclusively for testifying as

14   a defense expert on life expectancy, correct?

15        A.    No, not exactly.  I provide expert

16   services not only to the legal profession, but also

17   to the indemnity world and to the legal profession.

18        Q.    Okay.  And when you say the indemnity

19   world you provide services, you're talking about the

20   insurance industry, correct?

21        A.    Yes.

22        Q.    Now, let me ask you a little bit more

23   about your relationship with the United States as a

24   defendant specifically.  Now, you have been asked by

Anthony F. Milano, MD

1  United States Attorneys to speak at CLEs that have

2  been put on by United States Attorneys for defense of

3  malpractice cases, correct?

4      A.    Yes.

5      Q.    In other words, you've been invited by

6  United States Attorneys to speak at legal seminars

7  where United States Attorneys are attempting to learn

8  about defending cases, correct?

9      A.    Yes.

10      Q.    All right.  And in fact, you have

11  previously listed in your CVs that you developed as a

12  life expectancy doctor, in your CVs, you have listed

13  multiple U.S. Attorneys as references in your CV,

14  correct?

15              MR. PLOURDE:  Do you need to look at

16  the exhibits?

17              THE WITNESS:  Yes.

18              MR. PLOURDE:  Do you have your CV in

19  front of you, exhibit 1?

20              MR. ALSAFFAR:  I believe he answered

21  the question.  That's a different exhibit, David.

22  That's not the one I was referring to.

23      A.    I think you may mean in another venue

24  that's an online legal venue that years and years

Anthony F. Milano, MD

105

1  ago, but I can't remember the name of it even — I

2  just don't remember the name of it.  It was years

3  ago.

4       Q.    Doctor, you're talking about a legal venue

5  in which you were invited by United States Attorneys

6  to come speak to them about defending cases against

7  the government, correct, is that what you're talking

8  about?

9       A.    Yes, that's correct, yes.

10      Q.    Okay.  And my question was you have also

11  in resumes' and CVs that you have prepared you have

12  listed United States Attorneys as references, as

13  expert witness references for people to contact about

14  your life expectancy expertise, is that correct?

15      A.    I think that's correct.

16      Q.    Okay.  And in your — let me go back to

17  your current CV.  And that's the one you should have

18  in front of you, that I believe was marked exhibit

19  number 1.  If you look at that, that current CV, you

20  list as one of the seminars that you spoke at for the

21  United States Attorneys seminar, the topic was "Using

22  Damages Expert Witnesses Effectively in Catastrophic

23  Cases," is that correct?

24      A.    Yes.

Anthony F. Milano, MD

106

1          Q.    And in this, Mr. Farley's case that you're

2     involved in today, this is a catastrophic injury

3     case, is it not?

4          A.    Yes.

5          Q.    And in addition to speaking at a couple of

6     United States Attorneys' seminars, you've also

7     published with the United States Attorney an article

8     in the United States Attorneys' bulletin about serving

9     as an expert witness on life expectancy, is that

10    correct?

11         A.    Yes.

12         Q.    All right.  And I'm going to pull up that

13    bulletin for you.  You may have a recollection

14    because we discussed it recently, but if you need to

15    look, I'm pulling it up right now.  We've marked

16    this, and this is going to be marked as exhibit 19 to

17    your deposition today.  So, exhibit 19, you should be

18    able to see it on your screen.

19                        (Whereupon, the document referred

20                         to by counsel was duly marked for

21                          identification as Exhibit #19.)

22                   BY MR. ALSAFFAR:

23         Q.    Okay.  I'm going to try to reload the

24    document, but I think we can talk about it even if

1    it's up there because we identified it in the prior

2    deposition.

3                        (A brief recess was taken.)

4              BY MR. ALSAFFAR:

5        Q.    Dr. Milano, are you ready?

6        A.    Yes.

7        Q.    Okay.  We were talking about what will be

8    exhibit 19 on this deposition.  This is the bulletin

9    in which you published an article.  And it's the

10   United States Attorneys' bulletin, is that correct?

11       A.    Yes.

12       Q.    Okay.  And in that article that you

13   authored and published for the United States

14   Attorneys, you stated that the power of using life

15   expectancy testimony to limit by thousands if not

16   millions of dollars, economic damages in medical

17   malpractice tort cases.  That's your language,

18   correct?

