# Exhibit 1

11 FJVR 7-13, 2011 WL 2710724 (Fla.Cir.Ct.) (Verdict and Settlement Summary)

Copyright (C) 2012 by Florida Legal Periodicals, Inc.
Florida Circuit Court, Thirteenth Judicial Circuit, Hillsborough County.

RICHARD OULETTE, as Guardian of SARAH HESTER EDWARDS vs. DAVID D. SCOTT

09-CA-026329
DATE OF VERDICT/SETTLEMENT: May 5, 2011

TOPIC: Assault and Battery/Head Injury Sustained During Robbery in Parking Lot.

**SUMMARY:**
VERDICT: $73,126,475.40 for Plaintiff on May 5, 2011 ($1,426,465.40 - past medical expenses; $6,700,000 - future medical expenses; $15,000,000 - past pain and suffering; $50,000,000 - future pain and suffering; $10,000 - punitive damages).

**EXPERT-WITNESSES:**
Plaintiff's:
John Merritt, M.D., Physiatry, Tampa, FL
Gerri Pennachio, M.A., C.R.C., C.C.M., C.V.E., C.L.C.P., Life Care Planning and Vocational Rehabilitation, Lakeland, FL
Brenda Mulder, Ph.D., Economics, Tampa, FL
Defendant's:
Leon Prockop, M.D., Neurology, Tampa, FL

**ATTORNEY(S):**
Plaintiff's: Gene Odom and Maryann Masella of Martinez Odom Law Group, Brandon, FL
Defendant's: Tina Dampf and Kari Aasheim of Mancuso & Diaz, P.A., Tampa, FL

JUDGE: Samuel Pendino

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Florida
COUNTY: Hillsborough

NATURE OF INJURY: Sub-arachnoid hemorrhage and multiple complications resulted from severe traumatic brain injury; quadriplegia; inability to communicate verbally; comprehension of an 8-10 year old; "locked-in" syndrome.

**SUMMARY:**
**Plaintiff Information:**
Age: 58

Sex: F

Occupation: Office clerk

**FACTS:**

Cause of Injury: Plaintiff Richard Oulette claimed that on Oct. 22, 2005, Sarah Hester Edwards was in a Winn Dixie parking lot at the corner of Palm River Road and 78th Street in Tampa, FL, when defendant David Scott, who was riding in his pick-up truck, reached out and grabbed Sarah's purse. The purse was wrapped around Sarah's arm and defendant allegedly yanked hard and drove away fast, causing plaintiff to strike her head on the side of the pick-up truck and on the concrete.

**NOTES:**
Editor's Note: Defendant was charged with robbery and aggravated battery for incidents involving four victims, including plaintiff. In a plea deal, defendant received a 20-year prison sentence.

LexisNexis, a division of Reed Elsevier Inc.
Florida Circuit Courts

PUBLISHED IN: Florida Jury Verdict Reporter(TM)

---

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00361-JJM   Document 43-1   Filed 10/24/14   Page 4 of 13

CAROL WHYTE AND SHELLYANN WATSON, AS..., 23 Fla. J.V.R.A. 6:C1...

23 Fla. J.V.R.A. 6:C1, 2013 WL 4034240 (Fla.Cir.Ct.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Florida Circuit Court, Seventeenth Judicial Circuit, Broward County.

CAROL WHYTE AND SHELLYANN WATSON, AS GUARDIANS OF DALE WHYTE
AND TINA MCGEE AS GUARDIAN OF CHRISTHA & TONIANN WHYTE vs. BASIL
MANGRA M.D., BASIL MANGRA, M.D., P.A., THOMAS RODENBERG M.D., ET AL.

CACE090007837
DATE OF VERDICT/SETTLEMENT: May 17, 2013

TOPIC: MEDICAL MALPRACTICE - ANESTHESIOLOGY - MAN FALLS INTO COMA WHILE UNDER PROPOFOL ANESTHESIA - ANOXIC BRAIN DAMAGE.

