# Exhibit 3

JVR No. 481102, 2007 WL 4878143 (Unknown State Ct. (Vt.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown Vermont State Ct.

CURRIER v. QUINN, PRO AMI; SCHIPPER

461-9-04 Wrcv
DATE OF INCIDENT: September, 2004
DATE OF TRIAL: August, 2007

TOPIC:

LIABILITY:

General: PASSENGER

Specific: Host Driver's Negligence

**SUMMARY**
**Outcome: Plaintiff Judgement**
**Non Verdict Award: $**
**Total Verdict: $21,751,308**
**Judge Reduced Award To: $**
**Claimed Past Medical: $862,999**
**Claimed Future Medical: $**
**Claimed Past Wage Expense: $**
**Claimed Future Wage Expense: $**
Plaintiff's Economist: $

Defendant's Economist: $

**EXPERT-WITNESSES:**
Life Care Planner / Vocational Rehabilitationist / Voc: Foreman, Lawrence S., Ph.D., Miami, FL
**ATTORNEY:**
Plaintiff: John F. Campbell, Quechee, VT
Walter G. Campbell Jr., Fort Lauderdale, FL
Defendant: Robert K. Reis, Rutland, VT

JUDGE: Theresa DiMauro

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Vermont
COUNTY: Windsor

**PRIMARY INJURY: Incomplete Quadriplegia**

**SUMMARY**

**PLAINTIFF:**

Sex: Male

Age: 18

General Occupation: GENERAL LABORER

**DECEDENT:**

Funeral Expense: $

Other Expenses: $

**DEFENDANT:**

Type: Multiple Individuals

Sex: Female

Policy Limit: $

**DAMAGES:**

Past Medical: $862,999

Future Medical: $14,897,060

Past Wage: $991,249

Future Wage: $

Pain and Suffering: $5,000,000

Other: $

Total: $21,751,308

Punitive: $

Hedonic: $

Property: $

Other: $

Interest: $

Loss of Services: $

Case 1:13-cv-00361-LM Document 42-3 Filed 10/24/14 Page 4 of 89

**FACTS:**

An 18-year-old male lawn maintenance worker alleged that he suffered vertebra fractures at C5, C6 and C7, which resulted in incomplete quadriplegia, quality of life loss, and emotional distress when the vehicle in which he was a passenger, operated by the 17-year-old female and owned by the female codefendant, lost control, veered off of the roadway, struck a propane tank, and collided into the second story of a building. The plaintiff contended that the defendant operated the vehicle in a negligent manner, failed to keep a proper lookout, drove at an excessive rate of speed, and failed to maintain control of the vehicle. The plaintiff further contended that the codefendant negligently entrusted her vehicle to the defendant. The defendants denied liability.

Jury Verdict Research
COURT:

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

JVR No. 1401130011, 2013 WL 7083114 (Vt.Super.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Superior Court of Vermont, Chittenden County.

HECO v. JOHNSON CONTROLS, INC.

S-0869-2010-CNC
DATE OF INCIDENT: August 04, 2007
DATE OF FILING: January 01, 2010
DATE OF TRIAL: June 28, 2013

TOPIC:

LIABILITY:

General: Products Liability - Seat

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $43,546,079**
**Judge Reduced Award To: $36,948,123**
HIGH AMOUNT: $0

LOW AMOUNT: $0

**Related Court Documents:**
Complaint:: 2010 WL 9933441

Plaintiff's motion for permission to appeal on the issue of whether Vermont will follow the Restatement (Third) of Torts:: 2013 WL 6926929

Verdict:: 2013 WL 6924794

Plaintiff's motion for entry of final judgment:: 2013 WL 6926963

Defendant's opposition to plaintiff's motion for entry of final judgment:: 2013 WL 6926927

Plaintiff's opposition to defendant's post-trial motions:: 2013 WL 6926937

**EXPERT-WITNESSES:**
Plaintiff:
Forensic Pathologist: Burton, Joseph, M.D., Alpharetta, GA
Plaintiff:
Mechanical Engineer: D'Aulerio, Louis, Penns Park, PA
Defendant:
Automotive Seat Expert: Tighe, William, Holland, MI

Automotive Engineer: Viano, David, Ph.D., Bloomfield Hills, MI
**ATTORNEY:**
Plaintiff: Robert L. Langdon, Lexington, MO
Plaintiff: Adam W. Graves, Lexington, MO
Plaintiff: James L. Gilbert, Arvada, CO
Plaintiff: Robin C. Curtiss, Orford, NH
Defendant: Thomas E. McCormick, Burlington, VT
Defendant: Thomas P. Simon, Burlington, VT
Defendant: Richard K. Wray, Chicago, IL
Defendant: Tracy G. Ferak, Chicago, IL
Defendant: Benjamin R. Davis, CO

JUDGE: Geoffrey Crawford

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: Vermont
COUNTY: Chittenden

**PRIMARY INJURY: Quadriplegia**
Specific: Spinal Cord Injury

**SUMMARY**
**PLAINTIFF:**
Sex: F

Age: Adult, 45

General Occupation: Food Service Worker

**DEFENDANT:**
Sex: O

Age:

Organization Type: Johnson Controls, Inc.

**DAMAGES:**
Compensatory Pain & Suffering: $14,373,000

Compensatory Past Medical: $621,171

Compensatory Future Medical: $26,522,032

Compensatory Past Wages: $355,024

Compensatory Future Wages: $1,247,935

Total Compensatory Award: $43,119,162

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $409,342

Other Damages: $0

Loss of Services: $0

Comparative Negligence Percentage: 0


**FACTS:**

Dzemila Heco, a 45-year-old female motorist, suffered a spinal cord injury resulting in quadriplegia when her vehicle, stopped at a red light, was struck from the rear by a non-party vehicle travelling approximately 35 mph then struck a vehicle directly in front of the plaintiff, and her seatback, designed by defendant Johnson Controls, Inc., collapsed allowing her body to be propelled backward relative to her vehicle and her head to strike the rear seatback. The plaintiff contended that the defendant was negligent in designing a seatback with a reclining mechanism on only one side, weakening its strength and resulting in its collapse. The plaintiff further contended that alternative designs were available and in use at the time the plaintiff's vehicle was manufactured that would have provided significantly greater protection and likely prevented the plaintiff's spinal cord injury. The defendant denied liability asserting that it had no duty to oversee the manner in which the seat was incorporated into a vehicle assembled and manufactured by a third party, the seatback satisfied all specifications of the vehicle manufacturer, and there was no reasonable alternative design as the vehicle manufacturer would not accept any of the designs suggested as alternatives. The defendant further asserted that the plaintiff was leaning forward at the time of the collision, as a result she was ejected from her seat and thrown toward the rear of her vehicle prior to the seatback reclining, and therefore an alternative design would have made no difference in preventing injury. The jury reached a verdict for the plaintiff in the amount of $43,119,162. The plaintiff's award was reduced to $36,948,123 following remittitur reducing the awards for future medical expenses by $3,319,183 and future lost wages by $124,761, a stipulation reducing the award for past medical expenses by $29,013, a set-off of $3,125,000 in light of a settlement the plaintiff reached prior to trial with former defendant Midstate Dodge, LLC, and the addition of prejudgment interest in the amount of $409,342 and costs of $17,575.


Jury Verdict Research
COURT: Superior

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

JVR No. 488800, 2007 WL 5433606 (Unknown State Ct. (Mass.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown Massachusetts State Ct.

DODGE v. TEZEL

N/A
DATE OF INCIDENT: April, 2005
DATE OF TRIAL: July, 2007

TOPIC:

LIABILITY:

General: PEDESTRIAN

Specific: In Crosswalk

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award:**
**Total Verdict: $16,000,000**
**Judge Reduced Award To:**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: James D. Gotz, Boston, MA

JUDGE:

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: Massachusetts
COUNTY: Suffolk

**PRIMARY INJURY: Quadriplegia**

**BODILY IMPAIRMENT: Back**

**SUMMARY**
**PLAINTIFF:**

Sex: Male

Age: 42

General Occupation: EXECUTIVE MANAGEMENT

Occupational Field: Services-Legal


**DECEDENT:**
Funeral Expense:

Other Expenses:


**DEFENDANT:**
Type: Single Individual

Sex: Male

Policy Limit:


**DAMAGES:**
Past Medical:

Future Medical:

Past Wage:

Future Wage:

Pain and Suffering: $13,129,671

Other:

Total: $13,129,671

Punitive:

Hedonic:

Property:

Other:

Interest: $2,870,329

Loss of Services:

**FACTS:**

A 42-year-old male manager of a nonparty law firm alleged that he suffered injuries that resulted in quadriplegia and degloving of a large portion of his scalp when he was struck by the male defendant's vehicle as the plaintiff attempted to cross the street in a crosswalk near a nonparty commuter railway station. The plaintiff contended that the defendant operated his vehicle in a negligent manner, failed to keep a proper lookout, drove at an excessive rate of speed, and failed to yield the right-of-way to a pedestrian. The defendant denied liability and contended that he was not speeding at the time of this accident, and that visibility was poor due to dark and rainy conditions.


Jury Verdict Research
COURT:

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

WestlawNext · © 2014 Thomson Reuters. No claim to original U.S. Government Works.   3

JVR No. 358105, 1998 WL 1019219 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)


Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.


IPPOLITO v. WEISER

103025 / 96
DATE OF INCIDENT: February, 1990
DATE OF FILING: October, 1995
DATE OF TRIAL: June, 1998

TOPIC:


LIABILITY:


General: DOCTOR MALPRACTICE


Specific: Medication


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award: $14,786,000**
**Total Verdict: $14,786,000**
**High / Low Agreement: Yes**
**High Amount: $1,500,000**
**Low Amount: $400,000**

**EXPERT-WITNESSES:**
**ATTORNEY:**

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: New York

**PRIMARY INJURY: Moderate Brain Damage**

**SUMMARY**
**PLAINTIFF:**
Sex: Male


Age: 44


**DECEDENT:**
**DEFENDANT:**
Type: Single Individual

Sex: Male

General Occupation: DOCTOR

**DAMAGES:**
Past Wage: $206,000

Future Wage: $1,080,000

Pain and Suffering: $8,000,000

Total: $9,286,000

Loss of Services: $5,500,000

**FACTS:**
A 44-year-old male suffered from moderate brain injury and seizure disorder due to a stroke as the result of the defendant doctor's failure to prescribe proper cardiac and anti-hypertensive medications. The defendant placed the plaintiff on a diet and his blood pressure dropped to normal but three years later he was diagnosed with paroxysmal atrial fibrillation and was placed on Digoxin which was renewed over the phone without mandatory office visits. The plaintiff contended that the defendant was negligent for failing to prescribe Coumadin, a drug that protects against strokes. The defendant contended that the plaintiff received the appropriate medication for his condition and that the plaintiff was negligent for failing to follow medical instructions. The plaintiff's spouse received $5,500,000 for loss of services. This case ultimately settled for $1,500,000 after the trial.

Jury Verdict Research
COURT:

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Dong Won Park v. Dr. Richard J. Rizzuti, All County..., 2007 WL 1039362...

Case 1:13-cv-00261-LM  Document 42-3  Filed 10/24/14  Page 13 of 89

2007 WL 1039362 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
Supreme Court, Eleventh Judicial District, Queens County, New York

Dong Won Park v. Dr. Richard J. Rizzuti, All County Open MRI & Diagnostic Radiology, P.C.

No. 4061/05

DATE OF VERDICT/SETTLEMENT: March 16, 2007

TOPIC: MEDICAL **MALPRACTICE** - FAILURE TO DIAGNOSE - MEDICAL **MALPRACTICE** - BRAIN INJURIES - MEDICAL **MALPRACTICE** - RADIOLOGIST - MEDICAL **MALPRACTICE** - RADIOLOGY

Unspotted Aneurysm Caused Brain Damage, Patient Alleged

**SUMMARY:**

RESULT: Verdict-Plaintiff

Award Total: $43,000,000

The jury found that Rizzuti misinterpreted the results of his MRI scan and that the error was a departure from accepted standards of medical practice. It determined that Park's damages totaled $43 million.

**EXPERT WITNESSES:**

Plaintiff: Dr. George Tyson; Neurosurgery; Stony Brook, NY Sondra J. Pfeffer, M.D.; Radiology; New York, NY

Defendant: Dr. Caren Jahre; Neuroradiology; New York, NY George DiGiacinto, M.D.; Neurosurgery; New York, NY

**ATTORNEYS:**

Plaintiff: Andrew W. Siegel; Geller & Siegel; New York, NY (Dong Won Park)

Defendant: Gerard J. Marulli; Marulli & Associates P.C.; New York, NY (All County Open MRI & Diagnostic Radiology, P.C., Richard J. Rizzuti)

JUDGE: Janice A. Taylor

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York

COUNTY: Queens

**INJURIES: Park suffered a rupture of an aneurysm that occupied her left posterior communicating artery. The rupture led to the development of a subarachnoid hemorrhage, which caused a vasospasm and hydrocephalus--the brain's excessive retention of cerebrospinal fluid. The latter condition compromised the brain's arteries and caused ischemic changes of multiple areas of the brain. Park underwent surgical placement of a frontal ventriculoperitoneal shunt, which allowed drainage of the trapped cerebrospinal fluid. She endured a seven-week-long hospitalization.**

**Facts:**

On Jan.16, 2003, plaintiff Dong Won Park, 61, a manicurist, presented to her primary care physician and reported that her head had been struck by a falling portion of a ceiling. She contended that she was suffering headaches. The doctor observed that Park's blood pressure was elevated, and he prescribed anti-hypersensitive medication, which was intended to treat her headaches. The doctor also determined that Park had to undergo a non-contrast MRI scan of her brain. Park was referred to a

Dong Won Park v. Dr. Richard J. Rizzuti, All County..., 2007 WL 1039362...

Case 1:13-cv-00261-LM Document 42-3 Filed 10/24/14 Page 14 of 89

diagnostic radiologist, Dr. Richard Rizzuti, who performed the test. Rizzuti reported that the test produced "normal" results, so Park did not seek further treatment.

On Sept. 28, 2003, Park collapsed. She was transported to a hospital, where she underwent a non-contrast CT scan. The test revealed the presence of a subarachnoid hemorrhage. Doctors opined that the hemorrhage probably stemmed from a ruptured berry aneurysm that occupied the brain's circle of Willis. Park subsequently underwent an angioplasty, which confirmed that she had sustained a rupture of an aneurysm that was located within her left posterior communicating artery, which passes through the circle of Willis. Park claimed that she suffers permanent brain damage and that the damage could have been prevented by earlier diagnosis of the aneurysm.

Park sued Rizzuti and his practice, All County Open MRI & Diagnostic Radiology, P.C. Park alleged that Rizzuti failed to properly interpret the results of his MRI scan, that his failure constituted medical **malpractice** and that his practice was vicariously liable for his actions.

Park's counsel claimed that Rizzuti's MRI scan revealed an abnormality that was located in the area of the posterior communicating artery, which passes through the midline area of the circle of Willis. He contended that the abnormality was an 8-millimeter rounded radiodensity that created asymmetry. He argued that the radiodensity and the resultant asymmetry were abnormal findings. He contended that Rizzuti should have reported the abnormalities and directed performance of clarifying studies. He claimed that clarifying studies would have led to the diagnosis of the aneurysm and that prompt treatment would have allowed harmless dissolution of the aneurysm.

Defense counsel contended that Park's initial symptoms suggested that she was suffering a **stroke** or a hemorrhage that stemmed from a traumatic injury of her head. The defense's expert neuroradiologist opined that Rizzuti's MRI scan did not reveal any abnormality of the tissue of Park's brain. She also opined that the asymmetry was not an abnormal finding. During cross-examination, plaintiff's counsel produced Rizzuti's MRI scan and identified the radiodensity, but the expert maintained that the density did not constitute an abnormality of the brain's tissue.

The defense's expert neurosurgeon opined that Park's experts had misinterpreted the results of Rizzuti's MRI scan. The expert opined that the radiodensity occupied the posterior cerebral artery. He noted that the posterior cerebral artery and the posterior communicating artery were located in "different districts" of the brain.

Park claimed that she suffers permanent brain damage that causes global impairment of her cognitive functions. She contended that the impairment affects her short- and long-term memory. She also contended that the damage has impaired her ability to simultaneously perform multiple tasks. She has undergone occupational therapy, physical therapy and speech therapy.

Plaintiff's counsel claimed that the aneurysm's rupture and its residual effects could have been prevented by prompt diagnosis and treatment of the aneurysm.

Park sought recovery of $3 million to $4 million for her past pain and suffering, $5 million to $6 million for her future pain and suffering, or a lesser amount that would be a result of the jury's conclusion that Park had already endured the worst of her injuries.

Insurer:

Medical Liability Mutual Insurance Co. for both defendants

ALM Properties, Inc.
Queens Supreme

PUBLISHED IN: VerdictSearch New York Reporter Vol. 24, Issue 40

Case 1:13-cv-00261-LM   Document 42-3   Filed 10/24/14   Page 15 of 89

JVR No. 414038, 2003 WL 23519401 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

SMITH v. MONTEFIORE MEDICAL CENTER

N/A
DATE OF INCIDENT: October, 1998
DATE OF TRIAL: February, 2003

TOPIC:

LIABILITY:

General: HOSPITAL MALPRACTICE

Specific: Diagnosis

**SUMMARY**
Property:

Other:

Interest:

Loss of Services:

**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Thomas A. Moore, New York, NY

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: New York

**PRIMARY INJURY: Mild Brain Injury**

**SUMMARY**

**PLAINTIFF:**

Sex: Male

Age: 42


**DECEDENT:**

Funeral Expense:

Other Expenses:


**DEFENDANT:**

Type: Single Organization

Sex: Organization

Policy Limit:


**DAMAGES:**

Past Medical:

Future Medical:

Past Wage:

Future Wage:

Pain and Suffering:

Other: $16,300,000

Total: $16,300,000

Punitive:

Hedonic:

Property:

Other:

Interest:

Loss of Services:


**FACTS:**

A 42-year-old male breakdancer suffered a mild brain injury resulting in memory loss and speech difficulties after he was treated at the defendant hospital. The plaintiff contended that the defendant failed to timely and properly diagnose his heart condition, that its negligence resulted in a subsequent stroke and that it failed to provide that proper standard of care. The defendant denied liability.