19       A.    Yes.

20       Q.    And this bulletin that you wrote, you

21   co—wrote it with a United States Attorney in North

22   Carolina, is that correct?

23       A.    Yes.

24       Q.    And this was a bulletin that went out to

Anthony F. Milano, MD

116

1    tables for data from 1999 to 2001, is that correct?

2         A.    Yes.

3         Q.    And it was specifically pulled from the

4    table of white male population death rates from 1999

5    to 2001, did I get that right?

6         A.    Yes.

7         Q.    I'm sorry, did I get that right?

8         A.    Yes, sir.

9         Q.    I just didn't hear you.  And so, what you

10   did was you went to that table in the 1999 to 2000

11   period Decennial Tables, you went to the age 59 to

12   60,  you ran your finger over — I'm sorry, 60 to 61,

13   ran your finger over and we get 19.9 expectation of

14   life, correct?

15        A.    Yes.

16        Q.    I just wanted to make sure the court

17   understands exactly how you did that.  Now, would you

18   agree, Doctor, I think you'll agree with me, wouldn't

19   you, that as a general rule, medically speaking and

20   statistically speaking that life expectancies have

21   been getting better in terms of length every few

22   years, correct?

23        A.    Yes.

24        Q.    In fact, the same organizations, the U.S.

Anthony F. Milano, MD

117

1   Department of Health and Human Services, the National

2   Vital Statistic Reports, the same organization that

3   published the 1999 to 2001 data that you relied on

4   also publishes death data as well, correct?

5        A.   Yes.

6        Q.   All right.  And I want to see if I can

7   pull this up because I want you to see what I'm

8   looking at.  We've marked this deposition exhibit

9   number 7 for this second deposition.  And give it a

10  second and let's hope it'll pull up here.  It's

11  loading.  Tell me whenever you can see it on your

12  screen and we'll go from there.  It should be popping

13  up on your screen in a second.

14       A.   It has popped up.

15            (Whereupon, the document referred

16            to by counsel was duly marked for

17            identification as Exhibit #7.)

18       BY MR. ALSAFFAR:

19       Q.   So, exhibit number 7, Doctor, is the

20  Deaths: Final Data for 2007.  Let's start there,

21  2007.  So this is about six years after the data from

22  your table.  And if you look on the very first page,

23  start with the first page there — let me scroll up

24  just a little bit.  Okay.  If you look under Results,

Anthony F. Milano, MD

118

1    on the very first page, if you look under Results on

2    the very first page of the death tables for 2007,

3    published by the CDC, it says that the age adjusted

4    death rate was 760.2 deaths per one hundred thousand

5    standard population, a decrease of 2.1 percent from

6    the 2006 rate and a record low historical figure, is

7    that correct?

8         A.    Yes.  I can barely see it, but I think

9    you're correct.

10        Q.    Well, let me do this.  Let me help you out

11   a little bit.  Is that better?

12        A.    Well, no.

13        Q.    Is that better?

14        A.    No.  It hasn't changed at all.

15        Q.    Okay.  And what that means is that just

16   from 2006 to 2007, the over all population death rate

17   had decreased, meaning — that's what that means,

18   correct?

19        A.    Yes.

20        Q.    And the CDC's table goes on to say that

21   life expectancy at birth rose .2 year, from a 2006

22   value of 77.7 years to a record 77.9 in 2007,

23   correct?

24        A.    Yes.

Anthony F. Milano, MD

119

1        Q.     And what it goes on to say is that age

2    specific death rates decreased for most age groups,

3    including the age group Mr. Farley's in, the 55 to 64

4    age group, is that correct?

5        A.     Yes.

6        Q.     And what that means is that people are

7    living longer in 2007 compared to 2006, correct?

8        A.     Yes.

9        Q.     All right.  And one of the reasons —— I

10   mean, there's a lot of reasons, but is it true, would

11   you agree that one of the reasons that people live

12   longer is due to advances in medical care once you

13   get to a certain age, correct?

14       A.     That is one of the reasons, but not a very

15   large reason.

16       Q.     Okay.  And let's look at —— the CDC also,

17   what they did was they followed this study up in

18   2014, I believe —— let me double check —— yeah, 2013,

19   the CDC updated this table that I just showed you

20   with death data for 2010.  And I'm uploading that to

21   your computer right now so just give it a second and

22   tell me when you see it on your screen.