**SUMMARY:**
Result: $38,500,000 VERDICT

**EXPERT WITNESSES:**
Plaintiff's anesthesiologist/critical care expert: Hans Schweiger from Tampa, FL.
Plaintiff's critical care/internal medicine expert: Robert Halloway from Atlanta, GA.
**ATTORNEY:**
Plaintiff's: Robert W. Kelley & Bonnie Navin of Kelley Uustal PLC in Fort Lauderdale, FL.
Defendant's: Dr. Basil Mangra: Brian Russell & James White of Bobo Ciotoli Bocchino Newman in North Palm Beach, FL.

JUDGE: Carlos Rodriguez

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Florida
COUNTY: Broward

**INJURIES:**
MEDICAL MALPRACTICE - ANESTHESIOLOGY - MAN FALLS INTO COMA WHILE UNDER PROPOFOL ANESTHESIA - ANOXIC BRAIN DAMAGE.

**FACTS:**
This matter arose from medical procedure that left a local man with permanent brain injuries. The matter was resolved by a Broward County jury after the defendants denied negligence.

On December 4, 2008, the plaintiff Dale W., 33, underwent a "manipulation under anesthesia" at Atlantic Surgical Center, a Pompano Beach medical facility, under the recommendation of the defendant Dr. Basil M. The procedure involved the use of anesthesia to perform chiropractic maneuvers that pain and resistance ordinarily prevent. Anesthesia for the procedure was administered by Dr. Thomas R., co-defendant in subsequent litigation. The plaintiff's vital signs diminished during the procedure until he became bradycardic. Dr. R. thereafter administered Propofol, which further compromised the plaintiff's condition. The procedure was continued nonetheless, including manipulation of the cervical region (which was not required).

CAROL WHYTE AND SHELLYANN WATSON, AS..., 23 Fla. J.V.R.A. 6:C1...

Case 1:13-cv-00361-LM   Document 43-1   Filed 10/24/14   Page 5 of 13

Due to the forcible cervical manipulation and poor oxygenation, the plaintiff suffered a cardiac arrest wherein his heartbeat and breathing ceased for five minutes. The plaintiff was finally revived by Pompano Fire Rescue. As a result of the five minutes without oxygen, the plaintiff sustained anoxic brain damage, causing him to slip into a locked-in/vegetative state. He is now cared for by his mother, sister and nurses at their home in Lawrenceville, Georgia.

The plaintiff filed suit in the 17th Judicial Circuit Court of Broward County. The plaintiff accused defendant Drs. Basil M. and Dr. Thomas R. of the Atlanta Surgical Center of negligence. The plaintiffs sought damages including $4 million in past medical bills, future medical expenses, and pain and suffering. There was no pre-trial settlement discussion.

At trial, the plaintiffs argued that the MUA procedure used on the plaintiff should not have been performed. Further, they asserted that Dr. Thomas R. breached the standard of care through his failure to monitor the plaintiff's vital signs, as well as take appropriate action after the patient's bradycardia was detected and after he stopped breathing. Finally, they asserted that the defendant failed to follow ACLS protocols during the code blue, further exacerbating the brain damage sustained by Mr. W.

Following four weeks of trial, the jury deliberated for 11 hours before finding under a greater weight of the evidence standard of the negligence of the doctors. The jury awarded $38.5 million in damages to Dale W. and his family. The jury thereafter returned to the jury room, and returned with an additional determination of negligence by clear and convincing evidence in their care and treatment. No additional damages were awarded based on the latter determination.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: Florida Jury Verdict Review & Analysis, Vol. 23, Issue 6

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Confidential vs. Confidential, 16 Trials Digest 13th 22 (2010)

Case 1:13-cv-00261-LM   Document 43-1   Filed 10/24/14   Page 6 of 13

16 Trials Digest 13th 22, 2010 WL 1435400 (N.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
United States District Court, N.D. California.

Confidential vs. Confidential

**TOPIC:**
Synopsis: Failure to timely correct low serum sodium in patient results in coma, brain damage

Case Type: Medical Malpractice-Procedures & Treatment; Failure to Diagnose/Treat; Medical Malpractice-Facility; Hospital; Medical Malpractice-Physicians & Health Professionals; Physician

DOCKET NUMBER: Confidential

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: January 2010.