Jury Verdict Research
COURT:

**End of Document**                                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

John E Bach Jr as Temporary Guardian of the Person..., 2008 WL 4488474...

Case 1:13-cv-00261-LM Document 43-2 Filed 10/24/14 Page 18 of 89

2008 WL 4488474 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
Supreme Court, Second Judicial District, Kings County, New York.

John E Bach Jr as Temporary Guardian of the Person and Property of Judith Totillo-Brier and Gertrude M. Brier, as the Administrator of the Estate of Ronald J. Brier v. Ahmad M Jaber M.D., Ahmad M. Jaber, M.D., P.C., Naji A Shahin, M.D., Lutheran Medical Center, Leon Rosenkranz, M.D., Advanced Care Inc. and St. Luke's Cornwall Hospital / Judith Totillo-Brier v. Naji A Shahin, M.D., and Lutheran Medical Center

No. 32757/01; 26131/04
DATE OF VERDICT/SETTLEMENT: July 21, 2008
TOPIC: MEDICAL MALPRACTICE - SURGICAL ERROR - MEDICAL MALPRACTICE - FAILURE TO MONITOR - MEDICAL MALPRACTICE - FAILURE TO DIAGNOSE - MEDICAL MALPRACTICE - GYNECOLOGICAL SURGERY - MEDICAL MALPRACTICE - OB-GYN

Ob/gyn's Gaffe Led to Heart Attack, Patient Alleged


**SUMMARY:**
RESULT: Verdict-Mixed

The jury rendered a mixed verdict. It found that Jaber and St. Luke's Cornwall Hospital's staff deviated from accepted standards of care. Jaber and his practice were assigned a total of 90-percent liability, and the hospital, which had been released from the suit, was assigned 10-percent liability. Shahin was not assigned liability.

The jury determined that Totillo-Brier's damages totaled $22,178,879.53, but the award was subject to an offset of St. Luke's Cornwall's liability. After the addition of the pretrial settlement, Totillo-Brier's recovery totaled $20,585,991.58.


**EXPERT WITNESSES:**
Plaintiff: Barry C. Root, M.D.; Physical Medicine; Kings Point, NY Douglas Philips, M.D.; Gynecology; Bellmore, NY Herbert Tanowitz, M.D.; Infectious Diseases; Bronx, NY Michael Drew, M.D.; Surgery; Forest Hills, NY
Defendant: Anthony Mustalish, M.D.; Emergency Medicine; New York, NY Michael Grieco, M.D.; Surgery; Manhasset, NY Milton O. Haynes, M.D.; Gynecology; New York, NY
**ATTORNEYS:**
Plaintiff: Lawrence W. Burnett; Jeffrey J. Shapiro & Associates; New York, NY (Estate of Ronald J. Brier, Judith Totillo-Brier)
Defendant: David W. Sisskind; Schiavetti, Corgan, DiEdwards & Nicholson; New York, NY (St. Luke's Cornwall Hospital); Jay W. Levy; Martin, Clearwater & Bell; New York, NY (Naji A. Shahin); Alfred P. Vigorito; Bartlett, McDonough, Bastone & Monaghan; White Plains, NY (Ahmad M. Jaber, Ahmad M. Jaber, M.D., PC); None reported (Leon Rosenkranz, Lutheran Medical Center)

JUDGE: Marsha L. Steinhardt

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Kings

John E Bach Jr as Temporary Guardian of the Person..., 2008 WL 4488474...

Case 1:13-cv-00261-LM   Document 43-2   Filed 10/24/14   Page 19 of 89

**INJURIES: In the fall of 2000, Totillo-Brier developed postoperative peritonitis. The condition persisted some three years. She underwent a colostomy, removal of a fistula and the insertion of a catheter line, which ultimately caused a bacterial infection. The infection traveled to her heart, and, in December 2003, she suffered a heart attack, a stroke, a brain abscess and endocarditis. She was unconscious during much of the ensuing year, and, as a result, she was not aware of her husband's death.**

**Facts:**

On Sept. 5, 2000, plaintiff Judith Totillo-Brier, 48, a department store's salesperson, underwent a hysterectomy that included the removal of a benign ovarian tumor. The procedure was performed by obstetrician/gynecologist Dr. Ahmad Jaber, at Lutheran Medical Center, in Brooklyn. The tumor was attached to Totillo-Brier's sigmoid colon.

Totillo-Brier suffered postoperative fevers and pain that stemmed from her abdomen. Doctors also suspected that she was suffering an infection. On Sept. 11, 2000, she opted to leave the hospital, despite her doctors' contrary wishes. One day later, Totillo-Brier returned to the hospital's emergency room, where Dr. Naji Shahin observed that she was suffering intense pain and distention of her abdomen. Shahin performed two exploratory laparotomies, and he discovered a large perforation of her sigmoid colon, sepsis, fecal material in her abdominal cavity and acute peritonitis. He performed a colostomy and eventually attempted to close her abdomen with mesh. Totillo-Brier was discharged Oct. 13, 2000, after having undergone a series of surgeries.

During the ensuing three years, Totillo-Brier continued to suffer peritonitis. She remained under Shahin's care, and she underwent seven procedures to treat complications involving fistula development and to remove portions of the mesh.

On Oct. 21, 2003, Totillo-Brier returned to Lutheran Medical Center, where she underwent surgery that was intended to involve closure of a draining fistula. However, Shahin determined that the procedure could not be performed because Totillo-Brier had not adequately healed. Instead, he inserted a peripherally inserted central catheter line to provide Totillo-Brier with nutrition, and he decided to wait to see if her fistula closed by itself. During the remainder of her hospitalization, Totillo-Brier's nutritional needs were managed by a nutritional-support internist, Dr. Leo Rosenkrantz. Totillo-Brier was discharged Nov. 6, 2003. She was told her to follow up with her doctor.

During the ensuing two weeks, Totillo-Brier was treated at an outpatient nursing facility, Advanced Care Inc. However, the catheter continued to cause problems, so she presented to the emergency room of St. Luke's Cornwall Hospital, in Newburgh. Dr. Samuel Mark found a stitch missing in the catheter line, restitched it and left it intact.

On Dec. 7, 2003, Totillo-Brier was transported to St. Luke's Cornwall Hospital. Doctors determined that she had suffered a heart attack, endocarditis, a brain abscess and a stroke as a result of sepsis caused by a blood-borne infection of her catheter line. The line had been feeding bacteria directly into her bloodstream, so the infection had gone to her heart. The infection could not be resolved via antibiotics, and Totillo-Brier remained unconscious during much of 2004.

On June 19, 2004, while Totillo-Brier was unconscious in the hospital, her husband died of a heart attack, unbeknownst to her. A guardian was appointed so that surgical procedures to close her abdomen could be undertaken. Those procedures eventually succeeded, allowing Totillo-Brier's release in June 2005.

Totillo-Brier sued Jaber, Jaber's practice and Lutheran Medical Center. She alleged that Jaber failed to properly perform the hysterectomy, that his failure constituted medical malpractice, and that the hospital and Jaber's practice were liable for Jaber's actions.

In a separate action, Totillo-Brier sued Shahin, St. Luke's Cornwall Hospital, Advanced Care and Rosenkrantz. Totillo-Brier alleged that Rosenkrantz and Shahin failed to properly treat her, that Shahin failed to detect her bacterial infection, that Advanced Care and St. Luke's Cornwall Hospital's staff failed to properly address the problematic catheter line, and that the failures constituted medical malpractice.

Plaintiff's counsel ultimately discontinued the claims against Lutheran Medical Center, and Advanced Care was dismissed via summary judgment. Totillo-Brier and St. Luke's Cornwall Hospital negotiated a $625,000 pretrial settlement, and the matter proceeded to a trial against Jaber, Jaber's practice, Shahin and Rosenkrantz.

Plaintiff's counsel claimed that Jaber was not adequately trained to address the sigmoid colon and that, as such, Jaber should have summoned a surgeon to separate the tumor and the sigmoid colon. He noted that Jaber strongly believed that the tumor was benign, and, thus, he argued that Jaber should have preserved more of the colon. He also claimed that Jaber should have checked for damage of the colon by inserting a colored fluid that would have revealed any leakage to the peritoneal space.

Plaintiff's counsel further claimed that Rosenkrantz and Shahin did not provide an adequate aftercare plan following Totillo-Brier's November 2003 discharge. He contended that Shahin did not properly monitor Totillo-Brier's catheter line during that hospitalization, thus allowing an infection to develop. He claimed that bacteria exposure occurred during the restitching of the line, but that Shahin failed to detect the resultant infection.

Plaintiff's counsel discontinued the claim against Rosenkrantz during the trial.

Totillo-Brier was hospitalized from December 2003 until June 2005. She was subsequently admitted to a nursing and rehabilitation facility, and she continues to reside at the facility. She has three colostomy bags, and she suffers hemiplegia that is a residual product of her stroke. She also suffers residual cognitive deficits. Although the deficits have waned, she suffers confusion, frustration and a major loss of memory. She is also confined to a wheelchair.

Totillo-Brier sought recovery of damages for her past and future pain and suffering. Her husband's estate presented a derivative claim.

Insurer:

Physicians' Reciprocal Insurers for Shahin

CCC Insurance Corp. for Jaber and Ahmad M. Jaber, M.D., PC

Medical Liability Mutual Insurance Co. for St. Luke's Cornwall Hospital


ALM Properties, Inc.
Kings Supreme

PUBLISHED IN: VerdictSearch New York Reporter Vol. 26, Issue 17

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:12-cv-00261-LM  Document 43-3  Filed 10/24/14  Page 21 of 89

JVR No. 389936, 2000 WL 33594818 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

DUNN v. CITY OF NEW YORK

12977 / 92
DATE OF TRIAL: August, 2000

TOPIC:

LIABILITY:

General: CITY GOVERNMENT

Specific: Negligent Road Design

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $46,377,823**
**Judge Reduced Award To: $22,261,355**

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Brian J. O'Leary, Garden City, NY
Stephen W. O'Leary, Garden City, NY
Defendant: William J. Faye, New York, NY

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Queens

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: 23

**DECEDENT:**
**DEFENDANT:**
Type: Single Organization

Sex: Organization

**DAMAGES:**

Past Medical: $687,580

Future Medical: $13,190,243

Past Wage: $2,000,000

Future Wage: $5,500,000

Pain and Suffering: $25,000,000

Total: $46,377,823

**COMPARATIVE NEGLIGENCE PERCENTAGE: 52%**

**FACTS:**

A 23-year-old male suffered injuries resulting in quadriplegia when his his motorcycle was caused to leave a roadway and overturn onto a sidewalk as he attemped to avoid colliding with a non-party vehicle which crossed the centerline of the roadway. The plaintiff contended that the defendant failed to maintain the intersection in a safe condition, negligently placed a sign before the curve which indicated that the roadway would curve in the opposite direction from the way it actually curved, failed to correct the dangerous condition after numerous collisions occurred on the curve and failed to warn of a known dangerous condition. The defendant denied liability and contended that no other vehicle was involved in the accident and that the plaintiff operated his motorcycle at an excessive rate of speed.

Jury Verdict Research
COURT:

---

**End of Document**                                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 104970, 1992 WL 439026 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West

Supreme Court, Eleventh Judicial District, Queens County, New York

PACHECO v. BOARD OF EDUCATION OF THE CITY OF NEW YORK; CITY OF NEW YORK

23195 / 86

DATE OF INCIDENT: November, 1986

DATE OF FILING: January, 1986

DATE OF TRIAL: September, 1992

TOPIC:

LIABILITY:

General: SCHOOL NEGLIGENCE

Specific: Negligent supervision

**SUMMARY**

**Outcome: Plaintiff Verdict**

**Non Verdict Award: $30,036,000**

**Total Verdict: $30,036,000**

**Claimed Future Medical: $20,000,000**

**EXPERT-WITNESSES:**

**ATTORNEY:**

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York

COUNTY: Queens

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**

**PLAINTIFF:**

Sex: Male

Age: 18

General Occupation: STUDENT

**DECEDENT:**

**DEFENDANT:**

Type: Multiple Organizations

Sex: Organization

Organization Type: Public Administration-Education

**DAMAGES:**
Past Wage: $36,000

Pain and Suffering: $6,000,000

Other: $24,000,000

Total: $30,036,000

**FACTS:**
An 18-year-old male suffered quadriplegia when he was shot by another male high school student in the defendant's high school auditorium. The two males had had an exchange a week before the shooting. The plaintiff contended that the defendants were negligent for failing to provide adequate supervision. The plaintiff maintained that the defendant school district's supervisor saw the two males in the auditorium, which was restricted to them at the time, but did nothing. The defendants denied responsibility and contended that the incident could have occurred anywhere. The defendant was found 50 percent negligent but is responsible for 100 percent of the economic damages under state law. The male perpetrator was also found 50 percent negligent. The case is on appeal.

Jury Verdict Research
COURT: Supreme

End of Document
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

1991 WL 718416 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (C) 2012 by Association of Trial Lawyers of America
Unknown New York State Ct.

ECKS v. NIZEN

No. 7420/85
DATE OF VERDICT/SETTLEMENT: October 18, 1991
TOPIC: AUTOMOBILE ACCIDENTS

**SUMMARY:**
Verdict: $46,800,000

**ATTORNEY(S):**
Plaintiff(s): Keegan, Raymond J.: White Plains

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Rockland

TYPE OF INJURY: BRAIN INJURIES : brain damage, quadriplegia

**SUMMARY:**
**Plaintiff Information:**
Sex: Male

Age: 18 Years

**FACTS:**
Overview: The plaintiff suffered severe brain damage, which left him quadriplegic and unable to speak or communicate, when he collided with an oncoming car while trying to evade a driver who was chasing him in the mistaken belief that the plaintiff had thrown a beer bottle at his car.

Association of Trial Lawyers of America
N.Y., Rockland County Superior Court, No. 7420/85, (10-18-91)

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 387578, 1999 WL 33298668 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)


Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

BROWN v. CITY OF NEW YORK

N/A
DATE OF TRIAL: May, 1999

TOPIC:

LIABILITY:

General: PREMISES LIABILITY

Specific: Accident At Recreational Facility


**SUMMARY**
Was Appeal Filed: Yes

Name of Person(s) Filing: City of New York


**Outcome: Plaintiff Verdict**
**Total Verdict: $49,900,218**

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Harvey Weitz, New York, NY
Defendant: Michael D. Hess, New York, NY

JUDGE:

**FOR RELATED CASE LAW OPINIONS SEE:**
713 N.Y.S.2d 223


RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Kings

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex: Male


Age: An adult of undetermined age.

**DECEDENT:**
**DEFENDANT:**
Type: Single Organization

Sex: Organization

**DAMAGES:**
Pain and Suffering: $35,000,000

Other: $14,900,218

Total: $49,900,218

**FACTS:**
A male suffered quadriplegia when he jumped off a pier, owned and maintained by the defendant city, and struck his head on the bottom of the ocean floor. The plaintiff contended that the defendant failed to maintain the premises in a safe condition, failed to post signs warning of the shallow condition of the water and / or stating that there was no diving allowed and failed to otherwise warn of a known dangerous condition. The defendant denied liability and contended that the plaintiffs were aware of the depth of the approximate depth of the water in that location. Another person also suffered injuries from jumping off the pier to assist the plaintiff and received an award.

Jury Verdict Research
COURT:

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 510637, 2004 WL 5803096 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

WALDRON v. CITY OF NEW YORK

25179 / 2000
DATE OF INCIDENT: August, 1999
DATE OF FILING: October, 2000
DATE OF TRIAL: April, 2004

TOPIC:

LIABILITY:

General: POLICE NEGLIGENCE

Specific: Negligent Supervision

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award: $**
**Total Verdict: $14,100,000**
**Judge Reduced Award To: $**
**Claimed Past Medical: $**
**Claimed Future Medical: $**
**Claimed Past Wage Expense: $**
**Claimed Future Wage Expense: $**
Plaintiff's Economist: $

Defendant's Economist: $

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Stuart M Tarshis, New York, NY
Defendant: Sheila M. Rossi, New York, NY

JUDGE: Francois A. Rivera

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: New York
COUNTY: Kings

**PRIMARY INJURY: Incomplete Quadriplegia**

**SUMMARY**
**PLAINTIFF:**

Sex: Male

Age: 58

**DECEDENT:**
Funeral Expense: $

Other Expenses: $

**DEFENDANT:**
Type: Single Organization

Sex: Organization

Policy Limit: $

**DAMAGES:**
Past Medical: $6,050,000

Future Medical: $

Past Wage: $

Future Wage: $

Pain and Suffering: $8,050,000

Other: $

Total: $14,100,000

Punitive: $

Hedonic: $

Property: $

Other: $

Interest: $

Loss of Services: $

**FACTS:**
A 58-year-old female alleged that she suffered a gunshot wound that resulted in a vertebra fracture at T-1, a spinal nerve injury that resulted in incomplete quadriplegia, pneumothorax, and the quality of life loss when he was shot by a nonparty police

Case 1:12-cv-09261-LM  Document 43-3   Filed 10/24/14   Page 30 of 89

officer in the course and scope of his employment with the defendant on a city street. The plaintiff contended that the defendant failed to properly train and supervise its police officers and that it was liable under the doctrine of respondeat superior. The defendant denied liability.