23       A.     I see, Deaths: Final Data for 2010.

24       Q.     And just like with the ——

Anthony F. Milano, MD

120

```
 1                      MR. ALSAFFAR:  This is marked exhibit
 2    number 6.
 3                          (Whereupon, the document referred
 4                          to by counsel was duly marked for
 5                           identification as Exhibit #6.)
 6                  BY MR. ALSAFFAR:
 7          Q.    And just like with the prior table I just
 8    showed you, this table again is published by National
 9    Vital Statistics Reports, which is the U.S.
10    Department of Health and Human Services, the same
11    governmental organization that published your tables
12    that you relied on from 1999 to 2001, correct?
13          A.    Yes.
14          Q.    Is that correct?
15          A.    Yes.
16          Q.    Thank you.  I'm sorry, I know you probably
17    answered, I just had a little hard time hearing.
18                      MR. PLOURDE:  The problem is the
19    computer is further away from the phone from where he
20    was originally sitting.
21          Q.    Okay.  Doctor, I'm showing you exhibit
22    number 6, which is the death data for 2010, which is
23    the update, 2010 update of the document I just showed
24    you from 2007.  Is that how you understand it?
```

Anthony F. Milano, MD

121

1        A.    Yes.

2        Q.    Okay.  Now, if you go down to the Results

3   section, it says that the age adjusted death was

4   747.0 deaths per 100,000 standard population, lower

5   than the 2009 rate and a record low rate.  Do you see

6   that?

7        A.    Yes.

8        Q.    So, in other words, in 2010, we have yet

9   another record low rate of deaths for the U.S.

10  population, correct?

11       A.    Yes.

12       Q.    So, the table goes on to say that life

13  expectancy at birth rose .2 year, from 78.5 years in

14  2009 to a record high of 78.7 in 2010.  Do you see

15  that?

16       A.    Yes.

17       Q.    All right.  So, again, what we have here

18  is the 2010 population data from the United States

19  shows that once again, life expectancy is increasing

20  from 2007 to 2008 to 2009, 2010, correct?

21       A.    Yes.

22       Q.    Is that right?

23       A.    Yes.

24            MR. PLOURDE:  Did you get it?  Yes.

Anthony F. Milano, MD

122

```
 1                      MR. ALSAFFAR:  Yes, thank you.
 2          Q.    Now, I'm going to show you the next page
 3   of this table, exhibit number 6.  Okay.  If you look
 4   under Trends, the CDC states that in 2010, life
 5   expectancy increased for the total population as well
 6   as for the black and white populations, both black ——
 7   both white and black male and female populations
 8   experienced an increase in life expectancy in 2010
 9   over 2009, is that correct?
10          A.    I think you're correct, but I can't see it
11   on this monitor.  I know the life expectancy has
12   increased.  But the page did not transition to
13   whatever page has Trends on it.
14                      MR. PLOURDE:  We still are
15   visualizing the first page of this.
16                      MR. ALSAFFAR:  Okay.  Let me do this.
17   Let me try this again.  Tell me when you see it in
18   front of you.
19          Q.    While we're waiting for the document to
20   pull up, Dr. Milano, would you agree that —— and
21   again, we're talking about 2010 —— that the rates for
22   the two leading causes of death in this United
23   States, heart disease and cancer, continued their
24   long—term decreasing trends?
```

Anthony F. Milano, MD

123

1     A.    Yes.

2     Q.   Okay.  Let me try to pull this up again.

3 I might just need to reload a little bit.

4           MR. PLOURDE:  The first document

5 disappeared but now it's blank.

6           MR. ALSAFFAR:  I closed it, David,

7 and reloaded it.  Sometimes that helps.

8           MR. PLOURDE:  A document has just

9 come up.  But it's the same that was up before.

10          MR. ALSAFFAR:  Right.  It's page 1.

11 I'm waiting for it to completely load and then I'll

12 see if it works.  And if it doesn't, we'll move on.

13 That's okay.  And I'm actually on page 3 of the

14 National Vital Statistics Reports U.S. death tables

15 of 2010.  Is page 3 showing up on your screen?

16    A.   No.

17    Q.   Okay.  Let me ask you a different question

18 then.  Do you agree that the pace of decline for age

19 adjusted death rates during the last 10 years, and

20 that would be from 2000 to 2010, has been faster than

21 for the previous decades?

22    A.   I think so.

23    Q.   Okay.

24          MR. ALSAFFAR:  Let me just close

1   this.  Since we're having trouble with this

2   particular document, we'll turn away from it for just

3   a second.

4                MR. PLOURDE:  For the record, I've

5   got an objection to the use of the document to the

6   extent that the Doctor is not able to visualize the

7   portions that you're referring to.