JUDGE: Not Applicable
**ATTORNEYS:**
Plaintiff: Russell S. Kussman, Kussman & Whitehill, Los Angeles.
Defendant: Confidential.

**SUMMARY:**

Verdict/Judgment: Settlement

Verdict/Judgment Amount: $20,000,000

Range: $5,000,000-$999,999,999
$20,000,000 approximate payout over a normal life expectancy ($6,500,000 present cash value). The mediator was Jay Horton, Esq. Since this was a medical malpractice case, under MICRA non-economic damages were severely limited. The bulk of the settlement reflected compensation for economic damages, primarily the need for ongoing medical, nursing, attendant, and rehabilitative care. Annuities were purchased to provide for much of this care, and the remainder of the settlement was paid in cash.

Trial Type: Settlement

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to Plaintiff: Plaintiff, a 35-year-old woman with a long history of an endocrine disorder involving the pituitary gland, leading to a condition called diabetes insipidus, was treated with hormone replacement in order to prevent abnormal sodium and fluid shifts, which could lead to a wide array of symptoms.
In early May 2008, plaintiff developed flu-like symptoms, and her serum sodium levels dropped significantly, leading to increased weakness and malaise. She went to her local physician, and a blood test revealed a serum sodium level of around 100, with normal being 135-145. This was a potential medical emergency since it could lead to seizures, coma, and/or death.

Case 1:13-cv-00261-LM   Document 43-1   Filed 10/24/14   Page 7 of 13

Confidential vs. Confidential, 16 Trials Digest 13th 22 (2010)

Her physician sent her home. A few days later, she returned to the doctor's office, where the extremely low sodium level was confirmed and she was admitted to a local hospital.

Correcting a low serum sodium is not difficult, but one of the well-known risks of a chronically low serum level is that the health care providers will correct the problem too quickly. When that occurs, rapid shifts of electrolytes and other solutes in the brain can cause damage to cells, which can be permanent (so-called "osmotic demyelination" or "central pontine demyelination" ("CPM"). This can lead to devastating consequences, including coma and catastrophic motor deficits ("locked-in syndrome"). Therefore, it is critical for the physicians and nurses to work together to make sure that the electrolyte imbalance is corrected, but not too quickly. In general, the serum sodium levels should not be brought back into the normal range at a rate of more than 8-10 units per day.

Defendants, although claiming to be aware of the risk of brain damage due to too-rapid correction of low serum sodium, proceeded to correct plaintiff's serum sodium at a rate of approximately 24 units per day, nearly three times the safe rate. They allowed the serum sodium levels to "overshoot" (i.e., enter the elevated range), which exacerbated the fluid shifts in the brain and caused even further damage. By the time the physicians consulted an endocrinologist, who took over the case and handled the electrolyte disorder properly, plaintiff was in a coma. It took many months for her to awaken from the coma, and she was left with severe brain damage. While her awareness and other cognitive functions have recovered considerably, she has not recovered normal sensory or motor function. She cannot move properly, cannot walk or speak normally, and is incontinent. She requires round-the-clock nursing and attendant care, as well as intensive and ongoing physical, occupational, and speech therapy.

Plaintiff alleged that defendants failed to react in a timely manner to the initial sodium level, which was extremely low. Instead of admitting her immediately to the hospital, they sent her home. Once she returned a few days later, they recognized the very low sodium but took steps to correct it much too rapidly. As a result, extreme shifts of water, electrolytes, and solutes took place in plaintiff's brain, leading to severe brain damage.

The main thrust of the defense was an attempt by the physicians to shift responsibility onto the hospital nurses for failing to keep them apprised of changes in the serum sodium and other parameters of fluid balance, while the hospital claimed that it was the physicians' responsibility to stay informed of their patient's laboratory tests and fluid balance.