Jury Verdict Research
COURT:

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 386991, 2001 WL 823268 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

DIAZ v. CITY OF NEW YORK

34949-92
DATE OF INCIDENT: August, 1991
DATE OF TRIAL: January, 2001

TOPIC:

LIABILITY:

General: PREMISES LIABILITY

Specific: Accident At Public Property

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $26,320,959**

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Ivan S. Schneider, New York, NY
Joseph S. Rosato, Manhattan, NY
Defendant: Christian Siragusa, Brooklyn, NY
Ava Safir, New York, NY

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Kings

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: 22

General Occupation: GENERAL LABORER

**DECEDENT:**
**DEFENDANT:**

Type: Single Organization

Sex: Organization

Organization Type: PUBLIC ADMN.-AFFAIRS

**DAMAGES:**
Future Medical: $18,320,959

Pain and Suffering: $8,000,000

Total: $26,320,959

**FACTS:**
A 22-year-old male factory employee suffered spinal injuries which resulted in quadriplegia when he dove off a pier at a beach area within the defendant city. The plaintiff contended that the water that he had entered was shallow and that the defendant failed to post warning signs of a known dangerous condition. The defendant denied liability, contended that the plaintiff failed to exercise due care and that signs were posted and a lifeguard gave notice of a dangerous condition which the plaintiff ignored.

Jury Verdict Research
COURT:

End of Document                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 140634, 1994 WL 729135 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Supreme Court, First Judicial District, New York County, New York

BARRETTO v. NEW YORK CITY BOARD OF EDUCATION; CITY OF NEW YORK

8648 / 89
DATE OF FILING: January, 1989
DATE OF TRIAL: October, 1994

TOPIC:

LIABILITY:

General: SCHOOL NEGLIGENCE

Specific: Sports


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Non Verdict Award: $18,834,000**
**Total Verdict: $18,834,000**
**Claimed Future Medical: $75,000**
**Claimed Future Wage Expense: $2,400,000**

**EXPERT-WITNESSES:**
**ATTORNEY:**

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: New York

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: 18

General Occupation: STUDENT


**DECEDENT:**
**DEFENDANT:**
Type: Multiple Organizations

Sex: Organization

Organization Type: Public Administration-Education

**DAMAGES:**
Future Medical: $1,675,000

Past Wage: $125,000

Future Wage: $2,200,000

Pain and Suffering: $8,500,000

Other: $6,334,000

Total: $18,834,000

**COMPARATIVE NEGLIGENCE PERCENTAGE: 20%**

**FACTS:**
An 18-year-old male high school volleyball team member suffered a compression fracture at C6, resulting in quadriplegia, and the loss of control of his bowel and bladder functions when he attempted to jump over a volleyball net at the defendant's high school when the coach was not present during after-school practice. The plaintiff contended that, if the defendant's coach was present, the plaintiff would not have attempted the jump. Another coach from the defendant school testified that the coach in charge of the practice had a duty to be in the area during the entire time that practice was being conducted. The defendant contended that the plaintiff, who had practiced a similar but less-difficult roll jump when he took karate classes at the age of nine, was aware that it was dangerous and that he assumed the risk. The plaintiff was found 20 percent negligent, and the defendant was found 80 percent negligent.

Jury Verdict Research
COURT: Supreme

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 172726, 1994 WL 896235 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

GAYLE v. CITY OF NEW YORK

15484 / 87
DATE OF INCIDENT: September, 1987
DATE OF TRIAL: April, 1994

TOPIC:

LIABILITY:

General: CITY GOVERNMENT

Specific: Road maintenance

**SUMMARY**
Was Appeal Filed: Yes

Name of Person(s) Filing: City of New York

**Outcome: Plaintiff Verdict**
**Non Verdict Award: $60,580,000**
**Total Verdict: $60,580,000**

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Brian O'Dwyer, New York, NY
Defendant: Eric C Thompson, Brooklyn, NY

**FOR RELATED CASE LAW OPINIONS SEE:**
682 N.Y.S.2d 426

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Kings

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: 30

**DECEDENT:**
**DEFENDANT:**
Type: Single Organization

Sex: Organization

Organization Type: Public Administration-Executive Legislative and General

**DAMAGES:**
Other: $60,580,000

Total: $60,580,000

**FACTS:**
A 30-year-old male suffered quadriplegia when his vehicle went out of control and struck the rear of a tractor-trailer after going through a flooded area of the roadway. The plaintiff contended that the defendant city failed to properly maintain a storm drain and also contended that the defendant was aware of the flooding problem. The defendant contended that the plaintiff was intoxicated at the time of the collision and denied negligence. The defendant filed an appeal and the case was reversed by the supreme court and the matter remitted to the appellate division.

Jury Verdict Research
COURT: Superior

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 419860, 2002 WL 34705242 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Supreme Court, Eighth Judicial District, Allegany County, New York.

SCHIFELBINE v. FOSTER WHEELER CORP.; K.C. SWANN ROOFING CO. INC.

N/A
DATE OF INCIDENT: July 27, 1999
DATE OF TRIAL: June 30, 2002

TOPIC:

LIABILITY:

General: Work Accidents

Specific: Construction


**SUMMARY**
Name of Person(s) Filing: K.C. Swann


**Outcome: Plaintiff Verdict**
**Total Verdict: $23,368,209**
**Judge Reduced Award To: $**
**Final Demand: $19,000,000**
**Final Offer: $10,000,000**
HIGH AMOUNT: $0

LOW AMOUNT: $0

Claimed Past Medical: $1,174,774

Claimed Future Medical: $15,366,529


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Jeffrey A. Black, Olean, NY
Joseph C. Dwyer, Olean, NY
Defendant: E. Gordon Haesloop, Mineola, NY
Weeden A. Wetmore, Elmira, NY

JUDGE: James E. Euken

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: New York
COUNTY: Allegany

**PRIMARY INJURY: Quadriplegia**

Amputation: Leg

Spinal Nerve Injury

Fractures of Both Arms

Skull Fracture

**SUMMARY**
**PLAINTIFF:**
Sex:Male

Age: Adult, 35

General Occupation: General Laborer

**DECEDENT:**
**DEFENDANT:**
Sex:Organization

Inactive Defendant (for organization): Foster Wheeler Corp.; K.C. Swann Roofing Co. Inc.

Defendant's Insurance (name of company): Liberty Mutual

Policy Limit: $

Sex:Organization

Inactive Defendant (for organization): Foster Wheeler Corp.; K.C. Swann Roofing Co. Inc.

Defendant's Insurance (name of company): Selective And State Ins.

Policy Limit: $

Other Expenses: $0

Claimed Past Wages: $26,906

Claimed Future Wages: $300,000

**DAMAGES:**
Compensatory Past Medical Award: $1,174,774

Compensatory Future Medical Award: $15,366,529

Compensatory Past Wages Award: $26,906

Compensatory Future Wages Award: $300,000

Compensatory Pain And Suffering Award: $6,500,000

Other Compensatory Award: $0

Total Compensatory Award: $23,368,209

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

Comparative Negligence Percentage: 0


**FACTS:**

A 35-year-old male roofer suffered a spinal nerve injury at C5-6 that resulted in quadriplegia, amputation of his right leg above the knee, fractures of both arms and a skull fracture that required approximately 16 surgical procedures when he fell approximately 45 feet through a skylight on the defendant's premises to the floor of a cement factory. The fall occurred while the plaintiff was repairing the roof in the course of his employment for the codefendant roofing company. The plaintiff contended that the defendants failed to provide a safe workplace, failed to provide the proper safety equipment and failed to properly supervise the job site to ensure the safety of construction personnel on the premises. The defendants denied liability. The past medical expense amount was stipulated by the parties during trial. The codefendant roofing company was found to be 100 percent liable and filed an appeal, but the judgment was affirmed.


Jury Verdict Research
COURT: Supreme

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

29 NY. J.V.R.A. 3:C1, 2012 WL 7810951 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Supreme Court, Eighth Judicial District, Erie County, New York.

NATALIE BARNHARD vs. CYBEX INTERNATIONAL INC.

CA11-00893
DATE OF VERDICT/SETTLEMENT: February 06, 2012
TOPIC: PRODUCT LIABILITY DEFECTIVE DESIGN NEW YORK JURY FINDS FOR WOMAN PARALYZED BY EXERCISE MACHINE QUADRIPLEGIA.


**SUMMARY:**
Result: $66,000,000 RECOVERY


**EXPERT WITNESSES:**
Plaintiff's economics expert: Ronald Reiber.

Plaintiff's human factors & mechanical engineering expert: Clyde Richard from NJ.

Plaintiff's life care planning expert: Kelly Lance.

Defendant's bio-medical engineering expert: Robert Cargill.

Defendant's physical therapy expert: Paul Roubal, Ph.D. from Troy, MI.

Defendant's warnings expert: Gerald Goldhaber.

**ATTORNEY:**
Plaintiff's: Kevin English and Michael Law of Phillips Lytle in Buffalo, NY.

Defendant's: Maynard Kirpilani and Donna Marie Baloy of Wilson Elser in Boston, MA, and Scott M. Duquin of Hurwitz & Fine in Buffalo, NY.


JUDGE: Diane Y. Devlin


RANGE AMOUNT: $5,000,000-999,999,999


STATE: New York
COUNTY: Erie


**INJURIES:**
PRODUCT LIABILITY DEFECTIVE DESIGN NEW YORK JURY FINDS FOR WOMAN PARALYZED BY EXERCISE MACHINE QUADRIPLEGIA.


**FACTS:**

In this matter, a woman sued after being rendered quadriplegic when an exercise machine fell on her. The defendant manufacturer asserted the plaintiff's own negligence in misuse of the machine, as well as assigning blame to a third party defendant for not securing the machine to the ground.

In October 2004, the plaintiff was at her place of employment, the Amherst Orthopedics Physical Therapy center in Cheektowaga, New York. The plaintiff was monitoring a patient when she grabbed the top bar of the exercise machine to stretch. The 600 pound leg extension machine fell on her, pinning her to the ground by her neck. It took four people to lift the machine off of her. The machine landing on her neck damaged the plaintiff's spinal cord, resulting in C-5 quadriplegia. The plaintiff has no dexterity in her hands, and requires round-the-clock home care.

The plaintiff filed suit in the New York Supreme Court, Erie County for product liability, arguing defective design and failure to warn. The plaintiff named Cybex Inc., the manufacturer of the machine, as the defendant. Cybex also filed suit against Amherst Orthopedics as a third party defendant, asserting that it should have bolted the machine to the floor or instructed its employees not to use it as a stretching bar. The plaintiff rejected Cybex's pretrial settlement offer of $2 million. In an eight week trial, the plaintiff asserted that the device was defectively designed, specifically asserting that its 400 pounds of stacked weights were too high off the ground, and further that the machine lacked stability on the side where the weights were stacked. An engineering expert testified that this created a tipping hazard with only 40 pounds of force. The plaintiff's expert testified that it should be able to withstand at least 100 pounds of force. The defendants argued that it was the negligence of the plaintiff that caused the machine to fall. They argued that the design had endured millions of sessions without similar incidents. The plaintiff countered this by putting into evidence a video of a similarly-sized woman stretching on a machine in a similar fashion. The machine tipped with little effort. The plaintiff further pointed out that, while there were no written standards at the time of the machine's manufacture, later models of a similar type were redesigned to be more stable. The defendant's expert asserted that the overall chances of an overturning were 115 million to one. Cross-examination, however, showed that this included machines of different models and designs that may have secured to the floor.

The defendant also contested damages, with the plaintiff presenting normal life expectancy as being 81 years. The defense disputed this, arguing that as a quadriplegic, her life expectancy was now only 64 years.

The jury, six men, awarded future medical expenses that assumed a life expectancy of 72 years, totaling $28.56 million. They further awarded $33 million in past and future pain and suffering. The total jury verdict was $66 million, including additional damages for past and future lost earning and medical expenses. Cybex was found 75% at fault, the employer 20% responsible, and the plaintiff 5% percent at fault.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 29, Issue 3

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

BROWN & BROWN vs. CITY OF NEW YORK., 15 NY. J.V.R.A. 5:C1 (1998)

Case 1:13-cv-00261-LM Document 13-3 Filed 10/24/14 Page 42 of 89

15 NY. J.V.R.A. 5:C1, 1998 WL 35468217 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.

Supreme Court, Second Judicial District, Kings County, New York.

BROWN & BROWN vs. CITY OF NEW YORK.

40864/92

DATE OF VERDICT/SETTLEMENT: April, 1998

TOPIC: TWO PLAINTIFF BROTHERS SUFFER QUADRIPLEGIA UPON DIVING FROM PIER AT CONEY ISLAND - FAILURE TO PLACE WARNING SIGNS.

**SUMMARY:**

Result: $104,795,032 VERDICT

**EXPERT WITNESSES:**

Plaintiff's recreational safety expert: Arthur Mittelstaedt from

**ATTORNEY:**

Plaintiff's: Harvey Weitz and Joseph Rosato of Schneider, Kleinick, Weitz, Damashek & Shoot in Manhattan;

Defendant's: Kenneth Sasmor, Corp. Counsel, Manhattan.

JUDGE: Gloria Aronin

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York

COUNTY: Kings

**INJURIES:**

TWO PLAINTIFF BROTHERS SUFFER QUADRIPLEGIA UPON DIVING FROM PIER AT CONEY ISLAND - FAILURE TO PLACE WARNING SIGNS.

**FACTS:**

In this action, the plaintiffs, two brothers in their mid-20's, contended that the defendant City's Deptartment of Parks and Recreation negligently failed to place signs warning against diving from a pier at Coney Island which the plaintiffs maintained were required under the City's beach safety plan. The plaintiff contended that as a result, the initial plaintiff did not realize that diving was dangerous and that he suffered cervical fractures which rendered him a quadriplegic when he dove from the pier and struck the bottom. The plaintiff further contended that the second plaintiff observed his brother floating face down in the water and dove in to rescue him, striking his head and suffering cervical fractures which also left him a quadriplegic.

The plaintiffs maintained that state law required the posting of a "No-diving" sign in areas in which the water would reach less than eight feet deep and contended that this particular area was covered under the Beach Safety Plan which the defendant had promulgated. The plaintiffs contended that despite the provision requiring a sign at this location, the defendant failed to post one. The plaintiffs also presented, as a notice witness, an individual who had suffered similar injuries when diving from the same pier during the prior season and the plaintiffs contended that the defendant was clearly aware of the need for a sign.

The plaintiffs also presented one of the life guards who maintained that in the three years in which he had been working at the beach, he had never seen a warning sign present at this location. The plaintiffs also elicited testimony from the life guard that

BROWN & BROWN vs. CITY OF NEW YORK., 15 N.Y. U.V.R.A. 5:01 (1998)

Case 1:13-cv-00261-LM Document 43-3 Filed 10/24/14 Page 43 of 89

he would be monitoring the ocean, beach and pier at the same time. The plaintiff maintained that although this life guard had a partner, the partner was not at his post. The defendant maintained that the partner had been assigned to an adjacent beach to teach whistle signals to a different life guard. The plaintiff countered that there were several life guards at this adjacent beach and maintained that the partner was probably present for social, rather than training reasons. The defendant maintained that both plaintiffs had assumed the risk of injury. The plaintiffs countered that there was no evidence that they were aware of the depth of the water and that it was clear that signs were necessary. The defendant further contended that the comparative negligence of the initial plaintiff was particularly great and established that he had climbed over a railing in order to dive from the pier. The defendant also contended that both plaintiffs were impaired from alcohol, rendering them comparatively negligent. The defendant also questioned the accuracy of the second brother's contentions that he had dove in to rescue his brother, maintaining that the alcohol consumption resulted in both plaintiffs exercising poor judgment.

The plaintiffs maintained that the second brother was found wearing long pants and his work boots and that his wallet and keys were still in his pocket, arguing that it was clear that he had dove into the water to save his brother.

The defendant's expert toxicologist maintained that the initial plaintiff had a BAC of .09 and the second plaintiff a BAC of .05, reflecting impairment, arguing and that in view of such consumption, it is doubtful that a warning sign would have prevented the incident. The plaintiff denied that this position should be accepted and maintained that even if accurate, such a blood alcohol level would not reflect inebriation to the point that a sign, if present, would be ignored, arguing that if the defendant had placed such a sign, the incident would not have occurred. The plaintiffs indicated that they consumed less beer than estimated by the expert. The plaintiffs contended that the defendant's toxicologist had based his estimate of at least three and six beers on a dissipation rate of half a drink per hour. The plaintiff argued that in prior testimony, the expert had used dissipation rates which varied from 1/4 drink to 1 drink per hour and argued that his credibility was, therefore, suspect.

The defendant's oceanographer maintained that based upon tide tables and maps, there was at least 15 feet of space between the pier and the water surface at the time of the incident, which occurred at the midway point between high and low tides, and that it should have been very evident that diving this distance would be dangerous. The plaintiffs had indicated that it appeared that there was only eight to nine feet distance between the pier and the water surface. The plaintiffs argued that the defendant's expert was not aware of two Nor'Easter storms which had occurred in the past year, arguing that this factor could well have changed the topography and that the exert's opinion should be questioned. The plaintiff further argued that warning signs would have obviated the hazard and would have been obeyed. The plaintiff also elicited testimony from the life guard that the distance appeared to be eight to nine feet between the pier and the water surface at the time of the incident.

The evidence disclosed that when the initial plaintiff dove in, he struck his head and suffered fractures at C-3,4 & 5, rendering him a quadriplegic. The second plaintiff struck his head and suffered a subluxation at C-1 with resulting quadriplegia. The plaintiff contended that both plaintiffs required a tracheostomy and the use of a ventilator for several months. The plaintiff further maintained that the second plaintiff suffered relatively significant difficulties with speech because of the high nature of the injury and that he required speech therapy. The evidence disclosed that the plaintiffs reside in the basement of the family home and have two shifts of one attendant each for eight hours per shift as well as their mother to care for them. The plaintiffs contended that each brother would fare better with their own attendant for three eight hour shifts per day.

The plaintiffs further contended that the brothers will face a myriad health problems, will require special medical attention and have already suffered decubitus ulcers. The plaintiff's specialist in physical rehabilitative medicine estimated that their life expectancies have been reduced by 10%-15%. The plaintiffs further contended that it is clear that virtually all enjoyment of their lives has come to an end.