8                MR. ALSAFFAR:  For those questions,

9   the last two questions, I just asked those generally.

10  So, any questions that are about the document itself,

11  I'll make sure that he can see it.  But that's fine.

12  I understand your objection.

13                MR. PLOURDE:  Can we take a quick

14  break?

15                MR. ALSAFFAR:  Oh, yeah, absolutely.

16                (A brief recess was taken.)

17             BY MR. ALSAFFAR:

18     Q.   Dr. Milano, don't apologize, stuff comes

19  up.  That's okay.  Now, let's go back to what we were

20  discussing before, and that's a little bit about your

21  methodology.  I want to go specifically to that.  So,

22  we just discussed the tables that you — one of the

23  places in which you started with your life expectancy

24  opinion was the decennial 1999 to 2001 table.  So, I

Anthony F. Milano, MD

125

1   want to talk to you about what you used next.  And in

2   order to do that, I want to see if I have your

3   methodology down, at least somewhat correctly, okay?

4           So, one of the things you did was you

5   created — you discerned what you felt to be seven

6   individual risk factors that Mr. Farley had on his

7   medical records, correct?

8       A.   Yes.

9       Q.   Okay.  Then what you did is you summed up

10  the death mortality for each one of those risk

11  factors independently, correct?

12      A.   Yes.

13      Q.   Then you created a group of 60-year-old

14  white males from the general population who you said

15  had a, quote-unquote, normal life expectancy

16  according to the decennial 1999 to 2001 figure,

17  correct?

18      A.   Yes.

19      Q.   All right.  So, let's talk about that

20  first comparison group, this cohort of 60 white males

21  from what you termed normal population.  You

22  determined based on doing that, looking up the table

23  of 60-year-old white males in the 1999 to 2001 data

24  that the starting life expectancy then was 19.9

Anthony F. Milano, MD

126

1    years, correct?

2          A.    Yes.

3          Q.    Just so the court understands, that's the

4    number you're going to be deducting from, right?

5          A.    Yes.

6          Q.    Now, in that group of 60-year-old white

7    males pulled from the 1999 to 2001 data, did you

8    determine in any way, shape or form how many of those

9    white males in that group had some of Mr. Farley's

10   risk factors as well?

11         A.    No.

12         Q.    In other words, you termed them normal

13   population, but you don't know how many of that group

14   that you're comparing Mr. Farley to already had some

15   of the risk factors or any of the risk factors that

16   Mr. Farley had, correct?

17         A.    Yes.

18         Q.    Now, presumably we know as a statistical

19   and almost scientific certainty that this group of,

20   quote-unquote, normal 60-year-old white males

21   probably did have some of Mr. Farley's risk factors,

22   correct?

23         A.    It is possible.

24         Q.    It's probable, isn't it, because they're

Anthony F. Milano, MD

127

1    the group of population of 60—year—olds?

2          A.    Well, I can't say that for sure.

3          Q.    Okay.  And the reason you can't ——

4          A.    But it is possible.

5          Q.    Go ahead.

6          A.    Well, it is possible.

7          Q.    Okay.  And really, you don't know one way

8    or another the answer to the question of this

9    comparison group if they already had some of Mr.

10   Farley's risk factors, right?  You just don't know?

11         A.    No.  But what I do know is that the

12   mortality rate for that group at age 60 is only 12.1

13   deaths a thousand, I think; as a group.  And that's

14   what we're comparing here.  We're not comparing

15   Mr. Farley by himself, but we are comparing a Farley

16   cohort, quote—en quote, of a thousand people with the

17   identical mathematical burden of mortality that Mr.

18   Farley had.  And so, that's what we are doing, is

19   comparing one population with another, not a single

20   person.

21         Q.    All right.

22                 MR. ALSAFFAR:  I have to object as

23   non responsive, Dr. Milano.  This is the trial

24   portion, so you need to answer just the question I

Anthony F. Milano, MD

128

1    ask.  Although I promise you we'll get to this Farley

2    cohort in just a minute; which is a separate group.

3          Q.    Please listen to the question I ask, let's

4    answer that one and then let's move on to the one

5    that you want to answer after that.  Okay.

6              My question was this group of 60—year—old

7    white males from the 1999 to 2001 population, the

8    group you pulled the 19.9 from, you don't know one

9    way or another whether men in that group had already

10   some of those risk factors that Mr. Farley had,

11   correct?