**CLAIMED INJURIES**
According to Plaintiff: Severe brain damage.

**CLAIMED DAMAGES**
According to Plaintiff: Not reported.

**SETTLEMENT DISCUSSIONS**
According to Plaintiff: Not reported.

**EXPERT TESTIMONY**
According to Plaintiff: The case settled prior to the designation of expert witnesses.

**COMMENTS**
According to Plaintiff: The complaint was filed in September 2008.

Trials Digest, A Thomson Reuters/West business.
Los Angeles County Superior Court/Unknown or Confidential District

---

End of Document                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

NISSEN vs. DILLARD ET AL., 27 Nat. J.V.R.A. 5:C3 (2011)

Case 1:13-cv-00261-JLM   Document 43-1   Filed 10/24/14   Page 8 of 13

27 Nat. J.V.R.A. 5:C3, 2011 WL 10550299 (Ill.Cir.Ct.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Circuit Court of Illinois, Cook County Judicial Circuit.

NISSEN vs. DILLARD ET AL.

05M4000888
DATE OF VERDICT/SETTLEMENT: August, 2011
TOPIC: MEDICAL MALPRACTICE - NURSING - FAILURE TO MONITOR INTRACRANIAL PRESSURE IN STROKE PATIENT DURING TESTING - BRAIN HERNIATION - PLAINTIFF PARALYZED FROM AREA OF EYES DOWN - LOCKED-IN SYNDROME.

**SUMMARY:**
Result: $17,757,000 COMBINED RECOVERY

**ATTORNEY:**
Plaintiff's: Steven M. Levin and Margaret P. Battersby of Levin & Perconti in Chicago, IL, and Louis Berns of Favil David Berns & Associates in Northlake, IL.

JUDGE: N/A

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Illinois
COUNTY: Cook

**INJURIES:**
MEDICAL MALPRACTICE - NURSING - FAILURE TO MONITOR INTRACRANIAL PRESSURE IN STROKE PATIENT DURING TESTING - BRAIN HERNIATION - PLAINTIFF PARALYZED FROM AREA OF EYES DOWN - LOCKED-IN SYNDROME.

**FACTS:**
This medical malpractice action involved a 41-year-old plaintiff, a municipal police officer, who had suffered a stroke. An external ventricular shunt was used to drain cerebral-spinal fluid, and since the device carries risks, such as infection, the drain was clamped for an approximate 15-hour period to ascertain if the drain was still required. The plaintiff maintained that although no difficulties were apparent during the initial approximate eight-hour period, the plaintiff showed signs and symptoms of increased intracranial pressure thereafter. The plaintiff contended that the defendants failed to monitor the increase and that although an alarm should have been sounding while the pressure was increasing during the drain "challenge", the defendants failed to observe the increase in pressure and remove the clamp. The plaintiff contended that the build-up of pressure caused a brain herniation that left him paralyzed from the eyes down and that the plaintiff suffered "locked-in syndrome," in which the plaintiff is aware and awake, but cannot move or communicate verbally.

The plaintiff had been a municipal police officer and the stroke was apparently precipitated by injuries sustained during an arrest the previous day. As of the time of the deviations, the extent of the residuals from the stroke had not been determined, but it was undisputed that the plaintiff would have suffered some permanent neurological deficits. A nurse in the employ of the hospital, who was on the evening shift and who had the responsibility to monitor the patient, actually went off duty shortly before midnight. The plaintiff contended that he began showing signs of an elevation of intracranial pressure approximately

NISSEN vs. DILLARD ET AL., 27 Nat. J.V.R.A. 5:C3 (2011)

Case 1:13-cv-00261-JLM   Document 43-1   Filed 10/24/14   Page 9 of 13

a-half hour before this nurse left. The plaintiff also contended that the increase should have triggered an alarm and that there was no explanation for the failure to quickly note the build-up in the absence of negligence. The plaintiff further contended that irrespective of the alarm, the vital signs should have alerted the defendants to the increase. The plaintiff also maintained that this initial nurse was anxious to leave, and that this factor probably contributed to her failure to note the increasing pressure. When the first nurse went off duty, a temporary nurse who was provided by an agency, and who was not employed by the State hospital, was assigned to monitor the plaintiff. The plaintiff maintained that the hospital's charge nurse should have given specific instructions to the temporary nurse regarding the importance of closely monitoring the patient. The plaintiff further contended that the intracranial pressure continued to increase in the ensuing hours and that despite this factor, the clamp was not removed from the drain.