The jury found the defendant negligent, that the initial plaintiff was comparatively negligent, but that there was an absence of proximate cause and that the second plaintiff rescuer was not negligent at all. They then awarded a total of $104,795,032. The jury awarded $49,900,218 to the initial plaintiff, including $15,000,000 for past pain and suffering and loss of enjoyment of life, $536,000 for past medical hospital and home care, $175,000 for past loss of earnings, $20,000,000 for future pain and

BROWN & BROWN vs. CITY OF NEW YORK., 15 NY. U.V.R.A. 5:01 (1998)

Case 1:13-cv-00261-LAK  Document 43-3  Filed 10/24/14  Page 44 of 89

suffering, $630,000 loss of earnings, $712,736 for medical and rehabilative services, $8,489,035 for liftemne costs of home health aid, $1,420,405 for future nursing care, $727,041 for drugs and medical supplies, $1,151,000 or future hospital bills, $389,630 for home equipment, $400,000 for transportaion costs, $18,411 for vocatioanl rehabilatation services, $200,000 for a part time housekeeper and $50,000 for barrier free home. All of the future awards were over 36.8 years, except for the award for future lost earnings, which was for 18 years. They also awarded $54,894,813 to the second plaintiff, including $20,000,000 for past pain and suffering and loss of enjoyment of life, $535,815 for past medical care, $72,000 for past lost earnings, $20,000,000 for future pain and suffering, $300,000 for future lost earnings, $748,221 for medical and rehabilitative services, $8,800,494 for lifetime costs of home health care, $1,420,405 for future nursing care, $697,643 for drugs and other medical supplies, $1,193,137 for future hospital bills, $411,449 for home equipment, $446,000 for costs of transportaton, $19,649 for vocational rehabiliation services, 200,000 for part time housekeeper, and $50,000 for costs of barrier free home (all future awards except for lost eaninings are for 37.7 years). The defendant's post-trial motions are pending.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 15, Issue 5

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 1011030042, 2009 WL 7419662 (N.Y.Sup.) (Verdict and Settlement Summary)


Copyright (c) 2012 Thomson Reuters/West
Supreme Court, Eighth Judicial District, Erie County, New York

SMOLINSKI v. SMOLINSKI; FORD MOTOR CO.

5874 / 01
DATE OF INCIDENT: November 20, 1999
DATE OF FILING: July 25, 2001
DATE OF TRIAL: March 20, 2009

TOPIC:


LIABILITY:


General: Passenger in Private Vehicle


Specific: Host Driver's Negligence Only


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $40,226,376**
**Judge Reduced Award To:**
**High Amount: $0**
**Low Amount: $0**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Anne B. Rimmier, Buffalo, NY
Defendant: Paul Morrison-Taylor, Buffalo, NY

JUDGE: Joseph R. Glownia

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: New York
COUNTY: Erie

**PRIMARY INJURY: Quadriplegia: Incomplete**
Multiple Vertebrae Fractures


Vertebra Subluxation


General Emotional Distress: Quality of Life Loss

**SUMMARY**

**PLAINTIFF:**

Sex: Male

Age: Adult, 24

General Occupation: General Laborer

**DECEDENT:**

Other Expenses: $0

**DEFENDANT:**

Sex: Male

Age: Adult

Organization Type: Smolinski

General Occupation: General Laborer

Policy Limit:

**DAMAGES:**

Past Medical: $0

Future Medical: $0

Past Wage: $0

Future Wage: $0

Pain and Suffering: $40,226,376

Other: $0

Total: $40,226,376

Punitive: $0

Hedonic: $0

Property: $0

Other: $0

Interest: $0

Loss of Services: $0

**COMPARATIVE NEGLIGENCE PERCENTAGE: 0**

**FACTS:**

A 24-year-old male rental car employee alleged that he suffered vertebra fractures at C6-7, with subluxation, that caused incomplete quadriplegia and a loss in the quality of life when the SUV in which he was a passenger, operated by the male defendant and owned by the codefendant, veered out of control, overturned, and came to rest in a ditch alongside a public roadway. The plaintiff contended that the defendant operated the SUV in a negligent manner, failed to keep a proper lookout, drove at an excessive rate of speed while intoxicated, and failed to maintain control of the vehicle while negotiating a curve in the road. The plaintiff further contended that the codefendant was vicariously liable as lessor of the vehicle. The defendants denied liability. The defendant contended that the plaintiff was the driver, even though medical technicians noted that the defendant suffered abrasions and lacerations associated with a driver being at the wheel of a vehicle. The defendant, after conceding that he was the driver, contended that he was faced with a sudden emergency while maneuvering the curve, and that he was unable to maintain control of the SUV.

Jury Verdict Research
COURT: Supreme

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 419224, 2003 WL 26096809 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Supreme Court, Eighth Judicial District, Erie County, New York

MURACH v. ISLAND OF BOB-LO CO. D/B/A FANTASY ISLAND; INTERNATIONAL BROADCASTING CORP.

CA 01-01040
DATE OF INCIDENT: June 23, 1990
DATE OF TRIAL: December 03, 2003

TOPIC:

LIABILITY:

General: Premises

Specific: Accident: Amusement Park


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $58,600,000**
**Judge Reduced Award To: $**
HIGH AMOUNT: $0

LOW AMOUNT: $0


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Terrence M. Connors, Buffalo, NY
Lawlor F. Quinlan, Buffalo, NY
Defendant: Richard T. Saraf, Buffalo, NY
Albert J. D'Aquino, Buffalo, NY

JUDGE: Joseph R. Glownia

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: New York
COUNTY: Erie

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex:Male

Age: Adult, 22

**DECEDENT:**
**DEFENDANT:**
Sex:Organization

Inactive Defendant (for organization): Island of Bob-Lo Co. d/b/a Fantasy Island; International Broadcasting Corp.

Policy Limit: $

Other Expenses: $0

**DAMAGES:**
Compensatory Past Medical Award: $0

Compensatory Future Medical Award: $0

Compensatory Past Wages Award: $0

Compensatory Future Wages Award: $0

Compensatory Pain And Suffering Award: $58,600,000

Other Compensatory Award: $0

Total Compensatory Award: $58,600,000

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

Comparative Negligence Percentage: 0

**FACTS:**
A 22-year-old male professional diver suffered from quadriplegia that required life-long care after he fell approximately 14 feet from a diving board during a comedy demonstration and hit his head on the side of the pool at an amusement park owned and operated by the defendants. The plaintiff contended that the diving board was too close to the pool side, that the recommended distance is a minimum of 6 feet and this board was only 38 inches, and that the defendant failed to remedy or warn of a known dangerous condition. The defendants denied liability.

7 NY. J.V.R.A. 11:C1, 1990 WL 10636079 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (C) 2007 New York Jury Verdict Review & Analysis
Supreme Court, Ninth Judicial District, Rockland County, New York.

TERRY CARLE FROM DENVER CO. BRAUN vs. GMAC AND SHAKI.

N/A
DATE OF VERDICT/SETTLEMENT: May 9, 1990
TOPIC: MOTOR VEHICLE NEGLIGENCE - DEFENDANT CROSS OVER CENTER LINE - QUADRIPLEGIA - DAMAGES ONLY.

**SUMMARY:**
Result: $20,110,500 VERDICT

**EXPERT WITNESSES:**
Plaintiff's specialist in physical rehabilitative medicine: Kristjan Ragnarsson from Manhattan.
Plaintiff's economist: Conrad Berenson from Manhattan.
Defendant's expert in physical rehabilitative medicine:
**ATTORNEY:**
Plaintiff's: Peter DeBlasio of DeBlasio & Alton in Manhattan;
Defendant's: lessor/owner: William J. Lewis of Rivkin, Radler, Bayh & Kremer in Uniondale;
Defendant's: driver: J. O'Neil Kelly of Sichol & Hicks in Suffern.

JUDGE: Robert Stolarik

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Rockland

**INJURIES:**
MOTOR VEHICLE NEGLIGENCE - DEFENDANT CROSS OVER CENTER LINE - QUADRIPLEGIA - DAMAGES ONLY.

**FACTS:**
The plaintiff's motion for summary judgment was granted in this case in which the plaintiff contended that the defendant driver had crossed over the center line, striking the plaintiff's automobile head on. The plaintiff contended that he sustained a displaced cervical fracture which caused quadriplegia. The plaintiff also contended that he sustained a ruptured aorta and a ruptured omentum which were surgically repaired.

The plaintiff's specialist in physical rehabilitative medicine related that the plaintiff suffered displaced fractures at C-4,C-5 which has left him quadriplegic, indicating that the plaintiff retained extremely limited use of one arm only. The physician testified that during an initial nine month hospitalization, the plaintiff underwent a cervical fusion. The physician also related that because the plaintiff lost bowel control and would permanently require daily digital bowel evacuation, a second surgery was performed in which the area was widened to minimize the chances of impaction. The physician maintained that the plaintiff will require catheterization because of urinary incontinence four times per day and contended that the plaintiff will permanently require around the clock care from either a R.N. or L.P.N. The defendant's expert specialist in physical rehabilitative medicine

contended that a home care attendant would be sufficient. The plaintiff's physician countered that the urinary and bowel incontinence poses a threat of a condition known as autonomic hyper-reflexia which entails an extremely rapid rise in blood pressure. The physician maintained that the condition can well be fatal and that frequent monitoring by a trained nurse is necessary.

The plaintiff contended that he will incur future costs of care which will approximate $11,000,000. The plaintiff's expert further contended that the plaintiff will permanently suffer frequent episodes of spasticity in which most of the body becomes rigid and which causes extensive pain. The physician maintained that as a result, the plaintiff is required to be strapped into his wheelchair to prevent him from falling from it. The plaintiff's physician contended that the decedent's life expectancy was reduced by only 10% and maintained that he has, therefore, a 30 year life expectancy. The defendant's expert did not dispute this contention.

The plaintiff had owned an egg selling business and contended that he had been earning approximately $19,000 per year. The plaintiff related that his brother and brother-in-law now run the business and that he has worked for the business part-time since the accident by using a speaker phone to obtain orders. The plaintiff related that he had been earning $80 per week in such endeavors and the remainder of the profits are paid to the relatives running the business. The jury awarded $20,110,500, including $4,000,000 for past and suffering, $8,000,000 for future pain and suffering, $5,040,000 for future custodial care, $730,500 for future medical care, $315,000 for future lost earnings until until age 63, $35,000 for past lost wages, $475,000 for medical equipment and supplies, $515,000 to the wife for past lost services and $1,000,000 for future lost services. The Court reduced the award to $12,110,500, lowering the past pain and suffering award to $1,000,000, the future pain and suffering award to $3,000,000 and did not disturb the remainder of the award. The case will not be appealed.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 7, Issue 11

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

POPE vs. NYCHHC ET AL., 29 NY. J.V.R.A. 7:C1 (2012)

Case 1-13-cv-00261-LM  Document 43-3  Filed 10/24/14  Page 52 of 89

29 NY. J.V.R.A. 7:C1, 2012 WL 7811128 (N.Y.Sup.) (Verdict and Settlement Summary)


Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Supreme Court, Twelfth Judicial District, Bronx County, New York.

POPE vs. NYCHHC ET AL.

23626/04
DATE OF VERDICT/SETTLEMENT: May 25, 2012
TOPIC: MEDICAL MALPRACTICE - HOSPITAL NEGLIGENCE - FAILURE OF NEUROLOGIST AND FIRST HOSPITAL TO DISCONTINUE DILANTIN AFTER PATIENT PRESENTS WITH DRUG REACTION SYMPTOMS - FAILURE BY SECOND HOSPITAL TO TIMELY TREAT STEVENS JOHNSON SYNDROME - THIRD HOSPITAL'S STAFF FAILS TO PROPERLY MONITOR PATIENT IN BURN UNIT LEADING TO CARDIORESPIRATORY ARREST - ANOXIC BRAIN DAMAGE - QUADRIPLEGIA.


**SUMMARY:**
Result: $121,000,000 VERDICT


**EXPERT WITNESSES:**
Plaintiff's economic expert: Les Seplaki, PhD in New
**ATTORNEY:**
Plaintiff's: Thomas A. Moore of Kramer Dillof Livingston & Moore in New York, NY.

JUDGE: Robert E. Torres

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Bronx

**INJURIES:**
MEDICAL MALPRACTICE - HOSPITAL NEGLIGENCE - FAILURE OF NEUROLOGIST AND FIRST HOSPITAL TO DISCONTINUE DILANTIN AFTER PATIENT PRESENTS WITH DRUG REACTION SYMPTOMS - FAILURE BY SECOND HOSPITAL TO TIMELY TREAT STEVENS JOHNSON SYNDROME - THIRD HOSPITAL'S STAFF FAILS TO PROPERLY MONITOR PATIENT IN BURN UNIT LEADING TO CARDIORESPIRATORY ARREST - ANOXIC BRAIN DAMAGE - QUADRIPLEGIA.


**FACTS:**
The plaintiff in this medical malpractice action was a 45-year-old mother of two. The plaintiff contended that the failures of care began when she presented to The Brookdale University Hospital and Medical Center's emergency room with complaints of swelling to her face, eyes and mouth, a rash and difficulty swallowing, which was a reaction to anti-seizure medications she had started two and a-half weeks prior after having a seizure and being treated at Brookdale by the defendant attending neurologist. The plaintiff was discharged from the E.R. after a few hours without being evaluated by the neurologist and without any instruction from the E.R. attending to discontinue the anti-seizure medication Dilantin she had been prescribed.

The plaintiff's condition worsened and two days later she took herself to Kings County Hospital, where she was diagnosed with Stevens Johnson Syndrome. Doctors at Kings County failed to administer intravenous immunoglobulin (IVIG), noting it

POPE vs. NYCHHC ET AL., 29 N.Y.J.V.R.A. 7:C1 (2012)

Case 1:13-cv-00261-LM Document 43-3 Filed 10/24/14 Page 53 of 89

was too late despite the fact that plaintiff was later given the drug as a patient in Jacobi Hospital's burn unit and their records showing that it was successful in stopping the progression of plaintiff's lesions. In addition, Kings County Hospital failed to transfer the patient to a burn unit earlier in her admission. The plaintiff's Stevens Johnson syndrome required her to be admitted to a burn unit where she would receive proper care and monitoring.

Five days after her admission to Kings County Hospital, the plaintiff was finally transferred to Jacobi Hospital's burn unit. At this point, 80% of the plaintiff's body had been covered by lesions. IVIG was administered and was noted by the chief attending of the burn unit to have halted the progression of the lesions. The plaintiff contended that although the IVIG stopped the progression of the Stevens Johnson Syndrome beginning on the morning February 26th, the plaintiff began to exhibit signs of respiratory distress. This respiratory distress continued throughout the day untreated as the hospital staff failed to properly monitor her as she deteriorated further. By 7:00 p.m., plaintiff had become unresponsive and required immediate oxygenation by intubation, but instead the staff attempted to oxygenate by other means which proved unsuccessful and her respiratory distress eventually led to cardiac and respiratory arrest. A code was called and it took another five minutes to intubate at which point the plaintiff had suffered catastrophic brain damage due to oxygen deprivation. The plaintiff suffered burns to 80% of her body due to Stevens-

Johnson syndrome, a rare and severe skin disorder. In addition, the plaintiff suffered severe anoxic brain damage that has left her quadriplegic and reliant on others for all her needs since February 26, 2004. The plaintiff, a claims adjuster for the state of New York at the time of the malpractice, has two children: a daughter, 16 at the time and 24 at trial, as well as a son, six at the time and 15 at trial. After her discharge from Jacobi Hospital, the plaintiff was taken care of at Schervier Nursing Home until 2009 when her mother brought her home to live with her.

The jury found New York Health and Hospitals Corporation 90% negligent (Jacobi Medical Center 50% and Kings County Hospital 40%), Brookdale Hospital 5% negligent, the defendant neurologist 4% negligent and the plaintiff 1% comparatively negligent. They then rendered a award of $121,000,000 which included $50,000,000 for past conscious pain and suffering, $30,000,000 for future pain suffering, $10,000,000 for past and future lost wages, $5,000,000 for past medical costs and an award for future costs of care with a present value of $26,000,000.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 29, Issue 7

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 413677, 2003 WL 23519332 (Unknown State Ct. (N.Y.)) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Unknown New York State Ct.

SOSA, PRO AMI v. BRONX LEBANON HOSPITAL CENTER

14032 / 94
DATE OF INCIDENT: September, 1991
DATE OF TRIAL: January, 2003

TOPIC:

LIABILITY:

General: HOSPITAL MALPRACTICE

Specific: Nonsurgical Treatment

**SUMMARY**
Hedonic:

Property:

Other:

Interest:

Loss of Services:

**Final Offer: $8,000,000**
**Claimed Past Medical:**
**Claimed Future Medical:**
**Claimed Past Wage Expense:**
**Claimed Future Wage Expense:**
Plaintiff's Economist:

Defendant's Economist:

**EXPERT-WITNESSES:**
Pediatrician: Lubin, Bertram, M.D., Oakland, CA
Pediatric Neurologist: Charash, Leon I., M.D., Hicksville, NY
Economist: Soudry, Michael,, New York, NY
Economist: Goldman, Fred, Ph.D., New York, NY
**ATTORNEY:**
Plaintiff: James F. Wilkens, Yonkers, NY
Linda A. Nelson, Yonkers, NY

Defendant: Nicholas J. Marotta, New York, NY
Allison R. Shields, New York, NY

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Bronx

**PRIMARY INJURY: Severe Mental Deficiency**

**SECONDARY INJURY:**

**SUMMARY**
**PLAINTIFF:**
Sex: Male

Age: 9

**DECEDENT:**
Funeral Expense:

Other Expenses:

**DEFENDANT:**
Type: Single Organization

Sex: Organization

Organization Type: SERVICES-HEALTH

Policy Limit:

**DAMAGES:**
Past Medical: $2,518,311

Future Medical: $5,150,712

Past Wage:

Future Wage: $2,200,000

Pain and Suffering: $11,000,000

Other:

Total: $20,869,023

Punitive:

Hedonic:

Property:

Other:

Interest:

Loss of Services:


**FACTS:**

A 9-year-old male suffered brain damage, resulting in severe mental deficiency and quadriplegia and requiring a feeding tube after undergoing a tracheostomy, when a single transfusion was performed in the defendant hospital to treat the plaintiff's sickle cell disease symptoms. The plaintiff contended that the defendant treated him in an improper manner, failed to perform an exchange transfusion to treat his acute chest syndrome, that it negligence resulting in the development of further sickling which created blood vessel closure and that it failed to provide the proper standard of care. The defendant denied liability. The plaintiff's guardian filed a claim for loss of services and received an award in the amount of $10,000.