12         A.    Correct.

13         Q.    And just so the court understands, any

14   time we're talking about a population group that

15   you're pulling from a life table like the 1999 to

16   2001 table that you pulled the group from, that is

17   all comers, do you know what that term means?

18         A.    Yes.

19         Q.    That means there are people with better

20   health than Michael Farley in that group, there are

21   also people with worse health in that group,

22   including people who have died, correct?

23         A.    Yes.

24         Q.    Okay.  Now, let's talk about the next step

Anthony F. Milano, MD

129

1   you did.  So, we've established how you got your 19.9

2   starting figure.  We established that you looked at

3   Mr. Farley and pulled out these seven major risk

4   factors that you added up individually, have I got it

5   right so far?

6        A.   Yes.

7        Q.   Then you created what you have tabbed a,

8   quote—unquote, Farley cohort male group, correct?

9        A.   Yes.

10        Q.   Now, I believe my understanding of your

11   wording is what you did was you created a cohort

12   group of men that you think have identical risk

13   factors as those to Mr. Farley, is that correct?

14        A.   I would term it the mathematical burden of

15   excess mortality identical to that of Mr. Farley.

16        Q.   And so that the court understands what the

17   Farley cohort group is, this is a fictional group of

18   people, correct?  It doesn't exist in the world,

19   correct?

20        A.   I would use the term virtual, not

21   fictional.

22        Q.   All right.  Virtual, to me, means — and

23   tell me if this is how you understand it, but when I

24   hear the word virtual in terms of like reality, what

Anthony F. Milano, MD

130

1   that means to me is a fake reality trying to simulate

2   a real thing, is that how you're using it?

3        A.   Yes.  We are using that mathematical

4   burden of the Farley group to compare to a similar

5   group by age, sex and race, in terms of a survival

6   and a life expectancy outcome.

7        Q.   Let me make sure the court understands

8   what you did here.  This group, Farley cohort group,

9   this virtual reality group that you created — well,

10  are you comfortable calling it a hypothetical group?

11  Because I know you used that term before.  Is that

12  something you're comfortable calling it?

13       A.   Yes.

14       Q.   Okay.  And the reason why it's okay to

15  call it a hypothetical group or virtual reality group

16  is because this group does not exist in reality,

17  these aren't real people that you created, correct?

18       A.   That's correct.

19       Q.   And what you've done is this Farley cohort

20  group is necessary, absolutely necessary for you to

21  make the ultimate conclusion in your report that Mr.

22  Farley's life expectancy is only 3.22 years, is that

23  fair?

24       A.   Yes.

Anthony F. Milano, MD

1       Q.    Without this hypothetical group that you

2    created to compare to Mr. Farley, you would be unable

3    to plug that into your computer program and get out

4    the 3.22 year life expectancy opinion that you've

5    given in this case, correct?

6       A.    Yes.

7       Q.    All right.  Now, just so going — I try to

8    do 35,000 views every few questions.  Okay?  So

9    that's what I'm doing right now.  So that the court

10   understands, you first — we start with a 19.9 year

11   life expectancy you pulled from data from 1999 to

12   2001, then you created the Farley cohort group to

13   hypothetically and virtually simulate Mr. Farley's

14   actual condition.  And by doing that, you ultimately

15   concluded that Mr. Farley life expectancy is probably

16   reduced by 83.82 percent, is that correct?

17      A.    Yes.

18      Q.    So, let's dig into that a little more now.

19   First of all, let's talk a little bit about the other

20   life tables that are out there.  And I understand you

21   prefer the Decennial Tables, and you have explained

22   in great detail today and in the prior deposition why

23   you prefer those tables.  But the same government

24   institution, the U.S. Department of Health and Human

Anthony F. Milano, MD

1    Services, CDC, National Vital Statistics Reports

2    published other life tables that are more recent,

3    even though you don't like using them, they're more

4    recent data, correct?

5        A.    Yes.

6        Q.    And the ——

7        A.    It's not that I don't like using them.

8    It's that they shouldn't and must not be used in this

9    context for the calculation of life expectancy.  One

10   should use the correct tables, which are the

11   Decennial Tables.  It's not a question of personal

12   like or dislike.

13       Q.    Right.  And I understand that's your

14   opinion and I understand that's what you do.  And I

15   understand that completely.  My question was the same

16   government organization publishes life tables that

17   provide life expectancy with more recent data than

18   the tables you used, right?

19       A.    Yes.

20       Q.    Okay.  And if the court were to use the

21   life tables from 2009 that the CDC and U.S.