The plaintiff contended that the continued increase in intracranial pressure caused a brain herniation. The plaintiff maintained that he is left with permanent paralysis below the eyes and so called "locked-in syndrome." The plaintiff cannot eat or speak, and can only communicate to family, friends and caregivers through eye movements, head shaking and adaptive technology communication devices. The plaintiff would have contended that this evidence showed that he has sufficient cognitive ability to be aware of the nature of his plight. The plaintiff maintained that although he would have suffered permanent deficits because of the stroke itself, the permanent injury would have been much less devastating than the locked in syndrome.

The case settled prior to trial for $17,757,000, including $16,200,000 for the defendant state hospital's nurses and $1,557,000 from the temporary nursing agency.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: National Jury Verdict Review & Analysis, Vol. 27, Issue 5

**End of Document**   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

HIPPELY vs. WALGREENS COMPANY ET AL., 22 Nat. J.V.R.A. 12:C5 (2007)

Case 1:13-cv-09261-LM Document 43-1 Filed 10/24/14 Page 10 of 13

22 Nat. J.V.R.A. 12:C5, 2007 WL 7952331 (Fla.Cir.Ct.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Florida Circuit Court, Tenth Judicial Circuit, Polk County.

HIPPELY vs. WALGREENS COMPANY ET AL.

2003-CA-003967
DATE OF VERDICT/SETTLEMENT: August 17, 2007

TOPIC: PHARMACEUTICAL NEGLIGENCE - MISFILING OF PRESCRIPTION FOR COUMADIN - DOSAGE TEN TIMES HIGHER THAN PRESCRIBED - CEREBRAL HEMORRHAGE - PERMANENT BRAIN DAMAGE - COMA - WRONGFUL DEATH AT AGE 46 - DAMAGES/CAUSATION ONLY.

**SUMMARY:**
Result: $25,850,583 VERDICT

**EXPERT WITNESSES:**
Plaintiff's neuropsychologist expert: David Bush from West Palm Beach, FL.
Plaintiff's neurologist expert: Daniel Hier from Chicago, IL.
Plaintiff's physiatrist expert: Craig H. Lichtblau from West Palm Beach, FL.
Plaintiff's oncologist expert: John A. Hayward from San Francisco, CA.
Plaintiff's economist expert: David Williams from Miami, FL.
Plaintiff's pathologist/medical examiner expert: Jose Suarez-Hoyos from Tampa, FL.
Defendant's psychiatrist expert: Norman Guthrie from

**ATTORNEY:**
Plaintiff's: Christian Searcy and Karen E. Terry of Searcy, Denney, Scarola, Barnhart & Shipley, P.A. in West Palm Beach, FL.
Defendant's: William V. Johnson and Robert J. Comfort of Johnson & Bell in Chicago, IL and James A. Coleman of Romano & Coleman, P.A. in Orlando, FL.

JUDGE: Bruce A. Smith

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Florida
COUNTY: Polk

**INJURIES:**
PHARMACEUTICAL NEGLIGENCE - MISFILING OF PRESCRIPTION FOR COUMADIN - DOSAGE TEN TIMES HIGHER THAN PRESCRIBED - CEREBRAL HEMORRHAGE - PERMANENT BRAIN DAMAGE - COMA - WRONGFUL DEATH AT AGE 46 - DAMAGES/CAUSATION ONLY.

**FACTS:**
The defendant, Walgreens Company, and its pharmacist stipulated to negligence in misfiling the decedent's prescription for the blood thinner, Coumadin. Instead of the prescribed one milligram tablets, the decedent received ten milligram tablets. The plaintiff claimed that the decedent's subsequent cerebral hemorrhage, brain damage, coma and ultimate death resulted from an overdose of the Coumadin. The defendant maintained that the decedent had a complicated medical history, including breast cancer and that her death did not result from the prescription error.