Jury Verdict Research
COURT:

---

FIGUEROA vs. MONTEFIORE MEDICAL CENTER, 27 NY. J.V.R.A. 3:C3 (2009)

Case 1:12-cv-09261-LM Document 43-3 Filed 10/24/14 Page 57 of 89

27 NY. J.V.R.A. 3:C3, 2009 WL 9053580 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Supreme Court, Twelfth Judicial District, Bronx County, New York.

FIGUEROA vs. MONTEFIORE MEDICAL CENTER

22326/06
DATE OF VERDICT/SETTLEMENT: September, 2009
TOPIC: MEDICAL MALPRACTICE - HOSPITAL NEGLIGENCE - FAILURE TO DIAGNOSE EPIDURAL ABSCESS -
TEMPORARY QUADRIPLEGIA - PERMANENT PARALYSIS FROM CHEST DOWN - PERMANENT BLADDER AND
BOWEL INCONTINENCE.

**SUMMARY:**
Result: $22,903,000 VERDICT

**EXPERT WITNESSES:**
Plaintiff's economist expert: Alan Lieken from East Setauket, NY.
Plaintiff's infectious disease physician expert: Angelo Scotti, M.D. from Colts Neck, NJ.
Plaintiff's life care planning expert: Sandra Gohshar from Staten Island, NY.
Plaintiff's neurologist expert: Richard Lechtenberg, M.D. from Brooklyn, NY.
Plaintiff's neuroradiologist expert: Robert Kirkwood, M.D. from Longmeadow, ME.
Defendant's infectious disease physician expert: William Mandell, M.D. from New York, NY.
Defendant's life care planning expert: Jane Mattson from Norwalk, CT.
Defendant's neurologist expert: George DiGiacinto, M.D. from New York, NY.
**ATTORNEY:**
Plaintiff's: James Wilkens and Edward Bithorn of Duffy & Duffy in Uniondale, NY.

JUDGE: Wilma Guzman

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Bronx

**INJURIES:**
MEDICAL MALPRACTICE - HOSPITAL NEGLIGENCE - FAILURE TO DIAGNOSE EPIDURAL ABSCESS -
TEMPORARY QUADRIPLEGIA - PERMANENT PARALYSIS FROM CHEST DOWN - PERMANENT BLADDER AND
BOWEL INCONTINENCE.

**FACTS:**
In this action, the plaintiff, 53 at time of the incident and 58 at trial, contended that the physicians at the defendant hospital
negligently failed to conduct cervical imaging studies when the plaintiff was having signs and symptoms that were consistent
with an epidural abscess in the cervical area over a ten to 12-day period. The plaintiff contended that as a result, he was rendered
an initial quadriplegic. The plaintiff was able to regain most of the use of his arms after some months of intensive physical
therapy. The evidence disclosed that the plaintiff will permanently be paralyzed from the chest down. Pursuant to a pre-trial
stipulation, the hospital was deemed vicariously liable for any medical departures committed by any of the doctors and/or staff

FIGUEROA vs. MONTEFIORE MEDICAL CENTER, 27 NY. J.V.R.A. 3:C3 (2009)

Case 1:12-cv-09261-LM  Document 43-2  Filed 10/24/14  Page 58 of 89

working there. The plaintiff was admitted to the defendant hospital on September 22nd with severe lower back pain, some difficulties walking and signs of an infectious process, including an elevated white count and fever. The plaintiff maintained that although the more severe complaints related to the lumbar region, there was some cervical component as evidenced by a generalized note in the chart in which a nurse checked the box next to cervical symptoms. The plaintiff indicated that because he was feeling so ill, he could not recall the symptoms about which he complained at the time. The plaintiff also maintained that the signs of infection were indicative of an abscess that was progressively occupying the confined space, compressing on the cord. On September 23rd, the plaintiff had a CAT scan of the lumbar spine. The lumbar CAT scan failed to indicate anything consistent with an infection or infectious process. After reviewing the CAT scan results, a rheumatologist determined that it was unlikely that an infection existed in the plaintiff's lumbar spine. The rheumatologist thought it was possible the plaintiff could have meningitis. Consequently, on September 24th a lumbar tap was performed to determine if the plaintiff had meningitis. The lumbar tap indicated that the plaintiff did in fact have meningitis. The bacteria causing the plaintiff's meningitis was staphylococcus aureus. The plaintiff contended that staphylococcus aureus is also the most common kind of bacteria found in connection with a spinal epidural abscess. On September 25th, an infectious disease specialist evaluated the plaintiff. The plaintiff pointed out that the specialist concluded that the plaintiff could have a spinal epidural abscess. The infectious disease specialist recommended that CAT scans of the plaintiff's spine be conducted to rule out the possibility of an epidural abscess. On September 28th, the plaintiff had a repeat lumbar CAT scan. However, a CAT scan of the cervical spine was not done. The plaintiff contended that his condition steadily deteriorated and that by October 2nd, he could not move his arms or legs. The evidence reflected that for the first time on October 3rd a neurologist examined the plaintiff. The neurologist concluded based on the physical exam, that the plaintiff did not have a central nervous system infection. The neurologist concluded that the cause of the plaintiff's extremity weakness was a muscular cause.

On October 7th, a CAT scan of the plaintiff's cervical spine was conducted. This CAT scan indicated that the plaintiff was and had been suffering from an abscess in his cervical spine. The plaintiff underwent a decompression of the spine, which the plaintiff contended is a relatively low risk procedure. The plaintiff maintained that by time the surgery took place, however, the damage caused by the abscess was irreversible. The defendant contended that the plaintiff's signs and symptoms upon presentation were vague and denied that the plaintiff's claims that deviations had occurred should be accepted. The defendant further maintained that irrespective of the issue of whether a cervical abscess should have been detected in the later portions of the hospitalization; there was an absence of proximate cause.

The plaintiff suffered temporary quadriplegia and after several months of difficult physical therapy, he regained movement of upper limbs; not as effectively, but he has function of the upper arms. The plaintiff will be permanently paralyzed from chest down. The plaintiff also maintained that he will permanently suffer bladder and bowel incontinence. The plaintiff contended that he will permanently require living in a residential setting. The plaintiff is married and has three children. The jury found that the defendant departed from good and accepted medical practice by failing to perform a timely CAT scan or MRI of the cervical spine to rule out the possibility of a cervical abscess. They then awarded $22,903,000, including $280,000 for past lost earnings, $3,000,000 for past pain and suffering, $12,000,000 for future pain and suffering, $2,500,000 to the wife for loss of services and $5,123,500 for future costs of care.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 27, Issue 3

---

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:13-cv-06361-LM Document 43-2 Filed 10/24/14 Page 59 of 89

JVR No. 170319, 1996 WL 45463 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West

Supreme Court, Twelfth Judicial District, Bronx County, New York.

BERMUDEZ v. RUIZ; MARBA FURNITURE CO.

N/A

DATE OF INCIDENT: February, 1986

DATE OF TRIAL: January, 1996

TOPIC:

LIABILITY:

General: BICYCLE & VEHICLE

Specific: Broadside Collision

**SUMMARY**

**Outcome: Plaintiff Verdict**

**Total Verdict: $80,500,000**

**EXPERT-WITNESSES:**

**ATTORNEY:**

Plaintiff: Ivan S. Schneider / New York, NY

JUDGE:

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York

COUNTY: Bronx

**PRIMARY INJURY: Severe Mental Deficiency**

**SECONDARY INJURY: Quadriplegia**

**SUMMARY**

**PLAINTIFF:**

Sex: Male

Age: 13

**DEFENDANT:**

Type: Combination of Individual(s) and organization(s)

Sex: Male / Organization

Organization Type: NA / Transportation-Trucking and Warehousing

Age: NA / NA

Race: NA / NA

General Occupation: General Laborer / NA

Occupational Field: Transportation-Trucking and Warehousing / NA

Insurance: NA / NA

Policy Limit: NA / NA

**DAMAGES:**
Other: $80,500,000

Total: $80,500,000

**FACTS:**
A 13-year-old male suffered left brain damage, requiring extensive surgery, and paralysis when he was struck by a truck operated by the male defendant on behalf of the co-defendant furniture company as he rode his bicycle. The plaintiff was comatose for months and presently has only the use of his left hand and is unable to speak.

Jury Verdict Research
COURT: Supreme

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:13-cv-00261-LM Document 43-3 Filed 10/24/14 Page 61 of 89

17 NY. J.V.R.A. 8:C1, 2000 WL 36096206 (N.Y.Sup.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.

Supreme Court, Second Judicial District, Kings County, New York.

PLAINTIFF vs. DEFENDANT

N/A

DATE OF VERDICT/SETTLEMENT: June 30, 2000

TOPIC: MEDICAL MALPRACTICE - FAILURE TO APPRECIATE SIGNS OF IMPENDING SUBARACHNOID HEMORRHAGE AND RUPTURED ANEURYSM - SEVERE BRAIN DAMAGE SUFFERED BY 23-YEAR-OLD MALE - QUADRIPLEGIA.

**SUMMARY:**
Result: $41,444,531 VERDICT

**EXPERT WITNESSES:**
Plaintiff's expert emergency room physician/internist: Craig
**ATTORNEY:**
Plaintiff's: Robert J. Bohner and Frank J. Livoti of Shaw Liccitra Bohner Escernio & Schwartz in Garden City.

JUDGE: Jules Spodek

RANGE AMOUNT: $5,000,000-999,999,999

STATE: New York
COUNTY: Kings

**INJURIES:**
MEDICAL MALPRACTICE - FAILURE TO APPRECIATE SIGNS OF IMPENDING SUBARACHNOID HEMORRHAGE AND RUPTURED ANEURYSM - SEVERE BRAIN DAMAGE SUFFERED BY 23-YEAR-OLD MALE - QUADRIPLEGIA.

**FACTS:**
This was a medical malpractice action in which the male plaintiff in his early 20's contended that the defendant hospital's nurses and physicians negligently failed to consider a rupture of a cerebral aneurysm and subarachnoid hemorrhage as a differential diagnosis when the plaintiff presented with the sudden onset of mid-back pain radiating to the head and vomiting which commenced approximate 45 minutes later. The plaintiff contended that the initial symptoms were probably a "Sentinel bleed" that would not be catastrophic and which provided warnings of an impending "Blow out" bleed. The plaintiff maintained that an immediate CAT scan should have been ordered which would have shown an expanding mass requiring immediate evacuation and that until surgery could be commenced, medication to control the blood pressure and reduce brain swelling, expanding the window of opportunity for surgical intervention, should have been administered. The plaintiff contended that as a results of the defendants' deviations in this regard, he suffered a catastrophic blow-out bleed approximately 3 1/2 hours after presenting to the hospital, sustaining severe brain damage which has left him quadriplegic and unable to talk. The plaintiff contended that although the brain damage left him with a severe impairment of his intellectual, emotional and cognitive abilities, he does have a level of awareness which is sufficient to reflect pain and suffering and a loss of enjoyment of life. The plaintiff is unmarried.

The evidence disclosed that the plaintiff had been a mechanic in the employ of an elevator maintenance company and had been assigned to work at the defendant hospital. The plaintiff contended that while he was working near the emergency room at

PLAINTIFF vs. DEFENDANT, 17 NY. J.V.R.A. 8:C1 (2000)

Case 1:13-cv-00261-JM   Document 43-3   Filed 10/24/14   Page 62 of 89

about 11:30 A.M., he experienced sudden, severe back pain which radiated up to his head and that he reported these symptoms to a triage nurse. The plaintiff's expert neurologist related the cerebral spinal fluid circulates through the entire subarachnoid space from the brain down along spinal cord and contended that the radiating pain from the back to the head was caused by the irritation of the blood in the cerebral fluid.

The plaintiff maintained that the sudden onset of back pain radiating to the head, causing severe headache, is a classic sign of a subarachnoid hemorrhage and that in view of the absence of any prior history of headaches which could account for these symptoms, the triage nurse should have summoned a resident immediately. The plaintiff further contended that once vomiting commenced, it was particularly clear that an ominous event was occurring.

The plaintiff further contended that the resident, whom the plaintiff contended was summoned prior to 1:30 P.M., failed to appreciate the critical nature of the plaintiff's situation. The plaintiff contended that a CAT scan was not ordered until after the blow-out occurred and that no preparations for surgery had

been made or medication given to reduce blood pressure until 4:30 P.M., after the plaintiff had already suffered the catastrophic blow-out and slipped into a coma.

The plaintiff contended through two co-workers, including his bother, who were with him during a portion of this time that during the afternoon, his condition appeared to deteriorate and that he became progressively weaker. The plaintiff's experts neurologist, emergency room physician and neurosurgeon each maintained that it was clear that the bleed was expanding and that the emergent nature of the condition continued to heighten until the blow-out occurred between 3:00 and 3:30 P.M. The defendant triage nurse contended that when the plaintiff presented at 11:40 A.M., he advised of " Pressure" on his back only and denied that he complained of severe pain, headache or vomiting until shortly before the nurse went on break at 1:10 P.M. and was relieved by another nurse. There was no evidence as to the identity of this subsequent nurse. The initial nurse contended that she gave the history to the relieving nurse, but conceded that she did not advise her to summon a physician. The plaintiff maintained that the initial triage nurse's notes reflected a finding of headache at 12:30 and contended that in view of this factor, the triage nurse's testimony should be rejected. The plaintiff further maintained that the history taken by the resident from the patient reflected that the back pain which radiated to the head had commenced at 11:40. The plaintiff contended that it was clear that the defendant's personnel failed to recognize the emergent nature of the plaintiff's symptoms and take appropriate action. The defendant contended that the standard of care would permit the physicians to wait 24 hours to stabilize a patient before performing surgery, contending that the chances of a blow-out occurring within this period are relatively small and that the benefits of stabilizing the patient are great. The plaintiff countered that if the defendant's staff had recognized the emergency and conducted appropriate testing including a timely CAT scan, they would have ascertained that the plaintiff was suffering from an expanding mass and that immediate evacuation was necessary. The plaintiff further contended that the defendant's staff failed to take any steps to expand the window of opportunity, such as giving medication to control blood pressure, and contended that in view of this factor, its contention that it was acceptable to wait 24 hours should be strongly rejected. The plaintiff's experts related that it is essential to control blood pressure after a sentinel bleed because the weakness in the vessel would render it less able to withstand higher blood pressure. The plaintiff's experts further contended that had the resident ordered such medication and arranged for surgery when first advised of the situation, it was very likely that a repair could have been performed in sufficient time to avert the catastrophic event.

The plaintiff maintained that the triage nurse's notes reflected that the resident was summoned at prior to 1:30 P.M. The resident contended that he was not brought into the case until 2:05 P.M., pointing to his records to support this position. The plaintiff contended that the discrepancy in the records regarding the time

at which the resident first saw the patient rendered the defendant hospital's position suspect. The plaintiff also contended that although the resident indicated that he had discussions with the attending physician, the attending physician's EBT reflected that she had no recollection of this case. The plaintiff maintained that in view of the tragic nature of the case, it was very surprising that the attending physician could not recall the case. The plaintiff argued that either the defendant resident's contentions that

PLAINTIFF vs. DEFENDANT, 17 N.Y. J.V.R.A. 8:C1 (2000)

Case 1:13-cv-00261-LM   Document 43-3   Filed 10/24/14   Page 63 of 89

he had such a conversation with the attending was inaccurate, or that the attending's denial of having a recollection of such a conversation with the attending was untrue, arguing that the defendant's position was suspect in either case.

The defendant further maintained that an angiogram, which the defendant contended would take several hours to complete, should be conducted prior to surgery in order to provide a surgical "road map" to the aneurysm. The plaintiff contended that the CAT scan report reflected the area of the aneurysm and contended that this "map" was sufficient. The plaintiff further contended that after the blow-out occurred, the defendant immediately performed surgery without the use of an angiogram and maintained that the defendant's contentions in this regard should be rejected. The plaintiff contended that when the blow-out occurred, he suffered catastrophic brain damage which has left him quadriplegic and unable to talk. The plaintiff maintained that although the brain damage was severe, the plaintiff has the capacity for some awareness and the plaintiff made a claim for pain and suffering and loss of enjoyment of life. The defendant denied that the plaintiff has the capacity to experience pain and suffering or a loss of enjoyment of life. The plaintiff's mother testified that when she spoke of the plaintiff's father's death, which occurred after the hemorrhage, the plaintiff appeared to cry and that he cries when he experiences pain. The plaintiff also contended that the jury could determine from a day-in-the-life video that the plaintiff did, in fact, have some awareness. In the video, a nurse's aide initially brushed the plaintiff's teeth and he gave no resistance. The plaintiff contended that the jury could observe that when the aide returned moments later with a different instrument to do more detailed flossing type work between the teeth, the plaintiff closed his lips tightly in an apparent attempt to prevent the nurse's aide from continuing.

The plaintiff also contended through the plaintiff's life care planner that the plaintiff, who is fed through a tube, will require permanent round-the-clock care and the plaintiff's economist discussed approximately $25,000,000 in economic damages, including the cost of care and loss of income and benefits.

The jury found for the plaintiff and awarded $41,444,531, including $9,000,000 for past pain and suffering and loss of enjoyment of life, $570,000 for past lost earnings, $3,922,581 for future lost earnings, and $7,951,950 for future costs of care.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: New York Jury Verdict Review & Analysis, Vol. 17, Issue 8

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vito Saladino and Annmarie Saladino v. Stewart &..., 2010 WL 4926826...

Case 1:13-cv-00261-LM Document 43-3 Filed 10/24/14 Page 64 of 89

2010 WL 4926826 (E.D.N.Y.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
United States District Court, E.D. New York.