22   Department of Health and Human Services published in

23   the year January, 2014, that starting number, that

24   19.9 starting number for white males age 60 would be

Anthony F. Milano, MD

133

1   a couple years higher than your number, correct?

2        A.   Could you repeat?  I missed the first part

3   of your question, of your statement.

4        Q.   If we looked at the 2009 U.S. Life Tables

5   that were published by the Department of Health and

6   Human Services and CDC published them in January,

7   2014, the life expectancy for white males, if that

8   number was the starting point for 60-year-old white

9   males, the starting point number instead of being

10  19.9 years would be a couple years higher, correct?

11       A.   Yes.

12       Q.   Okay.  And I want to go to the next step.

13  We've talked about what you call the normal group.

14  And we talked about this hypothetical Farley cohort.

15  Now, I want to talk about that critical cohort that

16  you've created to compare to Mr. Farley to reduce his

17  life expectancy by 83 percent.  Now, you did not rely

18  on any studies of an actual person or group of people

19  who had all seven of those major risk factors that

20  you've identified Mr. Farley having, true?

21       A.   True.

22       Q.   All right.  And you did not do any

23  analysis to determine that there was any reduction

24  required for overlap of these major risk factors that

Anthony F. Milano, MD

134

1  you identified for Mr. Farley, is that true?

2       A.    That is true.  But there is more to this

3  answer than you're allowing me.

4       Q.    I understand.  And Mr. Plourde can go into

5  that.  But my statement is true that you provided no

6  reduction requiring —— let me rephrase it.  My

7  statement is true you did not do any analysis to

8  determine if there was any reduction required for

9  overlap of these major risk factors that you

10 identified for Mr. Farley, correct?

11      A.    Yes.

12      Q.    Now, people who have cerebrovascular

13 occlusive disease also often have cardiomyopathy,

14 correct?

15      A.    It is common.  Yes.

16      Q.    And people with cardiomyopathy and

17 occlusive cerebrovascular disease can also have

18 coronary heart disease, correct?

19      A.    Yes.

20      Q.    And people with coronary heart disease and

21 cardiomyopathy also have hypertension often, correct?

22      A.    Yes.

23      Q.    And certainly people who have any long—

24 term smoking problem, have cardiovascular disease,

Anthony F. Milano, MD

135

1  hypertension and coronary heart disease, correct?

2       A.    Yes.

3       Q.    Now, I've heard you mention Dr. Singer

4  several times during Mr. Plourde's questioning of

5  you.  And you called Dr. Singer a close colleague and

6  close personal friend of yours, is that right?

7       A.    Yes.

8       Q.    And I understand that obviously we know

9  that from your report, you cited Dr. Singer several

10  times in supporting your opinion in this case,

11  correct?

12       A.    Yes.

13       Q.    But Dr. Singer, back in one of, I believe

14  in one of the several publications that you've listed

15  in your report, he concluded himself that he often

16  when he does these kind of life expectancy reports

17  that he discounts the total excess death rate by as

18  much as 20 percent or more to allow for overlap in

19  multiple risk factors and future improvement in

20  medical care with general reduction in mortality, is

21  that correct?

22            THE WITNESS:  May I see that, Mr.

23  Plourde, that report of Dr. Singer that you have

24  here?

Anthony F. Milano, MD

140

1   said this would provide plaintiff attorneys a certain

2   versimilitude which —— and then I'm paraphrasing a

3   bit.

4                    MR. ALSAFFAR:  Dr. Milano ——

5                    THE WITNESS:  Yes.

6                    MR. ALSAFFAR:  I'm objecting to non

7   responsive.  Mr. Plourde will have a chance to ——

8        A.    And the point is —— I'm sorry. Go ahead.

9        Q.    It's okay.  We're in the trial portion of

10  it.  It's okay.  I want you to listen to my question.

11  And I understand that you don't agree with Dr. Singer

12  on this, I understand that. I really do.  But my

13  question is that the Singer reduction, the reduction,

14  20 percent reduction that Dr. Singer is talking

15  about, the effect on life expectancy opinion when he

16  applies the Singer reduction is to not lessen life

17  expectancy but add a little bit to the life

18  expectancy of a patient, is that fair?

19       A.    Yes.  He uses ——

20       Q.    And I understand you don't agree with it.

21  I'm not asking you why you don't agree with it, I'm

22  just asking if that's what it is.  Now, let me flip

23  to a different topic.