HIPPELY vs. WALGREENS COMPANY ET AL., 22 Nat. J.V.R.A. 12:C5 (2007)

Case 1:13-cv-00261-LM   Document 43-1   Filed 10/24/14   Page 11 of 13

Evidence showed that the decedent filled a prescription for one milligram Coumadin at the defendant's pharmacy department on September 20, 2002. The plaintiff was erroneously given ten milligram tablets and took the prescription until she presented to the emergency room and was diagnosed with a cerebral hemorrhage on October 15, 2002.

The decedent was in a coma and underwent a craniectomy and drainage procedure after which, her doctors gave her only a 15% chance of survival. The decedent came out of the coma, but persisted in a "locked-in" state for an extended period of time. During that period, testimony indicated that the decedent was aware of her surroundings, but could only blink an eye in response to outside stimuli. The decedent was then institutionalized in various hospitals, neurological rehabilitation facilities and nursing homes until her death approximately four years later. During her institutionalization, the decedent suffered complications including bed sores, urinary tract infections and incontinence.

The decedent did not work outside her home and was survived by her husband, two daughters and a son, ages ten, 14 and 20, at the time of her death. The plaintiff presented video of the decedent before the coma interacting with her children, as well as, "A day in the life" video taken after her brain injury.

The plaintiff's medical experts testified that the cerebral hemorrhage which caused the decedent's stroke, brain damage, coma and death was directly caused by the excessive amount of blood thinner she was ingesting. The decedent was diagnosed with preexisting breast cancer. She had been undergoing chemotherapy for approximately three months prior to the prescription error. She was prescribed Coumadin to keep an IV port open in relation to her chemotherapy.

The plaintiff's oncologist testified that the decedent's cerebral hemorrhage and coma prevented her from continuing her cancer therapy and a recurrence of the cancer occurred. The plaintiff's oncologist also testified that the decedent was responding well to treatment and had an 88% chance of cure at the time she went into a coma.

The defendant argued that the decedent's death stemmed from her breast cancer. The defendant conceded that the decedent was entitled to some damages as a result of the prescription error, but maintained that her cancer had already metastasized and her death stemmed from the cancer.

The decedent had a history of depression from age 18. She had been an in-patient in a psychiatric institution and suffered post-partum depression following the birth of her children. The defendant subpoenaed the decedent's treating psychiatrist who testified from his records that the decedent relayed to him that she was in a marriage of convenience.

The jury awarded the plaintiffs $25,850,584 in damages. The award included $3,841,989 to the decedent's husband; $6,639,168 to the decedent's oldest son; $6,737,098 to her oldest daughter; $6,790,577 to her youngest daughter and $1,841,752 to the decedent's estate. A ruling on the defendant's post-trial motion for new trial is pending.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: National Jury Verdict Review & Analysis, Vol. 22, Issue 12

End of Document    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 358164, 1998 WL 1019254 (Unknown State Ct. (Ga.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown Georgia State Ct.

ELAM v. EMRO MARKETING CO.

97 VS 0125197H
DATE OF INCIDENT: June, 1995

TOPIC:

LIABILITY:

General: PEDESTRIAN

Specific: On Sidewalk

**SUMMARY**
**Outcome: Settlement**
**Non Verdict Award: $15,130,000**
**Total Verdict: $15,130,000**

**EXPERT-WITNESSES:**
**ATTORNEY:**

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Georgia
COUNTY: Fulton

**PRIMARY INJURY: Severe Mental Deficiency**

**SUMMARY**
**SETTLEMENT TIME: Before Filing**
**PLAINTIFF:**
Sex: Female


**DECEDENT:**
**DEFENDANT:**
Type: Single Organization


**DAMAGES:**
Other: $15,100,000

Total: $15,100,000

Punitive: $30,000

**FACTS:**
A 15-year-old female suffered locked-in brain injury when she was struck by defendant's vehicle while walking on the sidewalk. The plaintiff contended that the defendant was operating his vehicle in a negligent manner. The defendant denied liability.

Jury Verdict Research
COURT:

---

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.