Vito Saladino and Annmarie Saladino v. Stewart & Stevenson Services, Inc.,
Stewart & Stevenson Technical Services, Inc. and Stewart & Stevenson Tug

No. 01-CV-7644
DATE OF VERDICT/SETTLEMENT: July 26, 2010
TOPIC: AVIATION - AIRPLANE ACCIDENTS - PRODUCTS LIABILITY - FAILURE TO WARN

Airport Baggage Cart too Dangerous for Use, Suit Alleged

**SUMMARY:**
RESULT: Verdict-Plaintiff

Award Total: $40,190,417

In November 2008, the jury found Stewart & Stevenson Services, Inc., Stewart & Stevenson Technical Services, Inc. and Stewart & Stevenson Tug, LLC to be 30 percent liable. The jury found American Airlines, Inc. to be 70 percent liable.

In July 2010, the jury awarded Vito Saladino $39,440,417.20 and Annmarie Saladino $750,000. The award total was $40,190,417.20. American Airlines will be responsible for 70 percent of the verdict while Stewart & Stevenson will be responsible for 30 percent.

**EXPERT WITNESSES:**
Plaintiff: Adam Stein, M.D.; Physical Medicine; Great Neck, NY Alan M. Leiken, Ph.D.; Economics; Stony Brook, NY William Burke, Ph.D.; Life Care Planning; Portsmouth, NH
Defendant: Charles Manning, Ph.D.; Engineering; Raleigh, NC Edmond Provder; Life Care Planning; Hackensack, NJ Frank Tinari, Ph.D.; Economics; Livingston, NJ Steven Kirshblum, M.D.; Physical Medicine; West Orange, NJ
**ATTORNEYS:**
Plaintiff: Kevin B. McAndrew; McAndrew, Conboy & Prisco; Woodbury, NY (Annmarie Saladino, Vito Saladino); William J. Poisson; Poisson & Hackett; Garden City, NY (Annmarie Saladino, Annmarie Saladino, Vito Saladino, Vito Saladino); Nadia M. Chionchio; McAndrew, Conboy & Prisco; Woodbury, NY (Annmarie Saladino, Vito Saladino); Jonathan I. Edelstein; Law Office of Jonathan I. Edelstein, New York, NY, of counsel to McAndrew Conboy & Prisco, Woodbury, NY; New York, NY (Annmarie Saladino, Vito Saladino)
Defendant: Marc J. Citrin; Shaub, Ahmuty, Citrin & Spratt, L.L.P..; Lake Success, NY (American Airlines Inc., American Airlines Inc.); David S. Rutherford; Renzulli & Rutherford, L.L.P.; New York, NY (American Airlines Inc.); Timothy I. Duffy; Coughlin Duffy; Morristown, NJ (Stewart & Stevenson Services Inc., Stewart & Stevenson Technical Services Inc., Stewart & Stevenson Tug); Mark K. Silver; Coughlin & Duffy; Morristown, NJ (Stewart & Stevenson Services Inc., Stewart & Stevenson Technical Services Inc., Stewart & Stevenson Tug); Michael J. Sullivan; Coughlin & Duffy; Morristown, NJ (Stewart & Stevenson Services Inc., Stewart & Stevenson Technical Services Inc., Stewart & Stevenson Tug)

JUDGE: Sandra L. Townes

RANGE AMOUNT: $5,000,000-999,999,999

Vito Saladino and Annmarie Saladino v. Stewart &..., 2010 WL 4926826...

Case 1:13-cv-00261-LM   Document 43-2   Filed 10/24/14   Page 65 of 89

STATE: New York
COUNTY: Not Applicable

**INJURIES: Salandino was diagnosed with multiple cervical spine fractures, spinal instability, spinal cord compression and a spinal cord injury. He underwent a C4 hemi corpectomy, C5 total corpectomy, microdiscectomies, spinal cord decompression and fusion. He underwent extensive rehabilitation and was hospitalized for bedsores. Saladino was rendered a quadriplegic as a result of the accident. He requires 16 hours of nursing care and eight hours of home health aide assistance. His past medical expenses totaled $4,908,108, which was paid by workers compensation.**

Facts:
On Jan. 17, 1999, plaintiff Vito Saladino, 36, a flight service clerk for American Airlines, Inc., was a passenger in a baggage tractor manufactured by Stewart & Stevenson and driven by a fellow American Airlines employee, Daniel Snow, at John F. Kennedy International Airport in Jamaica. The baggage tractor passed behind an aircraft that was undergoing an engine idle run up. As the tug approached the aircraft from the right, it encountered jet wash from the idling engine. The jet wash blew the hood of the tug upward, rotated 180 degrees and struck Saladino on the head. As a result of the accident, Saladino became a quadriplegic. The subject tug was a Stewart & Stevenson model BT345G.

Saladino sued Stewart & Stevenson Services, Inc., Stewart & Stevenson Technical Services, Inc. and Stewart & Stevenson Tug, LLC, alleging failure to warn. The Stewart & Stevenson defendants named American Airlines, Inc. as a third-party defendant.

Plaintiff's counsel stated that the cab of the tug could be removed at any time and the hood of the tug was manufactured with a hinge that had a near 180 degree arc of movement. Plaintiff's counsel argued that Stewart & Stevenson knew that the hood could breach the passenger compartment. Plaintiff's counsel argued that Stewart & Stevenson knew that the hinges could be constructed with stops that restricted the range of motion. There was no warning not to remove the cab nor was there any sign on the cab reflecting that it was a safety device. There were no warnings on the product itself or in any manuals or bulletins warning users that the hood might rotate into the passenger compartment if the cab were not present. Saladino and Snow believed that the hinges were like regular car hinges on the hood, which can only open halfway.

Defense counsel for Stewart & Stevenson argued that the company was not liable to Saladino on a failure to warn claim. At the time the tractor was sold to American Airlines, the hood of the tractor was designed to be secured by two rubber side latches. In addition, the tractor was fitted with a steel cab that encased the passenger compartment. Sometime during the summer of 1990, Stewart & Stevenson installed a third latching mechanism in the center of the tractor's hood. Between May 1990 and Jan. 17, 1999, the tractor was in the sole possession of, used by, and maintained by American Airlines. It was inspected on a monthly basis by American Airlines personnel. Additionally, because all vehicles operating on airport property are required to have Port Authority of New York (PONY) license plates, the tractor was inspected on a yearly basis by PONY personnel, defense counsel for Stewart & Stevenson argued.

Defense counsel for Stewart & Stevenson argued that on Oct. 14, 1998, approximately three months before Saladino's accident, the tractor was involved in a prior accident in which the cab was crushed and then subsequently removed. As a result of that accident, the tractor was brought to American Airlines's maintenance shop for repair. Repairs began on or about Nov. 1, 1998. Because the tractor required repairs that were expected to take a long time, American Airlines removed the PONY license plates, took the vehicle out of service by placing a red "out of service" tag on the steering wheel, and parked the tractor outside of Hangar 10, Stewart & Stevenson counsel argued. American Airlines's removal of the PONY license plates was purportedly the airline's attempt to ensure that no one would use the vehicle while it was in need of repair.

Defense counsel for Stewart & Stevenson argued that because the tractor was already in for repairs, American Airlines decided to perform a "total refurbishment" of the tractor. Repairs on the unit took place periodically between Nov. 1, 1998 and Dec. 17, 1998, but the repairs were not completed because repairs to other equipment took priority. During the repair period, the steel cab, the side panels, fenders, and hood latches were not attached to the unit, defense counsel for Stewart & Stevenson argued.

Vito Saladino and Annmarie Saladino v. Stewart &..., 2010 WL 4926826...

Case 1:13-cv-00261-LM   Document 43-3   Filed 10/24/14   Page 66 of 89

Counsel for Stewart & Stevenson claimed that on Jan. 3, 1999, American Airlines's repair personnel discovered that they were unable to locate the tractor. Eventually, airline personnel determined that the vehicle had been taken from the repair facility without permission by a person or persons unknown sometime between Dec. 21, 1998, and Dec. 31, 1998, according to counsel for Stewart & Stevenson. The repairs that began on or about Nov.1, 1998, were not completed and the tractor remained missing until Jan. 17, 1999.

Counsel for Stewart & Stevenson stated that Saladino and Snow found the tractor, it no longer had a red "out of service" tag on the steering wheel, nor was it fitted with a cab. Additionally, at least one, if not both, of the front side panels of the engine compartment were missing. Finally, the side hood latches were damaged/modified and were not functional and the center hood latch was missing, counsel for Stewart & Stevenson stated. In fact, according to Snow's testimony, the hood was tied down with a baggage strap.

Counsel for Stewart & Stevenson stated that despite the tractor being in an obvious and extreme state of disrepair, Snow, with Saladino riding as a passenger, drove the tractor across the tarmac to their assignment. Upon completion of their task, Snow, with Saladino again riding as a passenger, drove back across the tarmac and began to approach the aircraft that was parked near another gate. American Airlines's personnel failed to properly alert airport personnel that a jet engine test was being performed, counsel for Stewart & Stevenson argued.

Counsel for Stewart & Stevenson argued that none of the events described above were reasonably foreseeable to the manufacturer. Moreover, to the extent that Saladino utilized the tractor in a dilapidated condition, Saladino was a trained, knowledgeable user of the product and aware of dangers created by American Airlines's dismantling of the tractor.

Defense counsel for Stewart & Stevenson noted that at trial Saladino admitted that he was given specific training regarding the safe use of baggage tractors at the time of his initial hire, that he received additional training on a monthly basis, that he knew the importance of keeping baggage tractors away from running jet engines, that he knew the importance of securing a tractor's side rubber hood latches and that common sense told him that the unlatched latches should be latched down. He also admitted that he knew that there was a risk that the hood would not be kept down if the latches were not functional, that he was able to distinguish the difference between baggage tractors with operational latches and baggage tractors with missing or broken latches, that he admitted to intentionally operating baggage tractors with missing or broken latches during his nine years of service with American Airlines and that he was trained about the dangers of jet wash. He admitted that he that knew that "jet wash could hurt you if you get too close to a plane," that he knew that the force of jet wash "could move objects around," that he knew that jet wash could cause the hood of a baggage tractor to open and that he knew that jet wash could cause a hood on a baggage tractor to blow back towards the operator. Saladino admitted that he knew that jet wash could cause a hood of a baggage tractor to blow off, that he knew that if jet wash could cause a hood of a baggage tractor to blow off, that it could cause injury, that he was aware of the warnings on the tractors, specifically that he was responsible for the safe operation of the vehicle, and that he knew that the user of a baggage tractor - whether driver or occupant - was supposed to conduct a "walk-around" prior to using the vehicle. He admitted, according to defense counsel for Stewart & Stevenson, that that he knew it was inappropriate to use a piece of equipment if the PONY license plates were not present and that the result of all his training and his nine years of experience with baggage tractors, at the time of the accident, he considered himself a "knowledgeable user" of the tractor.

Snow testified that as he approached the airplane while he was driving the tractor, Saladino said to him, "[B]e careful, don't drive too fast because the hood could come up."

The defendants argued that Saladino was a knowledgeable user and no warning was necessary, according to plaintiffs' counsel.

Annmarie Saladino had a claim for loss of consortium.

ALM Properties, Inc.

COURT EXHIBIT

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
VITO SALADINO & ANNMARIE SALADINO,

                     PLAINTIFFS,

      - against -

STEWART & STEVENSON SERVICES, INC.,
STEWART & STEVENSON TECHNICAL
SERVICES, INC., STEWART & STEVENSON TUG,
& AMERICAN AIRLINES, INC.,

                     DEFENDANTS.
-------------------------------------------------------------------x

**VERDICT SHEET**

CV 01-7644 (SLT)

Please answer the following questions:

(1)    State separately the amount awarded for the following items of damages, if any, up to the date of your verdict:

        (a) Pain and Suffering To Date;          $ 5,000,000
        (b) Health Care Expenses To Date;     $ 4,908,108.20
        (c) Lost Earnings to Date.            $ 532,309

*If you decide not to make an award as to any of the above items, you will insert the word "None" as to that item.

**Your answer to this question must be unanimous.

(2)    State separately the amount awarded for the following items of damages, if any, from the date of your verdict to be incurred in the future:

        (a) Future Pain and Suffering;         $ 10,000,000
        (b) Future Health Care Expenses;      $ 18,000,000
        (c) Future Lost Earnings.            $ 1,000,000

*If you decide not to make an award as to any of the above items, you will insert the word "None" as to that item.

**Your answer to this question must be unanimous.

                                        Page 1 of 2

(3)  If you have made any award for amounts intended to compensate the Plaintiff Mr.
     Saladino for damages to be incurred in the future, then for each item for which an award
     is made, state the period of years over which such amounts are intended to provide
     compensation.

     (a) Future Pain and Suffering;                    _24_ years
     (b) Future Health Care Expenses;                  _24_ years
     (c) Future Lost Earnings.                         _14_ years

     *If you decide not to make an award as to any of the above items, you will insert the word
     "None" as to that item.

     **Your answer to this question must be unanimous.

(4)  State the amount awarded to Mrs. Saladino for loss of consortium:

     $ 150,000 

     *If you decide not to make an award as to this item, you will insert the word
     "None" in the space provided.

     **Your answer to this question must be unanimous.

Jena B. Blechman          7/26/2010

Page 2 of 2

2011 WL 4068268 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
WEST'S JURY VERDICTS - PENNSYLVANIA REPORTS

$23M Verdict Against Hospital in Med Mal Suit

Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

McGill v. Roxborough Mem'l Hosp.

**Type of Case:**
Medical Malpractice-Procedures & Treatment • Failure to Diagnose/Treat

Medical Malpractice-Procedures & Treatment • Medication

Medical Malpractice-Procedures & Treatment • Brain

Medical Malpractice-Physicians & Health Professionals • Emergency Physician

Medical Malpractice-Physicians & Health Professionals • Neurologist

Medical Malpractice-Physicians & Health Professionals • Radiologist

Medical Malpractice-Facility • Hospital

Vicarious Liability

**Specific Liability:** Health care providers failed to diagnose and timely treat patient's viral encephalitis

**General Injury:** Brain damage; medical expenses; lost wages; loss of earning capacity

**Jurisdiction:**
State: Pennsylvania
County: Philadelphia

**Related Court Documents:**
Plaintiff's complaint: 2008 WL 8604132

Defendants Tenet Healthsystem and Roxborough Memorial's joinder complaint: 2009 WL 8235286

Defendant Sapra's memorandum of law in support of response to plaintiff's motion *in limine*: 2008 WL 8604143

Defendant White's memorandum of law in support of motion *in limine*: 2011 WL 3154263

Verdict form: 2011 WL 3154007

Case Name: Mary McGill, Guardian of Moira Shaughnessy, an incompetent person v. Roxborough Memorial Hospital, Solis Healthcare LP, Tenet Healthsystem Roxborough LLC, Brian Silverman, MD, Ravi Sapra, MD, Robert Worthington-Kirsch, MD, Jennifer White, DO, Lawrence Livornese, MD, and Delaware Valley Infectious Disease Associates PC v. Roxborough Emergency Physician Associates LLC

**Docket/File Number:** 081204060

**Verdict: Plaintiff, $23,000,000.00**

**Verdict Range:** $5,000,000 - 999,999,999

**Verdict Date:** March 17, 2011

**Judge:** George W. Overton
**Attorneys:**
Plaintiff: Stephen E. Raynes, James F. Mundy and Jennifer Almquist Engelbrecht, Raynes McCarty Law Firm, Philadelphia, Pa.
Defendants (Tenet Healthsystem and Roxborough Memorial): Timothy I. McCann and Anne E. Pedersen, McCann & Geschke, Philadelphia, Pa.
Defendant (Sapra): Kevin H. Wright and Mark P. Merlini, Kevin H. Wright & Associates, Lansdale, Pa.
Defendants (Silverman, White and REPA): Nancy K. Raynor and Ellen Q. Suria, Raynor & Associates, Malvern, Pa.

**Trial Type: Jury**

**Experts:**
Plaintiff: Alexander McMeeking, MD, infectious diseases, New York City, N.Y.; Michael Rubenstein, MD, neurologist, Jenkintown, Pa.
Defendant (Sapra): Christine Emery, MD, neuroradiologist, Hockessin, Del.; Luther Rhodes III, MD, infectious diseases, Allentown, Pa.

**Breakdown of Award:**
**$23,000,000.00 to plaintiff from defendant Roxborough Memorial Hospital for damages**

**Summary of Facts:**
Moira Shaughnessy reportedly went to the Roxborough Memorial Hospital emergency room Jan. 2, 2007, at 12:55 p.m., exhibiting an altered mental status, a left facial droop, aphasia, fever and disorientation, as well as symptoms consistent with a viral infection. According to Mary McGill, Shaughnessy's sister, Alan Silverman, MD, an emergency physician, saw Shaughnessy at 1:15 p.m. and "documented an initial diagnosis of altered mental status and rule out encephalitis."

McGill said a neurology consult was requested but the consultation by Ravi Sapra, MD, a neurologist, was not performed until 3:30 p.m. A lumbar puncture, performed by Robert Worthington-Kirsch, MD, a radiologist, at 4 p.m., reportedly was consistent with viral encephalitis, but Acyclovir allegedly was not given.

Jennifer White, DO, an emergency physician, reportedly examined Shaughnessy at 6 p.m. and ordered Acyclovir after a conversation with the infectious disease consultant, Lawrence Livornese, MD. According to McGill, the Acyclovir was not immediately given, Livornese did not conduct an in-person consultation until 8:30 p.m., and a nurse noted at 10 p.m. that she was still waiting on the Acyclovir from the hospital pharmacy.

Shaughnessy reportedly did not receive the Acyclovir until 11 p.m. and sustained injuries to her brain, including severe amnesia, loss of recent memory and loss of cognitive and linguistic function. McGill said Shaughnessy was rendered totally incapacitated.

McGill, as guardian of her sister, filed a lawsuit against Roxborough Memorial, Solis Healthcare LP and Tenet Healthsystem Roxborough LLC, the alleged owners and operators of the hospital, Silverman, Sapra, Worthington-Kirsch, White, Livornese and Livornese's employer, Delaware Valley Infectious Disease Associates PC in the Court of Common Pleas of Philadelphia County.