24                    I want to talk now about this Farley

1   cohort group, this hypothetical group that you

2   created.  There were no existing tables of life

3   expectancy for a 60—year—old man with all of these

4   seven risk factors that you assigned to Mr. Farley,

5   is that correct?

6       A.   Yes.

7       Q.   And I believe that there's no peer

8   reviewed study of a similar cohort group coming to

9   conclusions regarding life expectancy for this

10  hypothetical group that you created for this case, is

11  that correct?

12      A.   Yes.

13      Q.   And Doctor, it's fair to say then that

14  this Farley cohort group that you created was created

15  entirely for the purpose of this particular

16  litigation, this case, correct?

17      A.   Yes.

18      Q.   Now, I'm not sure if you talked about this

19  with Mr. Plourde, but you remember that Framingham

20  study that you referenced several times during your

21  direct examination and that you cited in your report?

22      A.   Yes.

23      Q.   Now, that study was, if you look at your

24  report, and the reference on page, I believe it's

Anthony F. Milano, MD

142

1   page 25 of your report —— it's actually page 26.  The

2   Framingham study that you referenced several times in

3   your report and in your testimony was actually

4   published in 1990, is that correct?

5        A.   Yes.  Published by Lew and Gajewski in

6   their 2—volume monograph in 1990.

7        Q.   And if the Framingham —— because the

8   Framingham study was published in 1990, that means it

9   was relying on data from the 1980s and earlier,

10  correct?

11       A.   Yes, it was.

12       Q.   And you would agree that there's been an

13  enormous amount of medical advances in health care

14  and other advances that have significantly impacted

15  in the positive life expectancy since the '70s and

16  '80s, correct?

17       A.   I object to the use of the word enormous,

18  but I do agree that there have been medical advances.

19       Q.   And that's a fair point.  It's a very ——

20  it's in the eye of the beholder what enormous means.

21  So, let me rephrase the question.  You would agree

22  that there have been medical advances since the '70s

23  and '80s that have positively impacted life

24  expectancy on all groups, including groups that

Anthony F. Milano, MD

143

1    Michael Farley would belong to, correct?

2         A.    Yes.

3         Q.    Okay.  Dr. Milano, I think it would be a

4    good idea because I don't want to keep you all too

5    late, let's jump to a different cohort that I did not

6    see specifically, I don't think, in your report, and

7    that's the cohort of folks who have unfortunately

8    experienced the same tragedy as Mr. Farley, and that

9    is folks who have locked—in syndrome, do you

10   understand what I mean?

11        A.    Yes.

12        Q.    Okay.  Now, have you ever for purposes of

13   this opinion that you're giving in this case, have

14   you looked at any of the studies that have been

15   published in the medical literature about the life

16   expectancies of patients who actually have locked—in

17   syndrome, the actual syndrome that Mr. Farley has?

18        A.    I refreshed my knowledge about locked—in

19   syndrome and the severity of what it means to a

20   patient's well—being, but I did not do that from a

21   life expectancy standpoint.

22        Q.    So, in your field you must be aware of the

23   studies that have been done specifically on the

24   mortality and life expectancies of patients who have

Anthony F. Milano, MD

144

1    actual locked—in syndrome like Mr. Farley, you're

2    certainly aware that those have been done, correct?

3        A.    Yes.

4        Q.    Okay.  Are you familiar with the ——

5                    MR. ALSAFFAR:  I'll put this up as

6    exhibit number 8.

7                         (Whereupon, the document referred

8                         to by counsel was duly marked for

9                         identification as Exhibit #8.)

10                   BY MR. ALSAFFAR:

11       Q.    Are you familiar with the Haig—Katz study

12   that was first done in 1987, following 27 patients

13   who had locked—in syndrome for more than a year?  Are

14   you familiar with that study that was published in

15   the Archives of Physical Medicine and Rehabilitation

16   in 1987?

17       A.    No.

18       Q.    Okay.  And in this study, if you look at

19   it, I want you to look at it, Doctor, because I think

20   you should.  It's studying what we're talking about

21   right now, the mortality of folks with locked—in

22   syndrome like Mr. Farley.  So, let's talk about it

23   very quickly.

24                   You see in the first paragraph right

Anthony F. Milano, MD

146

1  patients?  Do you know that?

2      A.    Well, I haven't seen this study, but I saw

3  what I just read.

4      Q.    Okay.  So, you're not even aware of this

5  study following for a long—term period patients with

6  locked—in syndrome in order to determine their

7  mortality and life expectancy, you weren't even aware

8  that it existed, were you?