The plaintiff alleged the defendants failed to diagnose and timely treat Shaughnessy's viral encephalitis and failed to timely administer Acyclovir. She also alleged the entities failed to provide competent physicians and were vicariously liable for their employees' negligence. In addition, she claimed Livornese and his employer failed to promptly provide the requested consult and failed to recognize that the Acyclovir had been ordered but not yet given.

The plaintiff sought damages for medical expenses, lost wages, lost earning capacity, pain and emotional distress.

Tenet Healthsystem and Roxborough Memorial filed a joinder complaint against Roxborough Emergency Physicians Association (REPA), asserting the entity was the employer of Silverman and White and was vicariously liable for the treatment they rendered that was not in accordance with the standard of care.

Sapra and White argued that an earlier administration of Acyclovir would not have changed Shaughnessy's outcome.

The case proceeded to a jury trial with only Roxborough Memorial, Silverman and White remaining as defendants, and the jury determined all of the defendants were negligent but only the hospital's negligence was a factual cause of the plaintiff's damages. The jury attributed 100 percent of the causal negligence to the hospital and awarded the plaintiff $23,000,000 in damages March 17, 2011.

Court: Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:13-cv-00361-LM Document 43-3 Filed 10/24/14 Page 72 of 89

26 Pa. J.V.R.A. 12:C1, 2008 WL 9358353 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

MONTANEZ vs. TEMPLE HEALTH SYSTEM ET AL.

05-03-3412
DATE OF VERDICT/SETTLEMENT: August 18, 2008
TOPIC: MEDICAL MALPRACTICE - DELAY IN DIAGNOSIS OF BRAIN TUMOR - BRAIN HERNIATION - EMERGENCY CRANIOTOMY - PERMANENT BRAIN DAMAGE TO 21-YEAR-OLD MOTHER - BLINDNESS - RIGHT-SIDE PARALYSIS - COGNITIVE IMPAIRMENT.

**SUMMARY:**
Result: $11,200,545 VERDICT

**EXPERT WITNESSES:**
Plaintiff's emergency medicine expert: Peter G. Paige
**ATTORNEY:**
Plaintiff's: Kenneth M. Rothweiler and Daniel Jeck of Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., in Philadelphia, PA.
Defendant's: Charles A. Fitzpatrick, III of Rawle & Henderson in Philadelphia, PA.

JUDGE: Nita I. Quinones Alejandro

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania
COUNTY: Philadelphia

**INJURIES:**
MEDICAL MALPRACTICE - DELAY IN DIAGNOSIS OF BRAIN TUMOR - BRAIN HERNIATION - EMERGENCY CRANIOTOMY - PERMANENT BRAIN DAMAGE TO 21-YEAR-OLD MOTHER - BLINDNESS - RIGHT-SIDE PARALYSIS - COGNITIVE IMPAIRMENT.

**FACTS:**
This was a medical malpractice action filed against Temple Health System, its hospitals and three emergency room physicians, alleging delay in diagnosis and treatment of a brain tumor in a 21-year-old female. The plaintiff alleged that the defendant doctors failed to order brain imaging studies on three separate emergency room visits, despite the plaintiff's continued complaints which signaled neurological problems. As a result, the plaintiff alleged that she suffered a brain herniation and has been left with significant permanent brain damage. The defendants maintained that the doctors made a reasonable diagnosis based on the symptoms present and that the plaintiff's care met the required standard. The defense also argued that the plaintiff's current condition resulted from the brain tumor itself and the surgery required to remove the tumor, not from any alleged delay in diagnosis.

In March, 2004, shortly after the birth of her daughter, the plaintiff claimed that she began to experience problems with her right arm and hand and had trouble holding and grasping small objects. Next, the plaintiff contended that she began to experience

unrelenting headaches. The plaintiff called her primary care physician and reported these and other symptoms. The nurse on duty advised the plaintiff to immediately to go to the emergency room.

As directed, on March 23, 2004, the plaintiff presented to the defendant Temple-Episcopal Hospital. Her complaints were documented as vomiting, headaches, and numbness in her right hand and down her arm. The first defendant emergency room physician examined the plaintiff. The plaintiff argued that the defendant emergency room physician negligently failed to order a CAT scan or MRI of the brain. Instead, the first defendant doctor diagnosed the plaintiff with nausea/vomiting and sent her home.

The next morning, March 24, 2004, the plaintiff again called her primary care physician. She relayed that she had been vomiting overnight, that she now had diarrhea and still had decreased strength in her arm. The nurse on duty advised her to go to the emergency room and to be certain that the emergency room doctor was aware of her arm weakness. The plaintiff next went to the defendant Temple-Northeastern Hospital where, after a claimed wait of three hours, she was evaluated by the second defendant emergency room physician. The plaintiff allegedly reported arm and leg numbness, as well as numbness in her lips, nausea and vomiting, and severe migraine headaches. The second emergency room physician was aware that the plaintiff had been to the emergency department one day earlier. The second defendant doctor did not document an evaluation of the plaintiff, details of his neurologic examination or complaints of headache. The plaintiff contended that although she had a normal respiratory rate, the second defendant doctor diagnosed the plaintiff with hyperventilation syndrome. Based on elevated serum HCG lab results, the second defendant doctor also diagnosed the plaintiff as being pregnant.

The plaintiff claimed that the headaches, weakness and numbness persisted. Just prior to midnight on the following day, March 25, 2004, the plaintiff reported back to the defendant Temple Northeastern Hospital Emergency Room with a recorded complaint of "can't keep anything down". The plaintiff was then examined by the third emergency room physician. The third defendant physician learned from the plaintiff that she had presented to the emergency department the day before. He documented only that he checked her previous lab results. He did not document any further discussion of her symptoms on the previous two days, nor did he document her complaints of headache and of extremity weakness and numbness. The plaintiff argued that the third defendant doctor made no effort to obtain the records from either of the previous two emergency room visits.

The third defendant doctor repeated the plaintiff's HCG test, which was again positive for pregnancy. The third defendant doctor diagnosed the plaintiff with a urinary tract infection and pregnancy and sent her home. Less than six hours later, at approximately noon on March 26, 2004, the plaintiff lost consciousness at home and fell down a flight of steps. She was taken by ambulance to Temple University Hospital where she arrived not speaking and staring straight ahead. She was intubated and taken for a CT-scan of the head. The CT-scan demonstrated a mass (tumor) on the left side of her brain with evidence of brain herniation. The plaintiff received immediate treatment and, after further decline in her neurological status, on March 27, 2004, she underwent an emergency craniotomy. The tumor was successfully removed. However, the plaintiff claimed that due to the delay in the diagnosis and treatment of the tumor, the plaintiff's brain herniated. The herniation resulted in a series of infarcts or strokes that have caused permanent and irreversible brain damage, according to the plaintiff's doctors.

The plaintiff's doctors testified that the plaintiff is now blind, paralyzed on her right side and cognitively impaired as a result of ischemic brain injury. Pathology of the tumor determined this mass to be metastatic choriocarcinoma, a rapidly developing gynecologic cancer. Most fortunately, choricarcinoma is exquisitely sensitive to therapy and is curable. More than four years after treatment, the plaintiff remains cancer free and is cured. The gynecological cancer was apparently triggered by an incomplete pregnancy.

The plaintiff's emergency medicine expert testified that defendants were negligent by their failure to take an adequate and thorough history and by their failure to recognize and appreciate the nature of the signs, symptoms and complaints, which were potentially consistent with a neurological emergency and perform imaging to rule it out. With timely head imaging studies, the plaintiff's brain mass would have been discovered and appropriate steroid therapy and removal of the tumor would have stabilized her increasing intracranial pressure before herniation occurred, according to the plaintiff's claims. The

plaintiff's neuroradiologist concluded from the radiographic and clinical evidence that the plaintiff suffered brain herniation and irreversible neurological damage some time after the third defendant doctor discharged her from the Temple-

Northeastern Hospital Emergency Room and before her fall. The tumor was clearly present on the imaging and would have been identified if defendants would have chosen to order the imaging, according to this expert.

The plaintiff's physical medicine/rehabilitation expert testified that in addition to her blindness, the plaintiff is confined to her bed and, at times, a wheelchair, due to the inability to move or sense the entire right side of her body. She is incontinent of both the bladder and the bowel and wears diapers. Because she is brain damaged and sedentary, the plaintiff has gained more than 200 pounds since her injury and is at risk for skin breakdown and infection, according to testimony offered.

The plaintiff's neuropsychologist testified that the plaintiff's brain damage, in addition to accounting for her blindness, has resulted in, among other things, diminution in her memory and ability to reason, concentrate and process. This witness testified that the brain damage also accounts for the plaintiff's emotional damage and depression from which she suffers, requiring daily medication.

A day-in-the-life film was presented to the jury depicting the plaintiff's daily routine. Due to her paralysis and incontinence, the plaintiff's nursing expert opined that the plaintiff will need 24 hour supervision by a nurse's aide to assist in all activities of daily living including feeding and hygienic care. The plaintiff's nursing expert testified that because of the overwhelming amount of care and supervision that the plaintiff will require in the future, she will likely require residential placement in a nursing home facility.

The defendants maintained that appropriate neurological examinations were performed with normal results. The defendants denied that the plaintiff's complaints indicated neurological problems. Thus, the defense argued that there was no reason to order brain imaging at the time of the plaintiff's presentations to the emergency rooms. The defendants contended that the notation of the plaintiff's arm complaints in some of the medical records was not reproduced or acknowledged on physical examination and that there were no documented abnormalities. The defendants' medical experts also opined that the overwhelming majority of the deficits from which the plaintiff suffers are unrelated to any alleged delay in diagnosis, but are a result of the cancer itself and the treatment required to eradicate it.

The jury found the first defendant emergency room physician 35% negligent, the second physician 38% negligent and the third doctor 27% negligent. The plaintiff was awarded $11,200,545 in damages. Post-trial motions are pending.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: Pennsylvania Jury Verdict Review & Analysis, Vol. 26, Issue 12

End of Document      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

1989 WL 535471 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (C) 2012 by Association of Trial Lawyers of America
Court of Common Pleas of Pennsylvania, Fifth Judicial District, Allegheny County.

HUTCHINSON v. WESTINGHOUSE ELEVATOR CO.

No. G.D.'87-10027
No Date Given

TOPIC: PRODUCTS LIABILITY


**SUMMARY:**
Verdict: $ 20,900,000

**ATTORNEY(S):**
Plaintiff(s): Wycoff, William M. : Pittsburgh, PA Rangos, Jill E. : Pittsburgh, PA Kelly, Maureen P. : Pittsburgh, PA

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania
COUNTY: Allegheny

TYPE OF INJURY: SPINAL CORD INJURIES : Quadriplegia, ventilator-dependent


**SUMMARY:**
**Plaintiff Information:**
Sex: Male

Occupation: Concrete Installer


**FACTS:**
Overview: $20.9 million jury verdict, reduced by 20 percent for comparative negligence, for an employee of a precast concrete subcontractor who was crushed by a 2500 pound elevator counterweight as he was welding a precast concrete clip at the edge of the elevator shaft on a jobsite, severing his spinal cord in the cervical region and rendering him a ventilator dependent quadriplegic with brain stem damage which prevents him from speaking. The award included $8.7 million for pain and suffering and $2 million to plaintiff's wife, who separated from her husband two years after the incident, but was not divorced from him.


Association of Trial Lawyers of America
Pa., Allegheny County Court of Common Pleas, No. G.D.'87-10027, Oct. 18, 1989

BUONGIOVANNI vs. GENERAL MOTORS CORPORATION, 12 Nat. J.V.R.A. 12:C1...

Case 1:13-cv-00261-LM   Document 43-3   Filed 10/24/14   Page 76 of 89

12 Nat. J.V.R.A. 12:C1, 1997 WL 34884761 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.

Court of Common Pleas of Pennsylvania, Seventh Judicial District, Bucks County.

BUONGIOVANNI vs. GENERAL MOTORS CORPORATION.

n/a

DATE OF VERDICT/SETTLEMENT: September, 1997

TOPIC: PRODUCTS LIABILITY - DEFECTIVELY DESIGNED CAR SEAT ON 1984 CHEVROLET CHEVETTE - SEAT COLLAPSE - PERMANENT QUADRIPLEGIA TO 33-YEAR-OLD NURSE.

**SUMMARY:**

Result: $28,000,000 VERDICT

**EXPERT WITNESSES:**

Plaintiff's economist: Andrew Verzilli from Kintnersville, Pa.

Plaintiff's physiatrist: John Melvin from Philadelphia.

Plaintiff's accident reconstruction expert: Nicholas Perrone from Newtown, Pa.

Plaintiff's seat design expert: Alan Cantor from Richborough.

Plaintiff's crashworthiness expert: Donald Friedman from Santa Barbara, Ca.

Plaintiff's biomechanical engineer: Carly Ward from Ca.

Defendant's accident reconstruction expert: Brent

**ATTORNEY:**

Plaintiff's: Larry E. Coben of Coben & Associates in Scottsdale, Az.;

Defendant's: Evan Burkholder and Sandra McCollie of McQuire, Battle & Woods in Richmond, Va., and Francis Grey of Lavin, Coleman, O'Neil, Ricci, Finarelli & Grey in Philadelphia.

JUDGE: Edward G. Biester Jr.

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania

COUNTY: Bucks

**INJURIES:**

PRODUCTS LIABILITY - DEFECTIVELY DESIGNED CAR SEAT ON 1984 CHEVROLET CHEVETTE - SEAT COLLAPSE - PERMANENT QUADRIPLEGIA TO 33-YEAR-OLD NURSE.

**FACTS:**

This action was brought under strict liability theory against the defendant General Motors Corporation in relation to its design and manufacturer of the 1984 Chevrolet Chevette. The plaintiff, a 33-year-old female at the time of injury, alleged that the seats of the vehicle were defectively designed so as to cause the back of the seat to collapse upon rear end impact, throwing the plaintiff into the back seat. The plaintiff sustained a permanent spinal cord injury in the accident rendering her a complete quadriplegic. The defendant argued that the seats were designed for maximum safety and that more rigid seatback designs carried a greater risk of personal injury to occupants of the vehicle.

Evidence showed that the plaintiff, a single woman with no children, was a belted front seat passenger in a vehicle driven by a male friend. The host driver backed up the plaintiff's Chevette on the shoulder of the road after missing an exit. The plaintiff's accident reconstruction expert testified that the host driver stopped the car, but before he had a chance to move forward, the car was struck from behind by a Honda Prelude traveling approximately 35 mph. The plaintiff's biomechanical engineer testified that the rear end impact caused the front passenger seat of the vehicle to collapse, vaulting the plaintiff into the back seat where she sustained a sever injury to her spinal cord.

The plaintiff's seat design expert opined that the seatbacks of the Chevette were defectively designed by the defendant, General Motors, in that the seat should not have collapsed upon impact from behind. The plaintiff introduced evidence that the defendant had been involved in at least 60 prior claims involving seatback collapse in vehicles which it manufactured. The jury heard parts of four General Motors internal studies from 1966, 1968, 1982 and 1994 which all addressed the issue of yielding vs. less yielding seatback designs. The plaintiff contended that the reports recommended the seats remain relatively upright and not collapse at impacts speeds in the order of 30 mph in order to avoid the known risk of quadriplegia caused when occupants are vaulted into the rear seat. The plaintiff also introduced videos of General Motors crash tests which depicted a dummy being ramped into the back seat of the vehicle after the seat collapsed upon rear end impact.

The plaintiff's physiatrist testified that the plaintiff has been rendered a permanent quadriplegia and will require living assistance for the remainder of her life. The plaintiff's economist estimated the plaintiff's past and future wage loss as $1 to $1.2 million. A "Day in the Life Video" was presented to the jury showing the plaintiff's daily activities. The plaintiff's past and future medical expenses were estimated at an additional $11 to $13 million, including the cost of home modifications and specialized transportation.

The defendant's biomechanical expert testified that theplaintiff was twisted between the front seats looking out the rear window when the impact occurred. The defendant's accident reconstruction expert testified that the host vehicle was still moving backwards when it was struck from behind at a speed of approximately 50 mph. The defense maintained that a more rigid seatback would not have prevented the injuries sustained by the plaintiff. The defendant's in-house engineer testified that the seatbacks were designed to collapse or be more "yielding" because studies established that yielding seats provide safety benefits over rigid seats in preventing the more common neck and back injuries. Serious injuries related to seat collapse are very rare, according to defense arguments.

The jury found for the plaintiff in the amount of $28 million. The general verdict did not breakdown the amount of the award. Post-trial motions are pending.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: National Jury Verdict Review & Analysis, Vol. 12, Issue 12

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

CARLOS MARTINEZ AND ROSITA DE LOS SANTOS DE..., 32 Pa. J.V.R.A. 8:C1...

Case 1:13-cv-00261-LM   Document 43-3   Filed 10/24/14   Page 78 of 89

32 Pa. J.V.R.A. 8:C1, 2014 WL 4072189 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2013 Jury Verdict Review Publications, Inc.
Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

CARLOS MARTINEZ AND ROSITA DE LOS SANTOS DE MARTINEZ vs. HONDA MOTOR CO

111203763

DATE OF VERDICT/SETTLEMENT: June 26, 2014

TOPIC: PRODUCTS LIABILITY - AUTOMOTIVE DEFECT - DEFECTIVE SEAT BELT/RESTRAINT SYSTEM - PLAINTIFF CATASTROPHICALLY INJURED IN LOW SPEED ROLL OVER COLLISION - QUADRIPLEGIA.

**SUMMARY:**
Result: $55,325,714 VERDICT

**ATTORNEY:**
Plaintiff's: Stewart Eisenberg of Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. in Philadelphia, PA.
Defendant's: Tiffany Alexander of Campbell Campbell Edwards & Conroy in Berwyn, PA.

JUDGE: Lisa M. Rau

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania
COUNTY: Philadelphia

**INJURIES:**
PRODUCTS LIABILITY - AUTOMOTIVE DEFECT - DEFECTIVE SEAT BELT/RESTRAINT SYSTEM - PLAINTIFF CATASTROPHICALLY INJURED IN LOW SPEED ROLL OVER COLLISION - QUADRIPLEGIA.