9      A.    I did not see that paper.

10     Q.    I want to show you then and ask you about

11  another paper.  I'm showing you exhibit 9.

12              MR. ALSAFFAR:  This is marked as

13  exhibit 9.

14                  (Whereupon, the document referred

15                  to by counsel was duly marked for

16                  identification as Exhibit #9.)

17              BY MR. ALSAFFAR:

18     Q.    This is, again, by the same authors, Dr.

19  Katz and Dr. Haig, and this was published in 1992 by

20  the American Congress of Rehabilitation Medicine and

21  the American Academy of Physical Medicine and

22  Rehabilitation.  Do you see that, exhibit 9?

23     A.    Yes.

24     Q.    And the title of this is Long—Term

Anthony F. Milano, MD

150

1              And not only that, he had on concurrent

2    angiograms of his head and neck, middle and distal

3    basilar artery occlusions consistent with embolism

4    and infarctions seen on the MRI on his head.

5              As bad as locked—in syndrome is, his

6    condition, unfortunately, is much worse than that, as

7    bad as it is.

8                     MR. ALSAFFAR:  I have to object to

9    non responsive and move to strike.

10       Q.   Doctor, I'll let you talk because I know

11   you want to, but please listen to the question I ask.

12       A.   What I did was correct what you said.

13       Q.   Doctor, listen to the question I'm asking.

14       A.   If I can, I'll answer it.

15       Q.   Absolutely.  That's all I'm asking, sir.

16       A.   But if I hear you make a mistake, I'll

17   correct you as well.

18       Q.   Let's start from the most simple place to

19   start, which is your own report.  Is any one of these

20   references that you've cited, do they specifically

21   deal with study or peer reviewed study of groups of

22   people or cohorts of people who specifically have

23   locked—in syndrome?

24       A.   Not in my report.

Anthony F. Milano, MD

1    Now, I think you just told me this, but I don't

2    understand.  Why did he discount — first of all, did

3    he discount by 20 percent?  And if so, do you know

4    why?

5          A.    We've had, prior to his demise, we had

6    many discussions about that.  Because my discussions

7    would always be —

8                    MR. ALSAFFAR:  I'm going to object to

9    any discussions that allegedly Dr. Milano had with

10   the now deceased Dr. Singer as hearsay; and not

11   admissible and not disclosed in any way in his

12   report.

13                   MR. PLOURDE:  With respect to that,

14   I'll have to double check the Rules of Evidence.  But

15   I believe that an expert is allowed to rely on

16   hearsay, but that's not the main point.

17                   MR. ALSAFFAR:  He's not allowed to

18   rely on unreliable hearsay.

19                   MR. PLOURDE:  I understand.

20                   MR. ALSAFFAR:  Not of the type that's

21   reasonably relied upon by others in his field.  And

22   off hand conversations allegedly had that are not

23   documented anywhere would not qualify.

24                   MR. PLOURDE:  I understand.  I'm not

Anthony F. Milano, MD

184

```
 1                    C E R T I F I C A T E

 2                COMMONWEALTH OF MASSACHUSETTS
 3   Barnstable, ss
 4   Re: FARLEY, et al. V. USA

 5

 6        I, PAULA E. HOGAN, Notary Public in and for the
 7   Commonwealth of Massachusetts, do hereby certify as
 8   follows:

 9

10        1.    That ANTHONY F. MILANO, MD, the witness
11   whose testimony is herein before set forth was duly
12   recorded and transcribed by me;

13

14        2.    That such deposition is a true record of
15   the testimony given by said witness to the best of my
16   knowledge, skill and ability.

17

18        3.    I further certify that I am neither
19   attorney or counsel for, nor related to or employed
20   by, any of the parties, and further that I am not a
21   relative or employee of any attorney or counsel
22   employed by the parties hereto or financially
23   interested in this matter;

24

25   IN WITNESS WHEREOF, I hereunto set my hand and
26   notarial seal this 25th day of September, 2014.

27

28

29

30

31                        _____
32                        PAULA E. HOGAN,
33                        Notary Public
34                        My Commission Expires:
35                        August 27, 2021

36

37

38

39

40

41            ANY REPRODUCTION OF THIS TRANSCRIPT
42            IS NOT AUTHORIZED BY THE CERTIFYING
43            REPORTER AND PHOTOCOPIES ARE NOT AN
44                    OFFICIAL RECORD.
```