**FACTS:**
The plaintiff in this products liability action was rendered a quadriplegic when the car he was operating, manufactured by the defendant, rolled over and the plaintiff's head hit the roof of the car. The plaintiff argued that the catastrophic injuries he suffered were due to a faulty seat belt restraint system in the vehicle. The defendant denied all of the plaintiff's allegations of defects in the vehicle.

On May 8, 2010, the 57-year-old male plaintiff was operating his vehicle, a 1999 Acura Integra, on his way to work in suburban Baltimore. His nephew was riding as a front seat passenger. As the plaintiff was traveling westbound on I-70, a rear tire on the vehicle blew out causing the vehicle to go out of control and enter the left median strip where it rolled over. During the rollover sequence, the restraint system in the car manufactured by the defendant failed to provide the plaintiff with any meaningful protection. Carlos Martinez, age 57, sued the defendant car company on a products liability theory, claiming to have been paralyzed in the accident. He claimed that the seat belt in the vehicle that he was driving was defective and unreasonably dangerous, was not designed to prevent his head from hitting the roof of the car during the rollover accident, and that Honda had been aware since 1992, that occupants wearing the seat belt would strike their heads on roofs during rollovers. The plaintiff suffered a C6-7 fracture causing him permanent paralysis. The defendant denied that the restraint system was defective, and argued that the same restraint system was used by almost every car manufacturer.

The jury found that the plaintiff's injury was caused by the vehicle's defective seat belt design and that defendant was negligent for failing both to redesign the seat belt and to warn consumers that they were at risk for hitting their heads on the roof if the vehicle rolled. The jury awarded $25 million to Martinez for past and future noneconomic damages, $15 million to his wife, plaintiff Rosa De Los Santos De Martinez, for loss of consortium, about $14.6 million for future medical expenses and about $720,000 for past and future lost earnings.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: Pennsylvania Jury Verdict Review & Analysis, Vol. 32, Issue 8

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 416925, 2004 WL 6041581 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

TUSKI v. PETACCIO; IVYLAND CAFE LTD.

N/A
DATE OF INCIDENT: January 17, 2001
DATE OF TRIAL: January 12, 2004

TOPIC:

LIABILITY:

General: Pedestrian

Specific: At Work Site

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $75,683,906**
**Judge Reduced Award To: $**
HIGH AMOUNT: $0

LOW AMOUNT: $0

Claimed Past Medical: $1,683,906

Claimed Future Medical: $18,000,000

**EXPERT-WITNESSES:**
Plaintiff:
Economist: Verzilli, Andrew, M.B.A., Lansdale, PA
**ATTORNEY:**
Plaintiff: Christine G Boyle, Philadelphia, PA

JUDGE: John Milton Younge

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: Pennsylvania
COUNTY: Philadelphia

**PRIMARY INJURY: Quadriplegia**

**SUMMARY**
**PLAINTIFF:**
Sex:Male

Age: Adult, 34

General Occupation: General Laborer

**DECEDENT:**
**DEFENDANT:**
Sex:Male

Inactive Defendant (for organization): Petaccio; Ivyland Cafe Ltd.

Policy Limit: $

Sex:Organization

Inactive Defendant (for organization): Petaccio; Ivyland Cafe Ltd.

Defendant's Insurance (name of company): Princeton Ins. Co.

Policy Limit: $

Other Expenses: $0

Claimed Future Wages: $2,000,000

**DAMAGES:**
Compensatory Past Medical Award: $1,683,906

Compensatory Future Medical Award: $18,000,000

Compensatory Past Wages Award: $0

Compensatory Future Wages Award: $2,000,000

Compensatory Pain And Suffering Award: $29,000,000

Other Compensatory Award: $0

Total Compensatory Award: $50,683,906

Punitive Damages: $25,000,000

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

Comparative Negligence Percentage: 0

**FACTS:**
A 34-year-old highway construction flagman suffered injuries resulting in quadriplegia when he was struck by the 39-year-old male defendant, who had just left the codefendant tavern, as the plaintiff was working on a city street. The plaintiff contended that the defendant operated his vehicle in a negligent manner, failed to keep a proper lookout, failed to yield the right-of-way to a pedestrian, drove while under the influence of alcohol, and fled the scene of an accident. The plaintiff further contended that the codefendant negligently continued to serve alcohol to the defendant when he was visibly intoxicated in violation of the Dram Shop Act. The defendants denied liability. The codefendant tavern was assessed $5 million in punitive damages and the remainder was assessed to the defendant driver. The trial court granted the defendants' motion for remittitur on the punitive damage award and all of the parties appealed.

Jury Verdict Research
COURT: Common Pleas

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

1993 WL 819693 (W.D.Pa.) (Verdict and Settlement Summary)

Copyright (C) 2012 by Association of Trial Lawyers of America
United States District Court, W.D. Pennsylvania.

EIMERS v. HONDA MOTOR CO.

No. 90-25-Erie
DATE OF VERDICT/SETTLEMENT: May 28, 1993
TOPIC: PRODUCTS LIABILITY AUTOMOBILE ACCIDENTS

**SUMMARY:**
Verdict: $19,800,000

**ATTORNEY(S):**
Plaintiff(s): Leesfield, Ira : Miami, FL Mahfood, George : Pittsburgh Fogel, Joel : Miami, FL

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania
COUNTY: Not Applicable

TYPE OF INJURY: SPINAL CORD INJURIES : spinal injuries at C5 resulting in quadriplegia

**SUMMARY:**
**Plaintiff Information:**
Sex: Male

Age: 25 Years

Occupation: Heavy Equipment Operator

**FACTS:**
Overview: Plaintiff, while riding his motorcycle and making a left turn, was thrown from the bike when the rubber-tipped sidestand hit the ground. Plaintiff was unemployed at the time of the accident; he earned from $4,000 to $6,000 annually. CLAIMS: against the manufacturer, designer and distributor of the motorcycle: defective sidestand; failure to warn; failure to provide an interlock design. COUNTERCLAIMS: plaintiff lacked a motorcycle license, was an inexperienced rider, and accident occurred because he braked at a high speed.

Association of Trial Lawyers of America
U.S. Dist. Ct., W.D. Pa., No. 90-25-Erie, May 28, 1993

---

Natalia Mendez v. City of Philadelphia, Fairmount Park..., 2009 WL 1199239...

Case 1:13-cv-00361-LM Document 43-3 Filed 10/24/14 Page 84 of 89

2009 WL 1199239 (Pa.Com.Pl.) (Verdict and Settlement Summary)

Copyright (c) 2012 ALM Media Properties, LLC. All Rights Reserved
Court of Common Pleas of Pennsylvania, First Judicial District, Philadelphia County.

Natalia Mendez v. City of Philadelphia, Fairmount Park Commission, Vanessa R. Burgess,
administratix of the Estate of Cornelius B. Burgess Jr., deceased; Jesse J. Williams, individually
and t/d/b/a Jesse Williams and Sons Cement Work; and Jesse Williams and Sons Cement Work

No. 004525
DATE OF VERDICT/SETTLEMENT: February 26, 2009
TOPIC: PREMISES LIABILITY - DANGEROUS CONDITION - PREMISES LIABILITY - NEGLIGENT REPAIR AND/
OR MAINTENANCE - PREMISES LIABILITY - TREE - PREMISES LIABILITY - NOTICE

Tree Collapses on Vehicle, Paralyzing Driver

**SUMMARY:**
RESULT: Verdict-Plaintiff

Prior to jury deliberation, the plaintiff and defendants entered into a confidential settlement and agreed that the jury would determine only what Mendez's damages were. Jurors were not aware of any settlements or default judgments. The jury awarded Mendez $61 million.

**EXPERT WITNESSES:**
Plaintiff: Andrew William Graham Jr.; Arboriculture; Doylestown, PA Gary A. Young, M.Ed., C.R.C., C.D.M.S.; Vocational Rehabilitation; West Trenton, NJ
Defendant: Lew Bloch; Arboriculture; Potomac, MD Lowell Kravitz, Ph.D.; Weather Conditions; Philadelphia, PA
**ATTORNEYS:**
Plaintiff: Fred M. Feder; Feder Law LLC; Villanova, PA (Natalia Mendez)
Defendant: J. Brian Durkin; CNA Staff Counsel Department; Philadelphia, PA (City of Philadelphia, Fairmount Park Commission); Gary R. Gremminger; German, Gallagher & Murtagh, P.C.; Philadelphia, PA (Estate of Cornelius B. Burgess Jr., Vanessa R. Burgess)

JUDGE: Joseph I. Papalini

RANGE AMOUNT: $5,000,000-999,999,999

STATE: Pennsylvania
COUNTY: Philadelphia

**INJURIES: Mendez was trapped inside her car for over an hour before she was extricated by rescuers and taken to Albert Einstein Medical Center, where she was treated for a C6/C7 burst fracture, C6 ASIA B spinal cord injury, paraplegia and superior endplate fracture of C7 vertebra. She underwent an anterior interbody arthrodesis at C5-C7 with Senn cage and allograft; application of anterior plate at C5 to C7; posterior spinal fusion of C5 to C7 with instrumentation; posterolateral fusion from C5 to C7 with allograft; closed reduction C6-C7 vertebral bodies and halo placement; C5-C6 discectomy; C6-C7 discectomy; C6 corpectomy; bilateral foraminotomies at C5-C6, C6-C7; repair of dural laceration with Duragen and Tisseel; and, inferior vena cava filter placement.**

**Facts:**

On July 28, 2006, on a rainy and windy afternoon, plaintiff Natalia Mendez, 23, a chef/administrator, was driving a sedan in the southbound left lane of Cheltenham Avenue in Philadelphia, when a curbside street tree (adjacent to the right lane) uprooted and fell directly on top of Mendez's vehicle, which rendered her a paraplegic.

The tree, a very large Norway maple, affronted the property of Cornelius Burgess Jr., who had hired Jesse Williams of Jesse Williams and Sons Cement Work, Abington, to replace the property's sidewalk in August 2005; the sidewalk presented a hazard to passing pedestrians as it was raised and uneven because of the root structure of the tree. Williams' renovations included cutting the roots of the tree and re-cementing the sidewalk.

Mendez sued Burgess and Williams, as well as the Fairmount Park Commission and the city of Philadelphia, alleging negligence. Burgess, who died in March 2008, had settled with the plaintiff in exchange of a joint tortfeasor release of the policy limits of $100,000. In August 2007, default judgments were entered against Williams and his business after the parties failed to appear. The case proceeded to trial against the city and park commission. (In lieu of live expert testimony, the respective parties relied upon submitted reports.)

In a recorded statement to his insurance carrier prior to his death, Burgess claimed that he reported to various elected city officials and the parks department that there were problems with the tree, but to no avail. Nearly 11 months after the sidewalk repair and six days before the accident, Burgess claimed that he became alarmed when he noticed the tree noticeably leaning and an opening crack between the new sidewalk and the tree trunk. This prompted him to renew his efforts to contact the city and park commission, leaving a message for the park commission on July 22. Then on July 25, he contacted a city councilman about the dangerous tree and was told that he called the wrong councilman's office, but that the matter would be referred. But nothing came of this as well.

During his deposition, Christopher Palmer, director of operations of landscape management for the commission, said that there were only four or five arborists employed by the city to inspect over 135,000 trees in the system, and that regular tree inspections were not required. Palmer further testified in his deposition that the subject Norway maple tree was healthy at the time of failure and that his department had no records of any calls with complaints or concerns about the tree.

The plaintiff relied upon the testimony of an arborist who testified that the loss of roots substantially weakened the tree's anchoring root systems and its ability to survive the storm, which acted on this "preexisting man-made weakness." The wind speeds that existed that day were not so extreme as to cause other nearby trees of similar size and kind to uproot, the expert said.

The arborist also said it was reasonable to expect that the city should have periodically inspected every tree growing along its streets, even though the cement contractor did not obtain a permit for his work that would have alerted the city of the repair. If such an annual inspection had been performed, the tree inspector could have easily noticed the white color of the newly repaired sidewalk adjacent to the tree and it would have been obvious that stabilizing roots had been cut and removed to repair the sidewalk, causing a dangerous condition. Known as sidewalk buckling, the large tree species such as a Norway maple was crammed in a 2-foot wide area between the sidewalk and street curb where it had insufficient space to grow, thus causing the uprooted sidewalk. The expert further testified that the defendants should have expected that the tree would eventually cause sidewalk buckling when its roots and trunk flare expanded with growth each year, especially when such growth required prompt repairs by the adjacent property owner.

The defendants denied the allegations, asserting that the city had no notice of the said tree. The defense meteorologist opined that the weather conditions were a contributing factor to the tree falling, noting a severe thunderstorm accompanied by strong downburst/straight-line winds occurred during the late evening hours of July 27 and the first hours of July 28. The defense expert contended that in addition to the felled Norway maple, the same winds brought down trees and power lines throughout the area, including a tree that was toppled onto a house in the Rhawnhurst section of the city.

Natalia Mendez v. City of Philadelphia, Fairmount Park..., 2009 WL 1199239...

Case 1:13-cv-00361-LM   Document 42-3   Filed 10/24/14   Page 86 of 89

The defense arborist said that it would be speculation to conclude that the tree fell because too many roots were cut when this tree had a trunk diameter of 27 inches, a large canopy and was growing in a 24-inch tree space. Further, the defense arborist claimed a drive-by inspection from the city would have been too superficial and would actually have indicated the tree to be in good health. For example, said the expert, an inspector wouldn't have discovered that tree's roots were girded by a storm drain in the same area, another obstacle to growth.

On Aug. 21, Mendez was discharged and transferred to Moss Rehabilitation Hospital, where she remained until Dec. 23. Thereafter, she was admitted to the Beth Abraham Hospital in Bronx, N.Y., and was discharged in July 2008.

Mendez, who relocated from her home in New York to take a position as a chef/administrator for a Thai restaurant in Manayunk, was earning $39,000 per year at the time of her accident. Expected to earn a yearly income between $55,400 and $58,490 in her 43-year career, she sought $2,863,195 to $4,958,419 in future lost earnings, depending upon the appropriate allowances for productivity.

Living on her own with 24-hour care, Mendez requires assistance with every aspect of her life, including eating, bathing and dressing.

Despite bouts of depression, the plaintiff remains upbeat as she goes out to eat with her friends once a month. She aspires to write a culinary book and possibly have her own cooking show. She also involved in a quadriplegic support group. She sought an unspecified amount for past and future pain and suffering.

Insurer:

Nationwide Mutual Insurance Co. Estate of Cornelius Burgess

ALM Properties, Inc.
Philadelphia County Court of Common Pleas

PUBLISHED IN: VerdictSearch weekly, VandS 04-28-09

JVR No. 1210170017, 2012 WL 4959530 (R.I.Super.) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Superior Court of Rhode Island, Providence County.

KIZLINSKI v. MCRAE MD

PC-2007-06616
DATE OF INCIDENT: August 19, 2005
DATE OF TRIAL: May 25, 2012

TOPIC:

LIABILITY:

General: Doctor Malpractice

Specific: Cancer Treatment

Secondary: Doctor Malpractice: Lack of Informed Consent; Doctor Malpractice: Failure to Refer to Specialist; Doctor Malpractice: Failure to Test

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $10,000,000**
**Judge Reduced Award To: $**
HIGH AMOUNT: $0

LOW AMOUNT: $0

**EXPERT-WITNESSES:**
Plaintiff:
pathologist: Brandwein-Gensler, Margaret, M.D., Birmingham, AL
radiation oncologist: Randolph, Erich, M.D., Atlanta, GA
Defendant:
pathologist: Krane, Jeffrey, M.D., Boston, MA
otolarygologist: Eisele, David, M.D., Baltimore, MD
**ATTORNEY:**
Plaintiff: Mark S Mandell, Providence, RI
Yvette M. Boisclair, Providence, RI
Defendant: David W. Carroll, Providence, RI
Kristin Barkett Pettey, Providence, RI

JUDGE: Susan E. McGuirl

RANGE AMOUNT: $5,000,000 - 999,999,999

STATE: Rhode Island

COUNTY: Providence

**PRIMARY INJURY: General Nerve: Face**
Cancer: Skin

Facial Scarring

Surgical Scarring

Medical-Related: Unnecessary Surgery


**SUMMARY**
**PLAINTIFF:**
Sex: Female

Age: Adult, 59


**DECEDENT:**
**DEFENDANT:**
Sex: Male

Age: Adult

Defendant general occupation: Doctor

Organization Type: McRae MD

Policy Limit: $


**DAMAGES:**
Compensatory Pain And Suffering Award: $10,000,000

Total Compensatory Award: $10,000,000

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

Comparative Negligence Percentage: 0

**FACTS:**

Susan Kizlinksi, a 59-year-old female, said she suffered facial paralysis and the recurrence of parotid mucoepidermoid carcinoma after defendant ENT specialist Robert G. McRae MD performed a right superficial parotidectomy with facial nerve preservation and a second surgery a week later to remove additional tumor mass from the plaintiff's parotid gland, and reportedly failed to remove all of her parotid tumor during the two surgical procedures. The plaintiff claimed her cancer recurred, and as a result, another physician performed a right radical parotidectomy with skin excision, a right supraomohyoid neck dissection and an advancement flap closure of the neck that left her with full facial nerve paralysis, facial deformities, facial asymmetry and collapse of her ear canal. The plaintiff claimed the defendant was negligent and failed to comply with the standard of care by negligently failing to perform a complete and proper surgical removal of her tumor, failing to obtain additional frozen sections during the procedures to ensure the surgical margins were free of tumor, failing to refer her to a cancer specialist after the inadequate cancer surgery, failing to submit post-surgical aspirate from the wound for pathologic analysis, improperly subjecting her to radiation therapy following inadequate cancer surgery, and failing to obtain informed consent for the treatment. The defendant denied liability, claimed that he adhered to the standard of care in the surgeries and postoperative care, and asserted that he disclosed the risks of the surgeries. The jury awarded the plaintiff $10,000,000 in damages, and Judge Susan E. McGuirl added $5,349,041.10 in interest in the judgment, for a total award amount of $15,349,014.10.

Jury Verdict Research
COURT: Superior

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.