IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JEANICE FARLEY, | § | |
| individually and on behalf of | § | |
| MICHAEL FARLEY, an | § | |
| incompetent adult, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| | § | |
| vs. | § | No. 1:13-CV-261-LM |
| | § | |
| UNITED STATES OF | § | |
| AMERICA, | § | |
| | § | |
| Defendant | § | |
| | § | |

**PLAINTIFF'S AMENDED, PROPOSED
FINDINGS OF FACT & CONCLUSIONS OF LAW**

Pursuant to the Court's order on November 13, 2014, the Plaintiff files her amended findings of fact and conclusions of law after incorporating the testimony of witnesses in the trial held in this case from October 21st to 24th, 2014.

# TABLE OF CONTENTS

Jurisdiction and Venue ................................................................................. 5

Agency ........................................................................................................... 6

New Hampshire Medical Negligence ...................................................... 7

Medical History ........................................................................................... 8

I.   October 20th & 21st, 2010 ................................................................. 8

II.  November 5th & 18th, 2010 ............................................................... 12

III. December 1st & 2nd, 2010 ................................................................ 15

Expert Testimony on Liability .................................................................. 16

I.   Dr. Kenneth Stein ............................................................................. 16

II.  Dr. Bruce Charash ............................................................................ 18

III. Dr. J. Neal Rutledge ......................................................................... 23

IV.  Dr. James Frey .................................................................................. 25

Liability of the United States ................................................................... 28

I.   Breaches of the Standard of Care .................................................... 29

II.  Causation ........................................................................................... 34

Defenses ....................................................................................................... 38

I.   Cardiomyopathy ................................................................................ 38

II.  Alternative Possible Causes of Mr. Farley's Stroke ...................... 42

III. Non-Compliance ................................................................................ 48

**DAMAGES** ........................................................................................................... **50**

I.   Upfront Costs & Surgeries ............................................................. 52

II.  Life Expectancy of Mr. Farley ...................................................... 55

III. Reasonable & Necessary Future Medical Care ...................................... 57

IV.  Non-Economic Damages ......................................................... 60

**CONCLUSIONS OF LAW** ....................................................................... **66**

**CERTIFICATE OF SERVICE** ................................................................... **68**

**1.1.**    Pursuant to Rule 52(a)(1), this Court issues its findings of fact and conclusions of law in this action tried on the facts without a jury or advisory jury.

**1.2.**    This is a medical malpractice case against the United States of America under the Federal Tort Claims Act tried to the Court on October 21st to 24th, 2014. The Court has reviewed the record and the evidence presented at trial and the arguments of the parties. The Court has made determinations as to the relevancy and materiality of the evidence, assessed the credibility of the witnesses, and ascertained for its purposes the probative value of the evidence. After such consideration, the Court finds the following facts to have been proved by a preponderance of the evidence, and after applying the applicable law to such facts, makes the following conclusions of law.

**1.3.**    This is a healthcare negligence case brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671.

**1.4.**    Plaintiffs in this case are Jeanice and Michael Farley. Jeanice Farley brings this lawsuit on behalf of her husband, Michael Farley, who has been adjudged legally incompetent.[1] Michael Farley is a veteran who received an honorable discharge from the Navy.

**1.5.**    Michael Farley was a patient of the Manchester Veterans Affairs Medical Center from October 21, 2010 to December 1, 2010.[2]

**1.6.**    The Defendant in this case is the United States of America.

—

[1] Exh. 37 (Certificate of Guardianship).
[2] Document #37, Parties Second Set of Stipulations, at 1 (Oct. 14, 2014); Document #17, Stipulated Facts of Parties, at 1–2 (Sept. 16, 2014).

## JURISDICTION AND VENUE

**2.1.**   The United States District Court for the District of New Hampshire has jurisdiction over this case under the provisions of 28 U.S.C. §§ 1346(b), 2401, and 2671, *et seq.*[3]

**2.2.**   Venue is proper in this case pursuant to 28 U.S.C. § 1402(b) because Jeanice Farley resides within the District of New Hampshire and the acts or omissions complained of in this lawsuit occurred within the District of New Hampshire.[4]

**2.3.**   The department of Veterans Affairs received notice of the claims that are the subject of this lawsuit on June 27, 2012.[5] Jeanice and Michael Farley timely presented their claims under the Federal Tort Claims Act to the appropriate agency.[6]

**2.4.**   Jeanice Farley's individual claim set forth the *ad damnum* of $45,000,000.00 for her injuries individually.[7]

**2.5.**   Jeanice Farley, on behalf of her husband, Michael Farley, set forth the *ad damnum* of $45,000,000.00 for Mr. Farley's injuries.[8]

**2.6.**   The United States finally denied Michael and Jeanice Farley's administrative claims on December 21, 2012.[9]

**2.7.**   On June 7, 2013, less than six months after Michael and Jeanice Farley's administrative claims were denied, Mr. and Mrs. Farley filed suit in this Court.[10]

—

[3] Document #37, Parties Second Set of Stipulations, at 2 (Oct. 14, 2014).

[4] Document #17, Stipulated Facts of Parties, at 3 (Sept. 16, 2014); Document #37, Parties Second Set of Stipulations, at 2 (Oct. 14, 2014).

[5] Document #37, Parties Second Set of Stipulations, at 2 (Oct. 14, 2014).

[6] Document #17, Stipulated Facts of Parties, at 3 (Sept. 16, 2014).

[7] Exh. 35 (Form 95 of Jeanice Farley).

[8] Exh. 36 (Form 95 of Jeanice Farley on behalf of Michael Farley).

[9] Document #37, Parties Second Set of Stipulations, at 2 (Oct. 14, 2014).

**2.8.**     Michael and Jeanice Farley have complied with all jurisdictional and procedural prerequisites and conditions precedent to filing this lawsuit.[11]

**2.9.**     The United States was properly served and appeared in this suit.[12]

## AGENCY

**3.1.**     The remedy against the United States under the Federal Tort Claims Act is exclusive with regard to claims based upon torts of federal employees within the scope of their employment. 28 U.S.C. § 2679, *et seq*.

**3.2.**     The Department of Veterans Affairs is an agency of the United States of America.[13]

**3.3.**     The United States, through its agency, the Department of Veterans Affairs, at all times relevant to this lawsuit, owned, operated, and controlled the medical facility known as the Manchester Veterans Affairs Medical Center located in Manchester, New Hampshire (referred to here throughout as "Manchester VA"). And by and through its agency, the United States staffed the Manchester VA with its agents, servants, or employees.[14]

**3.4.**     Between October 21, 2010 and December 1, 2010, and at all times relevant to this lawsuit, all persons involved in the medical and health care provided to Michael Farley were officers, agents, servants, or employees of the Department of the Veterans

---

[10] *Id.* at 2 (Oct. 14, 2014).

[11] *Id.* at 2 (Oct. 14, 2014).

[12] Document #17, Stipulated Facts of Parties, at 3 (Sept. 16, 2014).

[13] Document #37, Parties Second Set of Stipulations, at 1 (Oct. 14, 2014).

[14] *Id.* at 1 (Oct. 14, 2014).

Affairs, acting within their course and scope of federal employment. This includes Dr. Gary Lamphere, Dr. Armando DelRio, and Dr. Daniel Lombardi.[15]

## NEW HAMPSHIRE MEDICAL NEGLIGENCE

**4.1.**    The substantive law of the state of New Hampshire applies to this lawsuit under the Federal Tort Claims Act. Federal law resolves all procedural disputes. *Gonzalez-Rucci v. U.S. I.N.S.*, 539 F.3d 66, 69 (1st Cir. 2008).

**4.2.**    Under New Hampshire law, when the defendant agreed to the relationship of physician and patient, he became obligated to use reasonable care in attending and treating the plaintiff. *Mehigan v. Sheehan*, 94 N.H. 274, 275 (1947). The Defendant is liable if he or she "had acted from negligence and carelessness, contrary to what must have been his [or her] better knowledge and judgment, if he [or she] had given proper attention to the case." *Id.*

**4.3.**    The Court is not limited to the standard of care accepted or established in any particular geographical area or locality. N.H. Rev. Stat. Ann. § 508:13. Instead, the Court considers only whether the Defendant has acted with due care in light of the standards and recommended practices and procedures of his profession. *Id.*

**4.4.**    The Plaintiff must also prove that the Defendant's negligence caused damages. *Pillsbury-Flood v. Portsmouth Hospital*, 512 A.2d 1126, 1129 (N.H. 1986). The negligence is a proximate and legal cause of the harm if the Defendant's conduct is a

---

[15] Document #37, Parties Second Set of Stipulations, at 1 (Oct. 14, 2014); Document #1, Original Complaint, at 4 ¶12 (Jun. 7, 2013); Document #6, Defendant's Answer, at 3 ¶12 (Aug. 12, 2013) (admitting the allegations in Plaintiff's complaint).

"substantial factor in bringing about the harm." *Id.* (citing Restatement of Torts § 431(a)). "Causation is a matter of probability, not possibility." *Id.* at 1130. Probability, in that context, refers to the preponderance of the evidence standard. *Bartlett Tree Experts Co. v. Johnson*, 532 A.2d 1373, 1376 (N.H. 1987). A party will be prohibited from putting forth evidence of possibilities if nothing else on the record "remove[s] the matter from mere speculation and justif[ies] a finding of probability." *Leavitt v. Bacon*, 200 A. 399, 405 (N.H. 1938).

## MEDICAL HISTORY

I.      **October 20th & 21st, 2010**

**5.2.**      On October 20, 2010, Michael Farley called his medical providers at the Manchester VA.[16] He told them he had a migraine and blurred vision.[17] He also said he had partial loss of vision in his right eye.[18] The medical records for that day state that he had a "small risk" of stroke.[19] The nurse talked to the optometrist and advised Mr. Farley to come to the VA for further treatment.[20] At the time, Mr. Farley lived in Keene, New Hampshire, which is approximately an hour to an hour and a half drive from the Manchester VA.[21] Mr. Farley could not drive due to his blurred vision.[22] He called back an hour later and said that he could not make the eye appointment, as he could not get a

---

[16] Exh. 1, at 156.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 156–57.
[21] Trial Testimony of Dr. Gary Lamphere, 92:4–15.
[22] Exh. 1, at 157 (Medical Records from the Manchester VA).

ride.[23] The staff at the Manchester VA informed him to come in the next day, but to call 911 if his symptoms worsen.[24]

**5.3.**   Mr. Farley presented to the Manchester VA Urgent Care on October 21, 2010 at 10:22 am.[25] Dr. Gary Lamphere, an emergency medicine physician, saw him.[26] The record noted that he had left temple headache, made worse with a cough and that his right visual field had been cut for the past two days.[27] Dr. Lamphere described Mr. Farley's presentation as the classic signs and symptoms of a patient with a recent stroke.[28] His medications were reviewed and it was noted that he was taking his prescribed morphine, and that no discrepancies were noted.[29]

**5.4.**   Mr. Farley was sent to an optometrist, who diagnosed him as having new onset incongruous right homonymous hemianopsia (loss of half of the visual field) in both eyes.[30] The optometrist believed that there was a likely hemorrhagic/ischemic event (i.e. a stroke) in his left occipital lobe and that he should get a CT done.[31]

**5.5.**   By way of background, a stroke occurs when a part of the brain does not receive oxygenated blood. There are two types of strokes: hemorrhagic or ischemic. Hemorrhagic stroke occurs when parts of the brain cannot receive oxygenated blood because the blood is hemorrhaging from the vessels due to trauma (dissection) or other

—

[23] *Id.* at 155.
[24] *Id.*
[25] Exh. 16, at 1.
[26] *Id.* at 9; Trial Testimony of Dr. Lamphere, at 4:3–6; Document #17, Stipulated Facts of Parties, at 1 (Sept. 16, 2014) (Dr. Lamphere stipulated to be an emergency medicine physician).
[27] Exh. 16, at 9.
[28] Trial Testimony of Dr. Lamphere, at 9:20–24.
[29] Exh. 16, at 9.
[30] *Id.* at 4.
[31] *Id.*

causes. Ischemic stroke comes in two flavors. First, an ischemic stroke can occur when plaque build up along the walls of the arteries narrows the flow of blood, preventing it from reaching parts of the brain. Second, a clot can form in the heart or break off from various parts of the body and travel through the heart to the brain and block the flow of blood. This second form of stroke is called a cardioembolic stroke.

**5.6.**   This Court finds by a preponderance of the evidence that the CT performed on October 21, 2010 revealed that there was no hemorrhagic source of stroke.[32] The CT revealed a "major abnormality," and Dr. Lamphere was made aware of the findings.[33] A CT-angiogram was also performed on Mr. Farley's head and neck that day.[34] This test revealed that there was no narrowing of Mr. Farley's arteries in his head or neck that could have caused his stroke.[35] Dr. Lamphere testified that the CTA showed the cause of Mr. Farley's stroke was most likely not atherosclerotic.[36] Dr. Lamphere was "fairly convinced" that atherosclerosis was not the cause of Mr. Farley's stroke.[37] The preponderance of the evidence and witnesses from both sides testified that this was sufficient evidence to rule out all but cardioembolic sources of Mr. Farley's stroke. Therefore, Manchester VA providers knew or should have known that Mr. Farley's stroke was cardioembolic (from his heart), and treated it accordingly.

———

[32] Exh. 16, at 6.
[33] Trial Testimony of Dr. Lamphere, at 16–17.
[34] Exh. 16, at 7–8.
[35] *Id.*
[36] Trial Testimony of Dr. Lamphere, at 19:19–20:3.
[37] *Id.* at 20:9–12.

**5.7.**     Manchester VA physician Dr. Lamphere discharged Mr. Farley from the VA on October 21, 2010.[38] His assessment stated: "1. Subacute left occipital CVA, ? etiology. 2. [Rule Out] cardiac source of embolic CVA."[39] In other words, the evidence established that Dr. Lamphere knew Mr. Farley's stroke was a cardioembolic embolus, or a clot that traveled from his heart to his brain.[40] However, Dr. Lamphere discharged Mr. Farley without determining what caused the clot to form in his heart to begin with. He instructed Mr. Farley to take two baby aspirin daily and that cardiology would contact him to schedule a transesophageal echocardiogram (TEE).[41] He noted that Mr. Farley left urgent care in stable condition.[42]

**5.8.**     Dr. Lamphere did not admit Mr. Farley to the hospital. Dr. Lamphere did not obtain a neurology consultation, even though the evidence proved that the VA had at least one neurologist on staff.[43] But Dr. Lamphere testified that if Mr. Farley had been admitted to the hospital, he would have gotten a neurology consult.[44] Dr. Lamphere did not inform Mr. Farley's primary care provider of his patient's status or attempt to get a consult from Mr. Farley's PCP.[45] Dr. Lamphere discharged Mr. Farley with a note that cardiology should schedule a TEE within a month.[46] At trial, Dr. Lamphere admitted

---

[38] Exh. 16, at 10.

[39] *Id.*

[40] Document #17, Stipulated Facts of Parties, at 1–2 (Sept. 16, 2014).

[41] Exh. 16, at 10.

[42] *Id.*

[43] Document #17, Stipulated Facts of Parties, at 2 (Sept. 16, 2014); Trial Testimony of Dr. Lombardi, at 4:24–5:7.

[44] Trial Testimony of Dr. Lamphere, 37:1–4.

[45] *Id.* at 73:23–74:3.

[46] Exh. 16, at 22.

scheduling the TEE was a mistake.[47] He admitted that he did not click the correct checkbox when scheduling the TEE for 7 days, as would be his normal standard. *See Mehigan v. Sheehan*, 94 N.H. 274, 275 (1947) (Defendant liable if he acts from negligence and carelessness). Nevertheless, on October 25, 2010, Dr. Lamphere canceled that TEE without explanation but did not reschedule it within 7 days.[48] And the VA did not correct Dr. Lamphere's mistake when the test was rescheduled for November 18th, 2010.

II.      **November 5th & 18th, 2010**

   **5.9.**      On November 5, 2010, Mr. Farley presented to the VA and asked about the echocardiogram that Dr. Lamphere had scheduled for him.[49] A nurse, after examining the consult requests, noted that it was canceled by Dr. Lamphere but couldn't "see the reason why to give to" Mr. Farley.[50] From the medical records, the Court concludes that Mr. Farley's question prompted the TEE to be rescheduled for November 18, 2010. On November 5, Mr. Farley also presented with a cane.[51] The VA nurse who examined him noted that it was "a first for this patient."[52] No further interventions were taken regarding this new symptom.

————

[47] Trial Testimony of Dr. Lamphere, at 80.
[48] *Id.* at 60:15–22, 61:6–10.
[49] Exh. 16, at 23.
[50] *Id.*
[51] Exh. 1, at 141.
[52] *Id.*

**5.10.**    Mr. Farley presented for the rescheduled TEE on November 18, 2010, almost a full month after his initial stroke presentation.[53] Mr. Farley presented to the VA that day, after fasting and abstaining from any substantial amount of liquids more than six ounces, as instructed by his medical providers.[54] However, after Mr. Farley checked in, Dr. Lombardi, the VA cardiologist, discovered that the TEE was not functioning.[55] *See* N.H. Rev. Stat. § 507-E:1(III) (medical injury includes those injuries arising out of the failure to properly maintain equipment or appliances necessary). Dr. Lombardi did not know how long the machine had been broken.[56] Instead, a transthoracic echocardiogram (TTE) was used on Mr. Farley.[57] A TEE is an echocardiogram that is inserted through the mouth and into the esophagus to view the heart.[58] A TTE is not—it views the heart from outside the body and is of lower resolution for identifying clots within the heart.[59] That is why a TEE was initially ordered by the Manchester VA physicians because it is a better test for diagnosing clots originating from the heart, which the VA knew was the probable source of Mr. Farley's first stroke.[60] A functioning TEE was available at a nearby VA in West Roxbury, Boston.[61] Also, the Manchester TEE was fixed later that same day.[62] But

---

[53] Exh. 16, at 24.

[54] Trial Testimony of Dr. Lombardi, at 7:14–20, 12:22–23, 13:4–11.

[55] *Id.* at 16:1–6.

[56] *Id.* at 17:23–25.

[57] *Id.* at 18:24–19:3.

[58] Trial Testimony of Dr. Lamphere, at 22:14–21; 23:15–21.

[59] Trial Testimony of Dr. Lombardi, at 19:9–12; 22:23–23:2 (TEE has higher resolution for imaging the heart).

[60] Trial Testimony of Dr. Lamphere, at 31:11–14 (The TEE was the best test to look at his heart to determine the source of the stroke, as an initial test.).

[61] Exhibit 66, at 1 (Defendant's Response to Plaintiff's Second Set of Interrogatories); In fact, Dr. Lamphere testified that the Manchester VA had a TEE available on October 21, 2010, but did nothing to find out whether Mr. Farley could have a TEE within the week. Trial Testimony of Dr. Lamphere, at 38–39.

Mr. Farley was not sent to Roxbury or rescheduled for the test the VA physicians determined he needed.[63] The Manchester VA also had the ability to perform Holter monitoring, for the purpose of evaluating a patient for atrial fibrillation, or irregular heartbeat.[64] But Mr. Farley was never given Holter monitoring.

**5.11.** The TTE report noted that the purpose was to rule out the source of the embolism that caused Mr. Farley's stroke.[65] Despite being an inferior test, the TTE results were abnormal.[66] It found a moderately reduced left ventricle function. The ejection fraction, or the percentage of blood the left ventricle pumped out, was reduced to 30-35%.[67] It also found asymmetrical heart wall motion abnormalities.[68] The left ventricle was also dilated. These findings were consistent with an increased risk of second stroke. Parties have stipulated that this test showed that Mr. Farley may have had a recent heart attack.[69] There was no evidence that Dr. Lombardi scheduled any follow up care for Mr. Farley despite these ominous findings.

**5.12.** Dr. Lombardi now claims that he discussed the results of Mr. Farley's TTE with Mr. Farley's primary care provider. However, Dr. Lombardi testified that he never

---

[62] Exh. 66, at 2 (Verified Interrogatory Responses of the United States) ("The TEE was repaired and in working order later that same day."). Dr. Lamphere testified that the TEE is normally available at the VA. Trial Testimony of Dr. Lamphere, at 37:11–14.

[63] Trial Testimony of Dr. Lombardi, at 18:21–23, 22:1–6.

[64] *Id.* at 4:7–23.

[65] Exh. 16, at 30.

[66] Trial Testimony of Dr. Lombardi, at 22:11–13.

[67] Exh. 16, at 30.

[68] *Id.* ("severe hypokinesis of the inferior wall and basal inferolateral wall.").

[69] Document #17, Stipulated Facts of Parties, at 2 (Sept. 16, 2014).

documented that conversation and neither Dr. DelRio's notes nor testimony mention that conversation.[70]

### III.   December 1st & 2nd, 2010

**5.13.**   Mr. Farley went into the Manchester VA Urgent Care for an issue complaining of (c/o) some hand pain on December 1, 2010.[71] This was a new symptom.[72] After being seen by Urgent Care, he was sent to his primary care provider, Dr. Armando DelRio. Dr. DelRio noted that Mr. Farley did not have an active prescription for atenolol, Crestor, and B12 and—after reviewing the recent TTE—that Mr. Farley most likely had a cardiac event by being off these medications.[73] Parties have further stipulated that Dr. DelRio's note indicates Mr. Farley most likely had a recent heart attack.[74] Dr. DelRio prescribed atenolol, Crestor, and B12.[75] The evidence established that these medications are ineffective at preventing a second stroke, like the one Mr. Farley would suffer the next day on December 2, 2010.[76] As of this date, December 1, 2012, the Manchester VA had still not consulted with a neurologist, admitted Mr. Farley for full stroke work-up, performed the originally ordered TEE, or initiated cardiac telemetry monitoring.[77] Six

—

[70] Trial Testimony of Dr. Lombardi, at 43:13–22.

[71] Exh. 16, at 34.

[72] *Id.* Mr. Farley previously had a longstanding issue with pain in his left hand for which he was being prescribed morphine. This pain, however, was in his right hand and had manifested approximately around the time of his TTE. *Id.*

[73] Exh. 16, at 37.

[74] Document #17, Stipulated Facts of Parties, at 2 (Sept. 16, 2014).

[75] *Id.*

[76] Trial Excerpt Testimony of Dr. Greer, 19:5–7; Trial Day 3 PM Session, 52:14–20 (Dr. Caplan's testimony); Trial Day 2 PM Session, 51:20–52:4 (Dr. Rutledge's testimony).

[77] *Id.*

weeks had passed since his first stroke and the Manchester VA had still failed to determine the likely source of Mr. Farley's stroke.

**5.14.**     The next day, Mr. Farley was found unconscious and rushed to a local Emergency Room.[78] A thorough workup discovered that he suffered a second stroke, which left him paralyzed from the neck down and unable to verbally communicate. A clot from his heart embolized and traveled up his blood stream and into his brain. It lodged itself in Mr. Farley's basilar artery, preventing blood flow to his left medial occipital lobe, areas of his right cerebellum, and his brain stem. These parts of the brain play a pivotal role in motor control and damage to these areas causes paralysis. Parties have stipulated that this second stroke caused Mr. Farley's "locked in" syndrome and that his condition is permanent.[79]

## EXPERT TESTIMONY ON LIABILITY

I.     **Dr. Kenneth Stein**

**6.2.**     Dr. Kenneth A. Stein is a board certified internal medicine, emergency medicine, and neurocritical care doctor. He practices emergency medicine and neurocritical care in St. Louis. He has been practicing emergency medicine for 23 years. He is currently licensed to practice medicine in Kentucky and went to medical school at Vanderbilt. He practices medicine at St. Anthony's Medical Center and at St. Louis

—

[78] *Id.*
[79] *Id.* at 2–3.

University, where he is a part of the emergency medicine staff, taking part in the treatment of patients and the training of residents.[80]

**6.3.**     Notably, Dr. Stein is the only emergency room and internal medicine expert who testified in this trial. Dr. Stein is board certified in emergency medicine and internal medicine. He testified that he would have taken similar tests, and received similar training and education as Dr. DelRio to become board certified in internal medicine. He also testified that he underwent similar testing, training, and education as Dr. Lamphere to receive his board certification in emergency medicine.[81] Dr. Stein's full CV has been entered into evidence as Exhibit 24. The United States had no objection to this Court accepting Dr. Stein as an expert in internal medicine, emergency medicine, and neurocritical care.[82]

**6.4.**     To a reasonable degree of medical certainty and after reviewing the medical record in this case, Dr. Stein discovered several violations of the standard of care. He testified that a patient presenting as Mr. Farley did on October 21, 2010, should not have been discharged with a prescription for two baby aspirin.[83] The key to his testimony as an emergency physician is, as he explained it, the difference between primary prevention of stroke and secondary prevention of stroke. Primary prevention of stroke is an attempt by doctors to prevent the first stroke in the patient. It includes measures such as smoking cessation, blood pressure control, controlling cholesterol. Secondary prevention of stroke occurs after the patient has already had one stroke. At this point, the risk of a second

---

[80] Trial Day 2 PM Session, 5–7.
[81] Trial Day 2 PM Session, 7–8.
[82] Trial Day 2 PM Session, 9:5–10.
[83] Trail Day 2 PM Session, 16.

stroke is much greater and the corresponding measures that should be taken also increase. In Mr. Farley's case, the providers should have attempted to prevent the second stroke.[84] It was a failure of the standard of care to not admit or transfer Mr. Farley for full stroke workup, including urgently scheduling an echocardiogram within two to three days of Mr. Farley's first stroke on October 21, 2010.[85] And once the test is scheduled, Dr. Stein testified that it was a standard of care violation as an ER physician to schedule a test but schedule no follow up care.[86] He stated, and the records confirm, that Mr. Farley's primary care physician was not aware that Mr. Farley had a stroke.[87] Further, it was a violation of the standard of care to fail to start this patient on anticoagulation once the appropriate stroke workup had been completed.[88]

## II.    **Dr. Bruce Charash**

   **6.5.**    Plaintiff also called Dr. Bruce Charash, a medical doctor who is board certified in internal medicine and cardiology. He was an assistant chief of the intensive care unit at New York Hospital and assistant professor of medicine at Cornell University. He also served as chief of the cardiac intensive care unit at Lenox Hill Hospital in New York and clinical associate professor of medicine at NYU and Columbia University.[89] In 2008, he was named by the Greater New York Hospital Association, a group representing 300 hospitals in the New York and tri-state region, as the outstanding physician of the

---

[84] Trial Day 2 PM Session, 15–17.

[85] Trial Day 2 PM Session, 18–19.

[86] Trial Day 2 PM Session, 19:8–15.

[87] Trial Day 2 PM Session, 20:24–21:1 (Testimony of Dr. Stein); Trial Day 3 PM Session, 121:16–22
   (Testimony of Dr. Manning).

[88] Trial Day 2 PM Session, 24–25.

[89] Trial Day 1 PM Session, 3–4.

year for New York State.[90] Ninety percent of his practice involves in-patient clinical treatment, including the performance of echocardiograms and stress testing; and the remaining ten percent is hospital based, where he sees patients in the hospital.[91] As a part of his practice, he treats and consults patients with the same or similar conditions that Mr. Farley presented to the Manchester VA in 2010.[92] Plaintiff entered into evidence Exhibit 22, which is a full recitation of Dr. Charash's training, education, and experience. The Court accepted Dr. Charash as an expert in cardiology without objection from the United States.[93]

**6.6.** Dr. Charash explained some of the basic medical standard of care rules that all physicians should follow in this case. First, he noted that a doctor should attempt to prevent a second stroke in a patient that presents with a stroke. Patients who present with a stroke are at extraordinarily high short-term risk for another stroke, depending upon the mechanism of the stroke.[94] Because the mechanism is important, the second basic medical rule that Dr. Charash discussed is that a doctor should identify the specific source of the stroke.[95] Third, a doctor should consult a neurologist when a patient presents with a stroke because, when it comes to preventing a second stroke a neurologist will have the highest level of skill to help make decisions about the results of testing that involve the brain. Most importantly, the providers need to work as a team to make sure that the patient has the best professional scrutiny because finding the source is the single most important

—

[90] Trial Day 1 PM Session, 5.
[91] Trial Day 1 PM Session, 5–6.
[92] Trial Day 1 PM Session, 7.
[93] Trial Day 1 PM Session, 8.
[94] Trial Day 1 PM Session, 9:17–10:20.
[95] Trial Day 1 PM Session, 10:21–11:19.

thing you can do for the patient. Dr. Charash testified that he has never, in his clinical career, seen a patient with a newly recognized stroke that did not have a neurologist evaluate them.[96] Next, a doctor should rule out a clot in the heart when a patient presents with a stroke. Dr. Charash explained that a clot in the heart is the most aggressive mechanism that would lead to a second stroke. For example, if the source of the stroke is a blocked artery in the brain but the other arteries are normal, the damage is already done and will not reoccur. However, clots from the heart carry the highest short-term concern for having a second stroke and therefore time sensitivity is the most urgent for a clot.[97] Finally, if you discover the mechanism of the stroke is a clot originating in the heart, a doctor should anticoagulate his or her patient. Dr. Charash testified that you wait a few days to a week after the first stroke before you begin anticoagulation,[98] but the only protection you can offer a patient with this mechanism of stroke is anticoagulation, including Heparin (which is therapeutic within a matter of hours) and Coumadin (generic name: warfarin).[99]

**6.7.** Dr. Charash testified that Mr. Farley's heart was prone to throwing clots. In a normal heart, blood flow travels through it in laminar flow, without interruption. Blood that is stagnant will coagulate. If a patient has atrial fibrillation—a common mechanism of clot formation in the heart—the upper chambers of the heart are quivering and blood is not going through those upper chambers with laminar flow anymore. Instead, the heart will have areas where it will sit still through the atrium, which sets the stage for clot

---

[96] Trial Day 1 PM Session, 11:20–12:24.
[97] Trial Day 1 PM Session, 13:3–14:15.
[98] *Id.* at 14.
[99] *Id.* at 14–15.

formation.[100] Dr. Charash testified that this is true of any mechanism that decreases blood flow in particular areas of the heart.[101] Dr. Charash testified that the left chamber of the heart is particularly prone to this pooled coagulation effect when there is an asymmetrical focal wall motion defect. In Mr. Farley's case, the asymmetrical focal wall motion defect was causing only 30–35% of the blood in the left ventricle to pump, or half the normal amount.[102] Mr. Farley's heart dysfunction was not merely a global dilated cardiomyopathy. A global dilated cardiomyopathy occurs when you have uniform and symmetric damage to the heart. The TTE in this case shows that there was no dilation of the right ventricle, right atrium, or left atrium: "The right ventricle appears normal in size with normal systolic function. The left atrium and right atrium are normal in size."[103] Instead, Dr. Charash testified that there was an asymmetry in Mr. Farley's heart, which occurs in people who have had a recent heart attack.[104] A heart attack will damage only one portion of the heart. The TTE results here show Mr. Farley's asymmetrical focal wall defect, with damage to one wall of one ventricle of the heart.[105] Indeed, not only did all Plaintiff's witness agree this was the case, but this fact garnered agreement from Defense experts Dr. Caplan[106] and Dr. Greer.[107] When the Court questioned Dr. Greer, he testified that if he saw the focal wall defect on the TTE as it showed in Mr. Farley's case, he would be more concerned about the potential for clot and would order the higher

—

[100] *Id.* at 29.

[101] *Id.* at 28–30.

[102] Trial Day 1 PM Session, 34–35.

[103] Exhibit 16, at 30.

[104] Trial Day 1 PM Session, 36–37. Parties stipulated that Mr. Farley suffered a recent heart attack.
   Document #17, Stipulated Facts of Parties, at 2 (Sept. 16, 2014).

[105] Exhibit 16, at 30.

[106] Trial Day 3 PM Session, 51:2–13.

[107] Trial Excerpt Testimony of Dr. Greer, 25:11–16.

resolution TEE.[108] In response to this Court's questioning, Dr. Greer also stated that if the TEE revealed the clot-mechanism of stroke in Mr. Farley's heart, he would "absolutely" anticoagulate.[109]

**6.8.**     Dr. Charash testified that he could say with almost 100% certainty that Mr. Farley threw a clot from his heart to his brain in October 2010.[110] Dr. Charash also explained that anticoagulation is highly effective at preventing a second clot from breaking off and traveling to the brain.[111] Blood clots form in a cascade through a chemical chain reaction where a series of proteins convert one into another until it coagulates into the clot, which forms and grows. Anticoagulation suppresses the creation of these blood-clotting mechanisms.[112] When a provider anticoagulates a patient, he must be sure to follow the patient to safely administer the drug. Following the team approach, usually one member of the team, like a primary care provider, is responsible for following and dosing of the patient.[113]

**6.9.**     Dr. Charash concluded that had the Manchester VA followed the standard of care and anticoagulated Mr. Farley, to a reasonable degree of medical probability, it would have more likely than not prevented Mr. Farley's second stroke on December 2nd, 2010.[114] Dr. Charash's unchallenged testimony is that Coumadin is so effective that it

---

[108] *Id.* at 38–39.
[109] *Id.* at 39.
[110] Trial Day 1 PM Session, 55.
[111] Trial Day 1 PM Session, 14–15.
[112] Trial Day 1 PM Session, 16–17.
[113] Trial Day 1 PM Session, 18.
[114] Trial Day 1 PM Session, 81:21–82:2.

takes only 48 hours to drop the likelihood of a stroke by 50%. By four days, the likelihood of a second stroke is down by 95%.[115]

III.    **Dr. J. Neal Rutledge**

  **6.10.**    Plaintiff next called Dr. John Neal Rutledge, a neurointerventional surgeon with board certifications in diagnostic radiology and neuroradiology.[116] As a neurointerventional surgeon and neuroradiologist, he completed specialty training in imaging and in neuroradiology. He has specific neuroradiology training on head and neck imaging. His training and experience includes the use of such modalities as CT, CT-angiogram, MRA, echocardiograms, and ultrasounds.[117] Dr. Rutledge has over 34 years of experience treating patients.[118] In that time, he's also practiced as an emergency room physician.[119] He is currently an adjunct professor at the University of Texas and is licensed to practice medicine in New York, Texas, California, and Oklahoma.[120] In 2005, Dr. Rutledge co-authored the Texas Stroke Act, which is a mandate for transport and certification of stroke centers throughout the state, and which is currently the law in Texas.[121] On a regular basis, he is on call to treat strokes from the Emergency Room.[122] In preparation for his testimony, Dr. Rutledge reviewed the medical records and the actual images of the various brain scans and echos conducted on Mr. Farley, instead of merely

———

[115] Trial Day 1 PM Session, 82:4–12.
[116] Trial Day 2 AM Session, 4–5.
[117] Trial Day 2 AM Session, 5.
[118] Trial Day 2 AM Session, 6:13–16.
[119] Trial Day 2 AM Session, 6:17–22.
[120] Trial Day 2 AM Session, 6–7.
[121] Trial Day 2 AM Session, 7.
[122] Trial Day 2 AM Session, 8.

reading the reports of the scans.[123] The United States had no objection to this Court accepting Dr. Rutledge as an expert in radiology, neuroradiology, and neurointerventional surgery.[124]

    **6.11.**    Dr. Rutledge testified that it was not standard of care to discharge Mr. Farley on October 21, 2010 with just aspirin.[125] Instead, Mr. Farley should have been admitted to address and limit the effect of the recent stroke he suffered. Mr. Farley should have had his blood pressure, blood sugar, temperature, and other vitals monitored. The VA should have diagnosed the cause of Mr. Farley's stroke to prevent him from having additional strokes. And the VA should have ensured that Mr. Farley got the appropriate follow up care, including physical therapy and occupational therapy. With half his visual field cut, the VA did nothing in Dr. Rutledge's opinion to address Mr. Farley's visual field issues, creating a danger for Mr. Farley and the public.[126] And if the VA could not admit and adequately work up Mr. Farley under the standard of care, they should have transferred Mr. Farley to a facility that could.[127]

    **6.12.**    Dr. Rutledge testified that the VA providers also breached the standard of care by failing to rule out a clot in Mr. Farley's heart. He testified that the TTE was not sufficient to rule out a clot because it does not have the same resolution as a TEE and it is only a one-time picture of the heart. Clots that occur in the heart come and go—they build up, they break loose, and they build up again.[128] The entire time Mr. Farley was in

—

[123] Trial Day 2 AM Session, 7–8.
[124] Trial Day 2 AM Session, 9:17–21.
[125] Trial Day 2 AM Session, 10.
[126] Trial Day 2, AM Session, 11–12, 15.
[127] Trial Day 2, AM Session, 12.
[128] Trial Day 2, AM Session, 17.

the care of the VA providers from October to December 2010, Mr. Farley was at heightened risk for a second stroke.[129]

    **6.13.**    In sum, Dr. Rutledge believes that Mr. Farley should have been anticoagulated with heparin or Coumadin. The providers at the Manchester VA had multiple opportunities to anticoagulate Mr. Farley. Dr. Rutledge testified that Mr. Farley should have been admitted for work up immediately, instead of delaying his care. He believes that a complete work up would have resulted in Mr. Farley being anticoagulated.[130] The medication that the VA provided Mr. Farley, aspirin, was not sufficient as demonstrated by Mr. Farley's second stroke.[131] Instead, if Mr. Farley had been provided anticoagulation as the standard of care required, Dr. Rutledge testified that within a reasonable degree of medical certainty Mr. Farley's second stroke on December 2, 2010 would have been prevented and Mr. Farley would not have locked-in syndrome.[132]

## IV.   **Dr. James Frey**

    **6.14.**    Plaintiff also called Dr. James Frey, a stroke neurologist who is the stroke program director at the Barrow Neurologic Institute of St. Joseph's Hospital in Phoenix, Arizona. In that role, he is responsible for maintaining his hospital's accreditation of the stroke program, original research, lectures, symposia, and professional education. He spends approximately 80% of his time treating stroke patients. He has been a medical doctor for 42 years and has been specialized in stroke care for at least 25 years. He went

---

[129] Trial Day 2, AM Session, 19.
[130] Trial Day 2, AM Session, 18.
[131] Trial Day 2, AM Session, 19.
[132] Trial Day 2, AM Session, 21:17–22:4; 24:12–17.

to medical school at Duke University, completed his internship and residency at the University of Chicago and Washington University in St. Louis. He is board certified in Neurology and Vascular Neurology.[133] The Court accepted Dr. Frey as an expert in neurology and vascular neurology without objection from the United States.[134]

    **6.15.**    Dr. Frey testified that under the standard of care, when Mr. Farley presented, a doctor would be required to hospitalize the patient and to provide him with at least eight of the Joint Commission and American Heart & Stroke Association guidelines' approaches to care, prevention, and diagnosis. This includes imaging the head and neck, imaging the heart, identifying risk factors, addressing risk factors, and differentiating fundamentally whether the stroke is caused by a problem in the artery versus a problem in the heart.[135] Other than obtaining imaging of his arteries, Dr. Frey testified that the VA "wholly violated" the standard of care in 2010.[136] The VA failed to transfer this patient, if they did not believe they had the capability to handle him appropriately under the standard of care.[137] Dr. Frey testified that had they performed the standard work up, the standard of care would require anticoagulation.[138] Anticoagulation with warfarin over aspirin was the standard long before 2010 because the mechanism that forms clots in the heart is substantially different from the mechanism by which clots form in the arteries. In an artery, blood flow is fast and it is platelets that initiate the clotting process. But anti-platelets (i.e., aspirin) do not work where there is decreased movement of the blood, such

---

[133] Trial Day 2, AM Session, 58–60.
[134] Trial Day 2, AM Session, 63.
[135] Trial Day 2, AM Session, 64–65.
[136] Trial Day 2, AM Session, 67:19–22.
[137] Trial Day 2, AM Session, 68.
[138] Trial Day 2, AM Session, 68–69.

as blood clots in the leg or in the cardiac chambers.[139] There, platelets do not have a role. Mr. Farley's stroke was caused by a clot created during the coagulation process inside his heart, where blood was moving slowly.[140] Dr. Frey testified that when blood sits still or doesn't move as fast as normal, its natural tendency is to coagulate. When blood doesn't move, Dr. Frey testified that there are thirteen large molecules that interact together to form a spider web net that binds red blood cells, and brings them together to form a clot. If the blood is moving, the molecules do not have the opportunity to bind and create that spider web effect.[141] The treatment for such coagulation is either to keep the blood moving or to anticoagulate the patient.[142] Anticoagulation works by reducing the vitamin K, a necessary ingredient in the coagulation process.[143]

   **6.16.**    Dr. Frey testified that Mr. Farley's heart fit the prototype of the type of ventricle that is prone to forming clots that anticoagulation is designed to prevent. Specifically, the focal wall injury to the left ventricle diminished blood flow with each heartbeat making it prone to forming a clot.[144] Thus, the treatment for Mr. Farley's situation was either to anticoagulate him or to keep the blood moving at normal or near normal speed.[145] Without anticoagulation, a clot broke off from Mr. Farley's heart, traveled into the aorta, and up the vertebral artery, which merges in the back and bottom of the brain. This artery supplies all the blood to the brain stem, cerebellum, and the

———

[139] Trial Day 2, AM Session, 69–70.

[140] Trial Day 2, AM Session, 70–71.

[141] Trial Day 2, AM Session, 73.

[142] Trial Day 2, AM Session, 71–72.

[143] Deposition of Dr. Kim, 74:23–75:13.

[144] Trial Day 2, AM Session, 73.

[145] *See* Trial Day 2 AM Session, 55–56 (discussing echo performed on Feb 2011, showing improved heart function); Exhibit 16, at 51 (echo of Feb. 2011).

blood up to the visual areas. The October 2010 clot went up to his visual cortex, which caused the damage that impaired his ability to see. The December 2010 clot was more severe and blocked blood flow to Mr. Farley's brainstem.[146] Locked-in syndrome is a natural consequence of Mr. Farley's brain stem being deprived of oxygenated blood.[147] Dr. Frey's testimony is supported by the parties' stipulation that established the cause of Mr. Farley's locked-in syndrome as the stroke on December 2, 2010, which left him completely and permanently quadriplegic.[148]

## LIABILITY OF THE UNITED STATES

**7.1.**     Every single liability expert at trial testified that the VA violated the standard of care. For example, Defense witnesses testified that the VA's breaches include failing to get a rehabilitation consultation,[149] failing to prescribe a statin,[150] failing to get Holter monitoring,[151] and failing to notify Mr. Farley's PCP of his presentation.[152] The Court finds that the United States healthcare providers violated the standard of care in multiple ways that would have prevented Mr. Farley's December 2, 2010 stroke.

—

[146] Trial Day 2, AM Session, 80–81.

[147] Trial Day 2, AM Session, 81–82.

[148] Document #17, Stipulated Facts of Parties, at 2–3 (Sept. 16, 2014).

[149] Deposition Testimony of Dr. Kim, 71:18–22.

[150] Trial Day 3 PM session, 130:1–9.

[151] Deposition Testimony of Dr. Kim, 228:12–16; 71:12–17.

[152] Trial Excerpt Testimony of Dr. Greer, 4:16–18.

## I.      Breaches of the Standard of Care

**7.2.**    First, when Mr. Farley presented on October 21, 2010, the Manchester VA

failed to admit him to the hospital or transfer him to a hospital that could properly work

him up. Both Plaintiff's experts and Defense expert Dr. Greer[153] testified that this was the

standard of care. Had the VA followed the standard of care and appropriately worked Mr.

Farley up after admission, they would have more likely than not discovered that the

source of Mr. Farley's stroke was a clot from the heart. Both Plaintiff's experts and

Defense expert Dr. Kim[154] and Dr. Caplan[155] testified this was the case. Every single

Plaintiff expert and Defense expert Drs. Greer,[156] Kim,[157] and Caplan[158] testified that the

standard of care for a clot-source in the heart is anticoagulation with warfarin. At the very

least, it is more likely than not that admission and work up would have identified Mr.

Farley has high risk for a second cardioembolic stroke and therefore would have resulted

in anticoagulation treatment.

**7.3.**    Second, the Manchester VA should have given Mr. Farley a neurology

consultation. Here, every single Plaintiff liability expert and *every single Defense*

*expert*[159] testified that a doctor should consult a neurologist when a patient presents with a

stroke. And the parties stipulated that VA's own physician at the West Roxbury VA, Dr.

Frank, would have not only provided a neurology consult on October 21, 2010 if he had

—

[153] Trial Excerpt Testimony of Dr. Greer, 5:12–15.
[154] Kim Deposition Testimony, 36:22–37:5, 55:12–19.
[155] Trial Day 3 PM Session, 52:3–6.
[156] Trial Excerpt Testimony of Dr. Greer, 20:19–22.
[157] Kim Deposition Testimony, 58:25–59:12.
[158] Trial Day 3, PM Session, 50:5–7.
[159] Trial Excerpt Testimony of Dr. Greer, 20:1–4; Kim Deposition Testimony, 67:4–10; Trial Day 3 PM
    Session, 141:6–14 (Dr. Manning); Trial Day 3 PM Session, 48:18–20 (Dr. Caplan).

been sent there, but he would have also been admitted and received a stroke work-up.[160] However, at no time in 2010 did the VA provide Mr. Farley a neurologist. Had they provided Mr. Farley a neurologist, a neurologist would have, more likely than not, appropriately worked Mr. Farley up, and discovered that the only plausible cause of Mr. Farley's stroke was a clot from the heart. At which point, the standard of care would have required anticoagulation. It's particularly telling that after Mr. Farley's second stroke, he was immediately admitted into Elliot Hospital and within 24 hours he was seen by a neurologist and provided anticoagulation for this entire stay at Elliot.[161] At the very minimum, it is more likely than not that a reasonable neurologist would have identified Mr. Farley was at a heightened risk for a second stroke from his heart and would have anticoagulated him.

**7.4.**   Third, the Manchester VA failed to rule out a clot in Mr. Farley's heart. Every Plaintiff liability expert and *every single Defense expert* testified that the standard of care required doctors to identify the source of Mr. Farley's stroke.[162] Every Plaintiff expert and Defense expert Drs. Greer[163] and Caplan[164] specifically testified that the providers had an obligation to rule out a clot in Mr. Farley's heart. Dr. Greer testified that at the time of Mr. Farley's presentation, the VA did not conduct an adequate search for the cause of Mr. Farley's stroke.[165] In the Manchester VA's failed attempt at ruling out a clot in Mr. Farley's heart, they breached the standard of care in two additional ways—both of which

---

[160] Document #30, Stipulation of the Parties, 1 (Oct. 10, 2014).

[161] Trial Day 3 PM Session, 47–58.

[162] Trial Excerpt Testimony of Dr. Greer, 19:21–23; Deposition Testimony of Dr. Kim, 35:4–8; Trial Day 3 PM Session, 48:14–17 (Dr. Caplan); Trial Day 3 PM Session, 134:21–135:2 (Dr. Manning).

[163] Trial Excerpt Testimony of Dr. Greer, 20:10–18.

[164] Trial Day 3 PM Session, 50:2–4 (Dr. Caplan).

[165] Trial Excerpt Testimony of Dr. Greer, 29:18–20.

had an impact on his subsequent care. First, in October of 2010, the VA failed to get an urgent transesophageal echocardiogram. Even the treating provider, Dr. Lamphere, testified that he scheduled the TEE in error and it should have been scheduled within a week.[166] All Plaintiff's experts and Defense expert Drs. Greer,[167] Kim,[168] and Manning[169] testified that they would not have waited a month to get the echo. This delay is important because if they did not wait a month to get the echo, the Manchester VA's TEE would not have been broken. That is the second way in which the Manchester VA violated the standard of care in their failed attempt to rule out a clot in Mr. Farley's heart—they provided him a TTE instead of a TEE. The preponderance of the evidence at trial showed that the TEE is better at ruling out clots in the heart than the TTE. Beyond the Plaintiff's expert witnesses, multiple Defense witnesses testified to this fact:

| | |
|---|---|
| Dr. Lamphere: | "TEE was superior to the TTE"[170] |
| | TEE was the "best test to look at his heart"[171] |
| Dr. Lombardi: | TEE "has higher resolution for imaging the heart."[172] |
| Dr. Greer: | "higher resolution for detecting clots"[173] |
| | "you can't rule out a clot" in the patient's heart with TTE[174] |
| | A TEE "would look at the aorta better."[175] |

———

[166] Trial Excerpt Testimony of Dr. Lamphere, at 59.
[167] Trial Excerpt Testimony of Dr. Greer, 4:19–23.
[168] Deposition Testimony of Dr. Kim, 70:21–71:7.
[169] Trial Day 3 PM Session, 139:3–11.
[170] Trial Excerpt Testimony of Dr. Lamphere, 30:19–21.
[171] *Id.* at 31:11–14.
[172] Trial Excerpt Testimony of Dr. Lombardi, 22:23–23:2.
[173] Trial Excerpt Testimony of Dr. Greer, 24:6–8
[174] *Id.* at 24:9–12
[175] *Id.* at 28:25–29:5.

"A TEE is definitely better for detecting a clot."[176]

Dr. Kim:                   A TEE "is better at assessing clot in the atria."[177]

**7.5.**      Dr. Greer further testified that he would have done a TEE in Mr. Farley's case

to rule out a clot.[178] Dr. Greer also relied on a peer-reviewed article titled,

*Transesophageal Echocardiography is Superior to Transthoracic Echocardiography in*

*Management of Patients of Any Age with TIA or Stroke.*[179] This article's conclusion does

not stray far from its title. It found that 96% of patients older than 45 would be

"incorrectly denied anticoagulation if only a TTE were used."[180] Plaintiff also presented

the learned treatise, Braunwald's Textbook on Cardiology—which was established as

accurate and authoritative at trial by a Defense witness.[181] Testimony from this book

revealed that the TEE provided superior imaging of the heart and is useful for ruling out

"intracardiac thrombi" (or a clot in the heart).[182] More likely than not, had the Manchester

VA followed the standard of care by giving Mr. Farley a timely transesophageal

echocardiogram, they would have discovered clot(s) in his heart, which would have

required them to anticoagulate Mr. Farley. New Hampshire law defines medical injury as

those injuries arising out of the failure to properly maintain equipment or appliances

necessary. N.H. Rev. Stat. § 507-E:1(III). Mr. Farley was injured as a result of the VA's

failure to properly maintain their equipment. Even with the VA's failed search, the results

of the TTE showed that Mr. Farley was at a high risk for a second stroke. In this scenario,

---

[176] *Id.* at 36:18.

[177] Deposition Testimony of Dr. Kim, 224:4–7.

[178] *Id.* at 39:1–9.

[179] Exhibit 54.

[180] *Id.* at 3.

[181] Trial Excerpt Testimony of Dr. Lombardi, 23.

[182] Trial Excerpt Testimony of Dr. Lombardi, 25–28

the preponderance of the evidence proved that the standard of care required anticoagulation.

    **7.6.**    The next two standard of care violations are also related. First, the Manchester VA breached the standard of care by not providing continuity of care for Mr. Farley in the form of follow-up care and management. Second, the Manchester VA further breached the standard of care by not communicating to Mr. Farley's primary care provider about Mr. Farley's presentation on October 21, 2010. A reasonable and prudent primary care physician could manage the follow-up care, management, and continuity of care. The testimony at trial was that either a primary care physician, a cardiologist, or neurologist would be capable of managing the care, but one must be delegated that responsibility. No one had that responsibility in Mr. Farley's case. Had the VA followed the standard of care in these respects, more likely than not, a managing doctor would be able to put Mr. Farley's entire care together. Dr. Rutledge, for example, testified that a managing doctor would be responsible for identifying anomalies in the patient's history, such as the new hand or leg pain that Mr. Farley experienced after his first stroke, and pairing that against the context of the full patient history to identify issues and problems. Instead, the records show and the witnesses confirmed that Mr. Farley's primary care provider did not know Mr. Farley had a stroke.[183] Without appropriate follow-up care, no one doctor had a big-picture view of what was happening to his or her patient. Had the Manchester VA provided appropriate follow-up care under the standard of care, they

―

[183] Trial Day 2 PM Session, 20:21–21:1 (Testimony of Dr. Stein); Trial Day 3 PM Session, 121:16–22 (Testimony of Dr. Manning).

would have recognized that Mr. Farley was at high risk for a second stroke and would have anticoagulated him.

**7.7.**    Finally, even under the Defendant's view of this case, the United States healthcare providers at the Manchester VA violated the standard of care. At best, the Government's position is that the choice between warfarin anticoagulation therapy and baby aspirin is an individualized choice. If the Defense is correct, the Court finds that it was a violation of the standard of care to make that choice for Mr. Farley. The Manchester VA should have relayed that choice, the risks, and benefits to Mr. Farley.[184] More likely than not, had the VA given Mr. Farley the choice and fully explained the effectiveness of warfarin at preventing stroke, it's likely that he would have chosen anticoagulation over aspirin, or both. This is based on his family's uncontroverted testimony that the first stroke was a wake up call for Mr. Farley and that he was prepared to make life-changing decisions to prevent another stroke. Additionally evidence is found in the medical records between October 21st and December 1, 2010, which show that Mr. Farley took his first stroke very seriously and was fully compliant during this time.

## II.    **Causation**

**7.8.**    Had the Manchester VA provided Mr. Farley anticoagulation, it is much more likely than not that warfarin would have prevented Mr. Farley's second stroke on December 2, 2010. Defense expert Dr. Kim testified that warfarin was a cheap medication, costing less than a dollar a pill.[185] Had the VA provided anticoagulation

---

[184] Kim Deposition Testimony, 106:16–107:4.
[185] Kim Deposition Testimony, 110:12–111:1.

therapy for Mr. Farley, the overwhelming testimony is that it would have prevented Mr. Farley's second stroke.

**7.9.**     Next, there is agreement from both Plaintiff's witnesses and Defense witnesses that anticoagulation would have prevented Mr. Farley's second stroke:

| | |
|---|---|
| Dr. Charash: | In 4 days, drops the likelihood of a second stroke by 95%[186] |
| Dr. Rutledge: | Yes, because multiple trials have shown that.[187] |
| Dr. Frey: | 995 of 1000 times, warfarin will prove superior.[188] |
| Dr. Stein: | Anticoagulation would have prevented the second stroke.[189] |
| Dr. Kim: | Warfarin would have reduced the risk of a second stroke.[190] |
| Dr. Caplan: | Anticoagulation would more likely than not prevented a second stroke.[191] |

On this basis alone, the Court has sufficient evidence to find by a preponderance of the evidence that Mr. Farley's second stroke on December 2, 2010 would have been prevented by warfarin anticoagulation therapy.

**7.10.**     But the peer-reviewed medical studies also prove that warfarin has a significant benefit in preventing recurrent strokes:

| | |
|---|---|
| Ex. 45, at 1: | "substantial benefit in reducing the risk" |
| Ex. 46, at 1: | "anticoagulants [were] more effective than aspirin" |
| Ex. 51, at 1: | "protective effect against stroke" |
| Ex. 52, at 8: | "constant and significant benefit" |

———

[186] Trial Day 1 PM Session, 81–82 (Dr. Charash's testimony).
[187] Trial Day 2 AM Session, 21–22.
[188] Trial Day 2 AM Session, 86–87, 24:12–17.
[189] Trial Day 2 PM Session, 33:10–15.
[190] Deposition of Dr. Kim, 81:4–7.
[191] Trial Day 3 PM Session, 52:25–53:3.

Ex. 53, at 1:          "warfarin . . . was superior to aspirin"

Ex. 58, at 1:          "anticoagulant agents should probably be prescribed"

Ex. 64, at 8:          Warfarin for long-term secondary prevention is reasonable

Ex. 72, at 1:          "improved outcomes"

Ex. 72, at 9           "significant reduction"

Defendant did not offer any credible evidence of contrary medical peer-reviewed literature to undermine these studies that show warfarin's benefit. Rather, the United States asks the Court to ignore this literature. Using a preponderance of the evidence, more likely than not, the Court finds that had Mr. Farley been prescribed warfarin in the time period between October 21, 2010 and December 2, 2010, it would have prevented his second stroke.

**7.11.**    Defendant argues that because Mr. Farley was never anticoagulated after his second stroke, that is evidence against the effectiveness of anticoagulation. First, this is factually incorrect. Within 24 hours of Mr. Farley's second stroke, Mr. Farley was anticoagulated and worked up by a neurologist.[192] The records also show that Mr. Farley was anticoagulated at different points in his hospital stay, depending upon his specific medical needs.[193] Additionally, the Defendant's own expert witness, Dr. Kim, testified that the appropriate therapy for a left ventricular clot under the standard of care is three to six months of anticoagulation.[194] The testimony at trial explained the reason for this duration. Mr. Farley's risk of a reoccurring stroke was caused by a recent heart attack,

---

[192] Exhibit 2, Elliot Hospital Medical Records, 101–02 (record dated 12/3/10, showing neurology consult and current prescription of heparin, a stronger form of anticoagulation).

[193] *E.g.*, Exhibit 7, Berkshire Medical Center Records, 463 (anticoagulated for a month), 779 (one dose of anticoagulation)

[194] Kim Deposition Testimony, 58:25–59:12.

which caused ischemic damage to Mr. Farley's heart muscle.[195] This asymmetric focal wall abnormality pooled blood and created the risk of a second stroke.[196] But when that wall damage heals like it did with Mr. Farley's heart, the risk of a second stroke decreases and so does the need for anticoagulation.[197] A TTE performed on February 16, 2011 showed that Mr. Farley's ejection fraction was 45–50%.[198] Most people would live without complications even with a 45% ejection fraction.[199] Consequently, the credible evidence proved that Defendant's argument is lacking merit.

**7.12.** Without anticoagulation, it was highly foreseeable that Mr. Farley was going to have another stroke after discharge. Without full anticoagulation treatment, blood clots are free to form inside the left ventricle of the heart and likewise break off as an embolus at virtually any imaginable pace or pattern. Once a clot dislodges, it travels through the bloodstream straight to the brain. When it reaches an artery that is too narrow for it to continue traveling, the clot prevents the flow of blood and causes ischemic damage to the brain. When this happens in the basilar artery—like it did with Mr. Farley—it causes locked-in syndrome. Mr. Farley's second and catastrophic stroke occurred approximately 6 weeks after his first stroke. This second stroke was a direct and proximate consequence of not being protected with full anticoagulation, as was required by the standard of care. And had the Manchester VA healthcare providers anticoagulated Mr. Farley, even as late as November 2010, this Court finds by a preponderance of the evidence that Mr. Farley's second catastrophic stroke on December 2, 2010, would not have occurred.

—

[195] Document #17, Pretrial Statement of the United States, Stipulated Facts, 2 (Sept. 16, 2014).
[196] Trial Day 1 PM Session, 36–37 (Testimony of Dr. Charash).
[197] Trial Day 2 AM Session, 55–56 (Testimony of Dr. Rutledge).
[198] Exhibit 16, at 15 (TTE of 2/16/11 showing improved heart function to almost normal levels).
[199] Trial Day 1 PM Session, at 33–34 (Testimony of Dr. Charash).

**DEFENSES**

I.       **Cardiomyopathy**

   **8.2.**      Defendant argues that Mr. Farley had a dilated cardiomyopathy, and therefore, under the American Heart Association's Stroke Guidelines, Exhibit 43, either aspirin or warfarin was appropriate. Initially, the Court notes that no one article or guideline is the standard of care. The standard of care is individualized to the particular patient and the particular circumstances. Examining these Guidelines, however, the Court notices that the general rule, as espoused by the 2006 Stroke Guidelines is stated as follows: "Patients who have suffered an ischemic stroke who have a high-risk source of cardiogenic embolism should generally be treated with anticoagulant to prevent reoccurrence."[200] Every single Plaintiff's liability expert testified that Mr. Farley was at high risk for a second stroke.[201] Defense experts Dr. Kim,[202] Dr. Greer,[203] and Dr. Caplan[204] also agreed that Mr. Farley was at high risk. The Court finds that the preponderance of the evidence established more likely than not that Mr. Farley had a high-risk source of cardiogenic embolism, and under the general rule of the American Stroke Guidelines, he should be treated with anticoagulation.

   **8.3.**      With the general rule in place, the Court finds no persuasive evidence to deviate to an exception. The United States argues that Mr. Farley had a dilated cardiomyopathy. This is simply contrary to the preponderance of the evidence and not a

---

[200] Exhibit 43, at 12.
[201] Trial Day 1, PM Session, 13 (Dr. Charash); Trial Day 2, AM Session, 48 (Dr. Rutledge); 70–71 (Dr. Frey); Trial Day 2, PM Session, 17 (Dr. Stein).
[202] Kim Deposition Testimony, 56:9–20; 57:3–7.
[203] Trial Excerpt Testimony of Dr. Greer, 18:15–18.
[204] Trial Day 3, PM Session, 51.

credible position. The evidence showed that this section of the Stroke guidelines has no application to Mr. Farley's particular circumstances. All four of the Plaintiff's experts and two experts for the Defendant testified that this section does not apply.[205] Dr. Rutledge was actually on the American Stroke Association Board of Directors when these Stroke Guidelines were written.[206] Dr. Greer, Defendant's expert, testified that, for patients with strokes caused by a clot from the heart, this section would not be used to treat those patients.[207] Dr. Greer further testified that he could not say to a reasonable degree of certainty that the diagnosis of Mr. Farley's stroke was cardiomyopathy.[208] Dr. Kim, when confronted with an article cited by the Stroke Guideline Section on dilated cardiomyopathy, and asked whether the article examined patients with a diagnosis of dilated cardiomyopathy, he testified, "A different kind of cardiomyopathy than our patient [Mr. Farley]."[209] The overwhelming preponderance of the credible evidence makes it more likely than not that the general rule applied and that anticoagulation was warranted.

**8.4.**    But if the Court were to examine the Cardiomyopathy section, it would find that it relied on the WARCEF study.[210] But the witness testimony was that the WARCEF

---

[205] Trial Day 1, PM Session, 76–77 (Dr. Charash); Trial Day 2, AM Session, 48–49 (Dr. Rutledge); Trial Day 2, AM Session, 83 (Dr. Frey); Trial Day 2, PM Session, 50 (Dr. Stein).

[206] Trial Day 2, AM Session, 36:21–25; 48:5–8.

[207] Trial Excerpt Testimony of Dr. Greer, 27:12–15.

[208] Trial Excerpt Testimony of Dr. Greer, 28:5–12.

[209] Deposition Testimony of Dr. Kim, 246:20–24.

[210] Exhibit 43, at 16. Defense witnesses also relied on the WATCH study. Defense Expert Dr. Greer testified that the WATCH study was underpowered to reach any conclusions. Trial Excerpt Testimony of Dr. Greer, 13:5–8. Because it was so unreliable, Dr. Greer testified he would not rely on it for any conclusions. *Id.* at 13:9–13.

study included a broader population of patients than of the kind similar to Mr. Farley.[211]

Even with that broad population, Dr. Greer testified that WARCEF actually showed a

constant and significant benefit in patients on warfarin in the prevention of ischemic

stroke.[212] Using this study and even acknowledging the benefits it finds for warfarin, the

Defendant argues that the risk of hemorrhage was too great to put Mr. Farley on

anticoagulation. In advancing this argument, the United States ignored the fact that the

WARCEF study by its own terms states that individuals randomized to aspirin or

warfarin, "did not differ significantly with respect to the rate of intracerebral

hemorrhage." What's more, the same scientists who conducted the WARCEF study,

examined the population of patients in that study for subgroups of patients that would

benefit from one drug or the other, notwithstanding hemorrhaging.[213] In doing so, the

WARCEF authors found that in patients younger than 60, warfarin improved outcomes

over aspirin, even taking into account hemorrhaging.[214] And aspirin also carried the risk

of hemorrhaging, with the additional risk of gastrointestinal bleeding.[215] Further, patients

can also be aspirin resistant, but nothing was done to determine whether Mr. Farley was

aspirin resistant when the VA prescribed aspirin.[216] The Defendant's argument that the

risks of warfarin outweigh any benefits rings hollow. The trial testimony revealed

---

[211] Trial Excerpt Testimony of Dr. Greer, 15.
[212] Trial Excerpt Testimony of Dr. Greer, 13:21–24.
[213] Trial Excerpt Testimony of Dr. Greer, at 15–16.
[214] Trial Excerpt Testimony of Dr. Greer, at 16–17.
[215] Trial Excerpt Testimony of Dr. Greer, at 10:11–16.
[216] Trial Excerpt Testimony of Dr. Greer, at 10:17–11:5.

warfarin has been out on the market for at least 20–30 years.[217] Today, millions of Americans take warfarin and, historically, it has saved millions of lives.[218]

**8.5.**    Finally, the specific facts of Mr. Farley's case easily settle the so-called controversy between warfarin and aspirin. The testimony from all of the Plaintiff's liability experts was that aspirin would not and could not prevent the type of stroke Mr. Farley had.[219] Dr. Greer and Dr. Caplan both testified that it would have been reasonable to anticoagulate Mr. Farley[220] and aspirin did not prevent Mr. Farley's second stroke.[221] Dr. Caplan further testified that anticoagulation would have prevented Mr. Farley's second stroke.[222] Defendant takes an untenable position if its stance is that it would be reasonable to anticoagulate, and anticoagulation was the only drug that would have prevented Mr. Farley's stroke, but the standard of care does not require a doctor to even offer such a life-saving medication to its patient.

**8.6.**    But assuming the Defendant's argument as true, Mr. Farley was never relayed this choice between warfarin and aspirin. No doctor sat Mr. Farley down and told him of the risks and benefits of aspirin versus warfarin, the risks of a second stroke without warfarin, or allowed Mr. Farley to be an active participant in his own health care decisions. Had they done so, this Court finds more likely than not that Mr. Farley would have chosen anticoagulation based on the testimony of James Farley and his family.

—

[217] Trial Excerpt Testimony of Dr. Greer, at 9:25–10:10.

[218] Trial Excerpt Testimony of Dr. Greer, at 9:22–24.

[219] Trial Day 1, PM Session, 76:1–10 (Dr. Charash); Trial Day 2, AM Session, 19:15–24 (Dr. Rutledge), 69–70 (Dr. Frey); Trial Day 2, PM Session, 27 (Dr. Stein).

[220] Trial Excerpt Testimony of Dr. Greer, 18:22–19:1; Trial Day 3 PM Session, 52:7–9 (Dr. Caplan).

[221] Trial Excerpt Testimony of Dr. Greer, 19:2–4; Trial Day 3 PM Session, 54:14–20 (Dr. Caplan).

[222] Trial Day 3 PM Session, 52:25–53:3.

II.     **Alternative Possible Causes of Mr. Farley's Stroke**

**8.7.**     Experts for the United States theorized alternative possible causes of Mr. Farley's stroke. At the outset, the Court discards these theories as lacking credibility because they are speculative and contrary to New Hampshire law. No witness for the defense was able to conclude to any reasonable degree of medical certainty, or more likely than not, that any of these possibilities suggested are the actual and probable cause of Mr. Farley's stroke. Under New Hampshire law, "causation is a matter of probability, not possibility." *Pillsbury-Flood v. Portsmouth Hospital*, 512 A.2d 1126, 1130 (N.H. 1986).

**8.8.**     Secondarily, the Court is not persuaded by the United States' new assertions of possible causes of this stroke because the United States stipulated as to the specific cause of the stroke: "[T]he blockage likely came from a clot originating in or flowing through the heart, or what's known as *cardioembolic* in nature."[223] Until as late as six days before trial, the United States was so unconcerned with this issue that it went so far as to stipulate that "the restriction of blood flow was most likely not from atherosclerotic blockage of the head and neck arteries *or a clot originating from such plaque*."[224] As a factual matter of evaluating the witnesses credibility, the Court is convinced that the most probable cause of Mr. Farley's stroke was the heart dysfunction as stipulated to by the parties and as most witnesses testified to.

**8.9.**     But alternatively, even if the Court were to entertain the possibilities the United States now posits, the Court remains unconvinced that those possibilities are

---

[223] Document #17, Stipulated Facts of Parties, at 1–2 (Sept. 16, 2014) (emphasis in original).
[224] Document #17, Stipulated Facts of Parties, at 1 (Sept. 16, 2014) (emphasis supplied).

supported by the medical records and the preponderance of the evidence and testimony at trial. In fact, many of the alternative "possible" causes presented by Defendant were contradicted by other experts in the Defendant's own case-in-chief. But the Court will now address each alternative raised.

**8.10.** ***Atherosclerosis.*** United States' expert witness Dr. Warren Manning testified that a potential cause of Mr. Farley's stroke was atherosclerosis. As a basis for his conclusion, he testified that a clot traveling from Mr. Farley's heart to his brain would be "unusual." He believed it would be unlikely that two clots ended up in the same posterior circulation of the brain.[225] This testimony is contradicted by Dr. Stein's studies that show, if you look at overall populations, the vertebral arteries, and the basilar artery in the back of the neck (which is where Mr. Farley had his stroke), are much more likely to stroke due to embolism.[226]

**8.11.** However, Dr. Manning's math can only be correct if Mr. Farley only had two strokes thrown from his heart. As more clots are thrown from his heart, the more opportunities those clots have to land in the brain. Dr. Bruce Charash testified that this is the very reason why patients are anticoagulated on an urgent basis: because the risk of clot formation is so high. He testified that clots can form, break off, and travel to any part of your body because the left chamber of the heart pumps blood to your entire body. So, if a clot is launched like a missile from your heart, it may land in one of your legs, blocking blood flow to that part of your leg; it may travel to the kidneys, causing kidney

---

[225] Trial Day 3 PM Session, 142:16–143:5.
[226] Trial Day 2 PM Session, 28–29.

disease; it can even travel to the coronary arteries causing a heart attack.[227] Dr. Neal Rutledge, a neuroradiology and neurointerventional surgeon, testified that Mr. Farley's records showed evidence of other clots launching to other regions of the body, manifesting in pain and other dysfunction.[228] For example, on November 5, 2010, Mr. Farley presented "today . . . using a cane which is a first for this [patient]."[229] Then, on December 1, 2010, Mr. Farley came into the ER complaining of new right hand pain. Defendant, in closing, argued that this was merely his pre-existing disease, but the records clearly show that his pre-existing pain was in his left hand.[230] New right-hand pain is particularly important and suspicious for a clot because when clots form in the heart and break loose, they can go any place the arteries go in your body. Both Dr. Rutledge and Dr. Frey testified that the first artery that comes off the aorta is the one that goes to your right hand.[231] These facts, which Dr. Manning failed to consider, make his math unreliable and unconvincing.

**8.12.**    The other basis for Dr. Manning's conclusion of atherosclerosis was that he believed Mr. Farley's heart attack was an old heart attack. Here again, the Court finds this basis unpersuasive because the United States stipulated twice that Mr. Farley's heart attack was a recent heart attack.[232] Further, at the time Mr. Farley was being treated, this

---

[227] Trial Day 1 PM Session, 30–31.

[228] Trial Day 2 AM Session, 22–23.

[229] Exhibit 1, at 141 (November 5, 2010 medical record).

[230] Exhibit 16, at 34 (December 1, 2010 medical record).

[231] Trial Day 2 AM Session, 23 (Testimony of Dr. Rutledge); 79 (Testimony of Dr. Frey).

[232] Document #17, Stipulated Facts of Parties, at 2 (Sept. 16, 2014) ("The results of this TTE also suggested that Mr. Farley may have had had a recent heart attack."); *id.* ("Dr. DelRio noted in the records that Mr. Farley most likely had a recent heart attack.").

issue was not enough of a concern for Manchester VA providers to perform a full work up and examination.

**8.13.**    ***Aortic Atherosclerosis***. Additionally, Dr. Manning suggested a potential cause of Mr. Farley's stroke was aortic plaque, or atherosclerosis of the aorta. However, the undisputed witness testimony was that when you run a CTA of the neck and head, as was done here,[233] it by definition looks at the aorta.[234] The CTA report was silent on this matter. In reality, CT-Angiogram performed on October 21st showed no atherosclerotic causes of stroke in *any* the posterior arteries where the stroke occurred—all were normal in appearance.[235] Dr. Neal Rutledge reviewed the underlying images of the CT and CTA performed on Mr. Farley. He testified that the CTA actually imaged the aorta and interpreted the images as normal, without significant atherosclerotic disease in the aorta that would contribute to stroke to any reasonable degree of medical probability.[236] The Court finds Dr. Rutledge's testimony credible because he is the only expert who is board certified in neuroradiology. He regularly reviews and operates on patients using the CT and CTA modalities of imaging and is the only expert trained, educated, and experienced in the physics of those modalities.[237] Moreover, Dr. Rutledge's findings are supported by the Manchester VA's own CTA report and radiologist.

**8.14.**    Additionally, Mr. Farley had two TTE's performed: one on November 18, 2010 and a second on February 16, 2011. The TTE of November 18, 2010 states that there is no stenosis (narrowing), which would be seen if aortic plaque were narrowing the

---

[233] Exhibit 16, at 7.
[234] Trial Day 1 PM Session, 47–49 (Testimony of Bruce Charash).
[235] Exhibit 16, at 6–8.
[236] Trial Day 2, AM Session, 15.
[237] Trial Day 2, AM Session, 5; Exhibit 25 (CV of Dr. Rutledge).

artery. And the TTE of February 2011 expressly documents the examination of the ascending aorta and states that it is of "normal size and structure."[238]

**8.15.**    Further, if there were an abnormal finding in one of the tests at the time the Manchester VA was looking for a cause of this stroke, the records would be expected to describe that finding.[239] But no additional medical testing or investigation was done by the Manchester VA to identify atherosclerosis as a potential cause of Mr. Farley's stroke. At the time that it mattered most in the treatment of this patient, the contemporaneous medical records show that this alternative possible cause was not a sufficient concern for the VA to investigate further.

**8.16.**    The overwhelming preponderance of witness testimony does not support the conclusion that this stroke was caused by atherosclerosis in Mr. Farley. Defendant's treating physician, Dr. Lamphere, testified under oath *four separate times* that atherosclerosis did not cause Mr. Farley's stroke.[240] One of those four separate admissions was in direct response to questioning from the United States.[241] Additionally, Defendant's retained testifying experts Dr. Greer[242] and Dr. Caplan[243] gave sworn testimony ruling out atherosclerotic disease. Defendant's expert Dr. Kim also disagreed with Dr. Manning. Dr. Kim testified twice under oath that the most likely cause of Mr. Farley's strokes, to a reasonable degree of medical certainty, was a clot formed in the left ventricle of Mr.

---

[238] Exhibit 16, at 50.
[239] Trial Day 1 PM Session, 47.
[240] Trial Excerpt Testimony of Dr. Lamphere, 19:19–24; 20:9–12; 58:17–19; 84:5–13.
[241] *Id.* at 84:7–13.
[242] Trial Excerpt Testimony of Dr. Greer, 28:20–21.
[243] Trial Day 3, PM Session, 45:1–7, 15–20.

Farley's heart.[244] When the Court considers this testimony combined with the Plaintiff's four experts, it is not credible to believe that Mr. Farley's stroke was caused by atherosclerosis and such a conclusion would be against the great weight and preponderance of the evidence.

   **8.17.**   Generally speaking, Dr. Manning's lone minority view is unsupported by any other witness or the evidence. It was often directly contradicted by the Defendant's own witnesses. Dr. Manning stated that he does not see these types of patients or know stroke protocol, which may explain his conclusions.[245]

   **8.18.**   *Dissection*. Defense expert, Dr. Greer, offered the possibility that a dissection may have caused Mr. Farley's stroke. Yet, he testified that the CTA performed on Mr. Farley was greater than 99% effective at detecting a dissection and the CTA found none.[246] Dr. Greer testified that he couldn't say to a reasonable degree of medical certainty that Mr. Farley had a dissection at any point in time.[247] But he still casually referenced dissection as a possible cause. Like atherosclerosis, this cause also does not meet the more-likely-than-not test for reliable and credible evidence. Like atherosclerosis, the United States stipulated that this was not the most likely cause.[248] Like atherosclerosis, this possibility is contradicted by the medical records.[249] And like

---

[244] Deposition Testimony of Dr. Kim, 36:22–37:5; 55:12–55:19.

[245] Trial Day 3, PM Session, 119:23–119:6 (Testimony of Dr. Manning.)

[246] Trial Excerpt Testimony of Dr. Greer, 34.

[247] Trial Excerpt Testimony of Dr. Greer, 33:18–24.

[248] Document #17, Stipulated Facts of Parties, at 1 (Sept. 16, 2014).

[249] Exhibit 16, at 6 (CT on Oct 21, 2010: "No intracranial hemorrhage").

atherosclerosis, the United States' own witnesses—some in response to the United States' direct examination—denied the possibility of a dissection.[250]

### III.    Non-Compliance

**8.19.**    Next, the United States referenced outdated and unrelated non-compliance character evidence in an attempt to defend its care. But Dr. Greer testified that any history of non-compliance was from before Mr. Farley's first stroke on October 21, 2010.[251] Dr. Greer testified that he would rely on the treating doctors documentation in the medical records as to whether Mr. Farley was taking his prescribed aspirin during the relevant time period.[252] Turning to those records, they showed that on October 21, 2010, Dr. Lamphere received a computerized print out of the medications that Mr. Farley was supposed to be taking.[253] Dr. Lamphere testified that, with the patient in front of him, he goes through the list of medications.[254] He goes through the medication list with the patient and determines whether the patient is taking his prescribed medications.[255] He reconciles what the patient is reporting with what the VA computer system notes, and stated in the medical records that there were no discrepancies noted.[256] Dr. Lamphere

—

[250] Trial Excerpt Testimony of Dr. Lamphere, 76:11–24 (Dr. Lamphere in response to Mr. Plourde's questioning); Trial Day 3, PM Session, 42:8–13 (Dr. Caplan).
[251] Trial Excerpt Testimony of Dr. Greer, 5:23–6:6.
[252] Trial Excerpt Testimony of Dr. Greer, at 6:18–7:3.
[253] Exh. 16, at 9.
[254] Trial Testimony of Dr. Lamphere, at 11:9–14.
[255] Trial Testimony of Dr. Lamphere, at 12.
[256] Exh. 16, at 9.

confirmed that the notation "no discrepancies" meant that Mr. Farley was taking the medications he was supposed to be taking on October 21, 2010.[257]

**8.20.**    Similarly, both Dr. Lombardi and a nurse completed separate medication reconciliations on November 18, 2010.[258] In both instances, no discrepancies were noted. Dr. Lombardi testified that he and his nurses would be expected to note any discrepancies in the patient's medication.[259] The December 1, 2010 urgent care note also notes no discrepancies with Mr. Farley's aspirin prescription.[260]

**8.21.**    These medical records support the fact that Mr. Farley was taking his aspirin per doctor's orders. It's also supported by the Manchester VA's pharmacy profile. This profile showed that Mr. Farley was prescribed two baby aspirin per day on October 21, 2010.[261] He was given 120 aspirin pills, or a 60-day supply.[262] Hence his prescription supply would expire on December 20, 2010. Exhibit 41 showed that Mr. Farley picked up a refill of aspirin on December 1, 2010, which is reliable evidence that Mr. Farley was taking his medication as prescribed.[263] Indeed, it is convincing evidence that Mr. Farley was very compliant as he was filling his prescription early in order to ensure there would be no gaps in his aspirin prescription. Mr. Farley's son, James Farley, also testified that Mr. Farley was taking his medication as prescribed and quit smoking. James Farley described Mr. Farley's first stroke as a wake-up call for Mr. Farley. Defendant offered no credible evidence to contradict what its own medical records and treating witnesses

---

[257] Trial Excerpt Testimony of Dr. Lamphere, at 12–13.
[258] Exh. 16, at 26, 29.
[259] Trial Testimony of Dr. Lombardi, at 9–11.
[260] Exh. 16, at 34, 35.
[261] Exh. 41, at 1.
[262] *Id.*
[263] *Id.*

confirmed—that between October 21, 2010 and December 2, 2010 Mr. Farley was a fully compliant patient taking the prescriptions the VA prescribed.

   **8.22.**    Defendant did make an attempt at suggesting that Mr. Farley had stopped taking his atenolol and Crestor during the operative time period. However, the VA's records prove that Mr. Farley was not prescribed this medication until December 1, 2010.[264] The VA's own treating physician undermined Defendant's position as well. Dr. DelRio testified that he would not have prescribed this medication if Mr. Farley had an existing prescription.[265] Both the October 21st and November 18th medication reconciliations showed that Mr. Farley was not prescribed these medications at the time.[266] The Court finds the witness testimony in combination with the medical and pharmacy records reliable and convincing evidence that Mr. Farley was compliant with his prescribed medications. Even if he had been prescribed the medications atenolol and Crestor, the Defendant's own witnesses testified that they would not have prevented Mr. Farley's second stroke.[267]


## DAMAGES


   **9.1.**    Having found the VA negligent by failing to admit Mr. Farley for work up, failing to get a neurology consult, failing to provide the appropriate and timely testing, failing to maintain continuity of care, and failing to offer Mr. Farley anticoagulation treatment, the Court will now address the damages caused by the VA's negligence.

———

[264] Exh. 16, at 44.
[265] Deposition Testimony of Dr. DelRio, 57:8–11.
[266] Exh. 16, at 9, 26.
[267] Trial Excerpt Testimony of Dr. Greer, 19:5–7; Day 3 PM Session, 53:21–24 (Dr. Caplan's testimony).

**9.2.**    As a result of the United States employees' negligence, Mr. Farley now suffers from what is known as "locked-in syndrome." It is stipulated that Mr. Farley's locked-in syndrome was caused by the December 2, 2010 stroke.[268] Paralyzed from head to toe, Mr. Farley—his mind intact—is imprisoned inside his own body, unable to speak or move other than by blinking his eyes and nodding his head. His condition is permanent and it is undisputed that he will have life long and permanent medical needs as a result of the stroke on December 2, 2010.[269]

**9.3.**    At trial, the plaintiff bears the burden of proving "the extent and the amount" of her damages. *Hutton v. Essex Grp.*, Inc., 885 F. Supp. 331, 334 (D.N.H. 1994). Plaintiff need not prove future damages with "mathematical certainty or sliderule precision." *See id.* Further, future damages must be reduced to present value. *Reed v. Nat'l Council of Boy Scouts of Am., Inc.*, 706 F. Supp. 2d 180, 194 (D.N.H. 2010).

**9.4.**    Plaintiff presented the only evidence at trial on damages suffered by Mr. Farley. This testimony was not contested with evidence or witness testimony by the United States. Plaintiff presented the testimony of Dr. Robert Eilers, a board-certified physical medicine and rehabilitation medicine doctor.[270] Physical medicine and rehabilitation addresses the diagnosis and the long-term treatment of patients with varying injuries, including the type of injury Mr. Farley has—locked-in syndrome from stroke.[271] Dr. Eilers is licensed to practice medicine in Illinois, Florida, Georgia,

---

[268] Document #17, Stipulated Statement of Facts, at 2–3 (Sept. 16, 2014).
[269] Document #17, Stipulated Facts of Parties, at 2–3 (Sept. 16, 2014).
[270] Exhibit 26, CV of Robert Eilers, at 4.
[271] Trial Day 2 PM Session, 59.

Michigan, Wisconsin, Indiana, and Kentucky.[272] He spends 95% of his time clinically caring for patients.[273] Dr. Eilers' full CV has been entered into evidence as Exhibit 26. The United States had no objection to this Court accepting Dr. Eilers as an expert in physical medicine and rehabilitation medicine.[274]

I.      **Upfront Costs & Surgeries**

**9.5.**     For the purposes of determining what medical care Mr. Farley would need, Dr. Eilers examined Mr. Farley, talked to his family, visited the facility at which Mr. Farley currently resides, and reviewed the medical records.[275] Dr. Eilers also conducted research into Keene, NH because the family and Mr. Farley have expressed their desire to relocate Mr. Farley to their hometown of Keene.[276] Dr. Eilers testified that being at home with family, in his experience, "unquestionably makes a difference" in terms of the patient's quality of life.[277]

**9.6.**     Mr. Farley is currently under the care of VA contracted healthcare providers in Pittsfield, MA.[278] His family lives in Keene, NH, almost two hours away. Mrs. Farley has tried on multiple occasions to get VA approval for a move closer to Mr. Farley's family, or provide in-home care to her husband so that he can live with his family; the VA has refused.[279] Mr. and Mrs. Farley have three natural children: George Farley (age

—

[272] Trial Day 2 PM Session, 61:4–6.
[273] Trial Day 2 PM Session, 63:9–14.
[274] Trial Day 2 PM Session, 63:15–19.
[275] Trial Day 2 PM Session, 66–67.
[276] Trial Day 2 PM Session, 68–69.
[277] Trial Day 2 PM Session, 78:7–14.
[278] Trial Day 2 PM Session, 67–68.
[279] Exhibit 33, Letter from the VA Denying Mrs. Farley's request to move Mr. Farley closer to home.

31); James Farley (age 25); and Kimberly-Rae Farley (age 23).[280] Mr. Farley expressed his desire to be with his family. Plaintiff presented a video of Mr. Farley in which he asked his family to "please, get me out of here."[281] Jeanice Farley, James Farley, and Kimberly-Rae Farley each testified that they want to bring Mr. Farley home. In addition, the only expert testimony on the issue established that proximity to regular and daily interaction with his family will provide Mr. Farley numerous benefits to his health (both mental and physical), his enjoyment of life, and even his life expectancy. This Court, after viewing the evidence and testimony, finds that a family support structure is both emotionally and physically necessary for Mr. Farley's well being. This Court finds no medical or other reason why Mr. Farley should not be allowed to return home and be provided in-home medical care. Mr. Farley cannot be made whole without returning him to his home in Keene, N.H.

**9.7.**    In order to have a suitable and safe in-home care environment, the Farley family will need to purchase a handicap modified and accessible home. Dr. Eilers relied on his expertise as a licensed real estate managing broker and his experience as a real estate contractor to develop the specifics of this housing plan.[282] The cost of this home would include accessibility improvements, with a number of reinforcements for joists and v-track systems that would be able to transport and move Mr. Farley.[283] The specific type of bed Mr. Farley needs requires additional joists to be placed in the basement because the weight of the bed and the pressure that's distributed on the wheels would otherwise

---

[280] Document #37, Parties Second Set of Stipulations, 1.
[281] Exhibit 29.
[282] Exhibit 26, CV of Robert Eilers, at 4, 9, 11.
[283] Trial Day 2 PM Session, 83–84.

damage and break the floor of a normal home.[284] Dr. Eilers' plan reasonably concludes, and the Court finds, this upfront cost for a modified and handicap accessible home totals **$577,440.00**. Defendant offered no evidence to contradict Dr. Eilers' conclusions on this cost.

**9.8.**     Dr. Eilers' plan addressed the immediate up front medical care costs that Mr. Farley needs. Mr. Farley has profound contractures. His elbow, for example, is contracted 90°. His hands are fisted in a decorticate position because his brain is disconnected from the rest of his body due to the second stroke.[285] His fingers painfully dig into his palms as a result. Mr. Farley's legs are permanently crossed without surgical release of the contractures.[286] Allowing more flexion reduces the risk of yeast and candida infections.[287] His contractures also prevent proper hygiene.[288] Further, releasing the contractures will allow Mr. Farley to properly sit in a wheelchair without pain and to be moved out of his room.[289] To address Mr. Farley's contractures and need for multiple surgical repairs, the life care plan reasonably concludes a cost of **$125,000.00**.[290] These are the minimum surgeries needed to release his knees, his ankles, and adductors.[291] This surgery is necessary because Mr. Farley does not get the physical and other therapies necessary to prevent contractures.[292] As such, Dr. Eilers' plan anticipates the reasonable and necessary

—

[284] Trial Day 2 PM Session, 84.
[285] Trial Day 2 PM Session, 88.
[286] Trial Day 2 PM Session, 95–96.
[287] Trial Day 2 PM Session, 89.
[288] Trial Day 2 PM Session, 91.
[289] Trial Day 2 PM Session, 91.
[290] Exhibit 39, at 1.
[291] Trial Day 2 PM Session, 89–92.
[292] Trial Day 2 PM Session, 105–106.

costs of preventing such injuries in the future. Defendant offered no evidence to contradict Dr. Eilers' conclusions on this cost.

**9.9.**    Plaintiff also presented evidence of billing records showing the reasonable and necessary charges billed to Mr. Farley for his subsequent care and treatment at various facilities subsequent to his stroke. Attached as **Exhibit A** is a breakdown of the specific charges based on the billing records. They total **$666,270.62.** Defendant offered no evidence to contest these past costs.

**9.10.**    The Court finds that as a proximate result of Defendant's negligence, the total reasonable and necessary upfront or one-time costs resulting from the Government's negligence are as follows:

|   |   |   |
|---|---|---|
| $ | 577,440.00 | Modified Home |
| $ | 125,000.00 | Contracture Surgeries |
| $ | 666,270.62 | Billing Total |
| **$ 1,368,710.62** | | **Total upfront or one-time costs** |

II.    **Life Expectancy of Mr. Farley**

**9.11.**    In order to make a determination of the cost of future medical care, Dr. Eilers calculated Mr. Farley's life expectancy. He based his calculation on his 35 years of experience and clinical treatment of 50,000 to 60,000 patients with catastrophic injuries.[293] He reviewed and relied upon the CDC Life Expectancy Tables, which were entered into evidence without objection as Exhibit 38. These life tables use data as recent

---

[293] Trial Day 2 PM Session, 71.

as January 2014 to determine life expectancy.[294] Based on this data, Dr. Eilers testified

that Mr. Farley would have a life expectancy of 22.2 years. His opinion is based on his

experience as a medical doctor treating and caring for patients like Mr. Farley, the United

States' own statistical data published by the Centers for Disease Control, and his own

physical and medical examination of Mr. Farley.

**9.12.**    The Court finds Dr. Eilers' life expectancy conclusion credible because Dr.

Eilers' conclusion accounts for Mr. Farley's co-morbidities, which would tend to

decrease one's life expectancy. His opinion also accounts for factors that are now present

in Mr. Farley that would tend to increase Mr. Farley's life expectancy, such as his

perfectly controlled diet, the fact that he no longer smokes, and his health is closely

monitored. Dr. Eilers' uncontested testimony is that the quality of care has an absolute

positive impact on life expectancy.[295]

**9.13.**    Dr. Eilers' conclusion regarding life expectancy is not a measure of perfect

health.[296] Instead, it is based on studies specifically examining the life expectancy of

locked-in patients, some of whom Dr. Eilers personally treated.[297] For example, Exhibit

59 is a study of specifically locked in patients, examining their life expectancies. The

study notes that the vast majority of deaths occur within the first four months of locked in

syndrome.[298] "Our data clearly suggest that once a patient has medically established in

[locked-in syndrome] for more than one year, the life span can be prolonged."[299] Finally,

—

[294] Trial Day 2 PM Session, 72–73.
[295] Trial Day 2 PM Session, 79.
[296] Trial Day 2 PM Session, 74–75.
[297] Trial Day 2 PM Session, 75–77.
[298] Exhibit 59, at 4.
[299] Exhibit 59, at 4.

the study, which was published in 1992, notes that improved patient care and technology will also improve life expectancy.[300] Similarly, the conclusion of another study in evidence shows,

> Once they become medically stable, some persons with [locked-in syndrome] will survive for decades. Contrary to the perceptions of some health care providers, who have experienced such a severe disability, they typically have a wish to live. They return home and develop meaningful roles in their families and communities. In the future, access to the improved computer voice prosthetics and the Internet will further enhance the quality of life.[301]

Defendant offered no medical expert testimony to question Dr. Eilers' life expectancy conclusion and it is essentially uncontested. The Court finds his underlying basis credible, and finds as a matter of fact that Mr. Farley will have a life expectancy of 22.2 years for the purposes of calculating his reasonable and necessary future medical, healthcare, and attendant care expenses.

### III.  Reasonable & Necessary Future Medical Care

**9.14.**  Mr. Farley is dependent for all his activities of daily living. He needs to be bathed, dressed, and transferred. His legs are crossed and impair some of his perineal hygiene. According to Dr. Eilers, Mr. Farley's current healthcare providers did not provide the appropriate provisional physical therapies to maintain his status. His contractures worsened as a result.[302] Mr. Farley is incontinent of both bowel and bladder. He is dependent for all of his self-care. He can communicate, but it is quite time

---

[300] Exhibit 59, at 5.
[301] Exhibit 61, at 9.
[302] Trial Day 2 PM Session, 106–107.

intensive. He is able to answer yes and no questions by nodding his head and using his eyes. In short, Mr. Farley is completely dependent on others for every detail of his life.[303] All of these facts about Mr. Farley's current condition are not in dispute.

**9.15.**    The life care plan presented by Dr. Robert Eilers fairly and reasonably projects Mr. Farley's future medical, therapy and related health care needs based on his permanent disability, and need for an in-home health care environment.[304] Again, Dr. Eilers' projections for Mr. Farley's future medical needs along with their associated costs were not contested by Defendant with any expert witness testimony and went virtually uncontested otherwise. As such, the Court finds that Dr. Eilers' plan reasonably provides for Mr. Farley's future medical, healthcare and attendant care needs and correctly assesses the reasonable and necessary costs of Mr. Farley's future medical care as a result of his stroke on December 2, 2010.

**9.16.**    To attend to all of Mr. Farley's activities of daily living as well as his medical needs, such as suctioning his g-tubes, cleaning his tracheostomy, preventing and monitoring pressure sores, full time in-home licensed nursing care will be required. Mr. Farley will have continued medical and allied healthcare, diagnostic services and hospital care and therapy care to address various issues such as his contractures. Along with these areas of care, he will also have ancillary needs, such as equipment and supplies for his various limitations and injuries; he is incontinent of bowel and bladder; he is completely immobile; and he relies entirely on his caregivers for adequate nutrition. The Court finds that the reasonable and necessary annual costs for such care, as outlined in Dr. Eilers'

---

[303] Document #17, Stipulated Facts of Parties, at 2–3 (Sept. 16, 2014).
[304] Exhibit 39, Dr. Eilers' Life Care Plan Summary Table;

plan, total $693,567.29. Projecting this annual cost over a 22.2 year life expectancy, accounting for both the inflationary effect of medical costs and the ability to invest the present sums and grow them over time, this Court finds that the present value of 22.2 years of Mr. Farley's future medical care is **$15,575,666.00.**

**9.17.**    Next, Mr. Farley also has spasticity that is uncontrolled. Because of the injury to his brain stem, his brain does not suppress primitive reflexes. For Mr. Farley, any slight irritation, transfers, and contact from people will cause spastic feedback.[305] Consequently, he will need a Baclofen pump to reduce the spasticity. This implanted device directly pumps the Baclofen drug into Mr. Farley's spinal cord so it can effectively suppress the spasticity.[306] Dr. Eilers testified that there would be yearly costs associated with this treatment. The reasonable and necessary present value of installing and maintaining the pump is **$1,005,232.**[307]

**9.18.**    The future medical costs Dr. Eilers presented in his report and testimony were reduced to present value by Plaintiff's expert economist, Catherine Newick. Ms. Newick earned her undergraduate degree in mathematics from the University of Rhode Island and masters in economics from the University of New Hampshire. She completed the coursework for a Ph.D. in economics at Boston College. Her full qualifications were provided in her CV, which was entered into evidence as Exhibit 27. The Court accepted Ms. Newick as an expert in economics without objection from the United States.[308] Her report and her tables were entered into evidence without objection from the United

---

[305] Trial Day 2 PM Session, 99.
[306] Trial Day 2 PM Session, 100.
[307] Exhibit 40.
[308] Trial Day 3 AM Session, 5.

States.[309] Ms. Newick's present value methodology consisted of growing each medical service and item in Dr. Eiler's plan annually, net of inflation. She then reduced each item to its present value employing a discount rate. Ms. Newick's report, Exhibit 73, detailed her present value methodology in this case. The United States did not contest Ms. Newick's methodology and the Court accepts it as a reliable methodology in present valuing future sums.

   **9.19.**   The total reasonable and necessary present value of Mr. Farley's future care caused by the United States' negligence is:

| | | |
|---|---|---|
| $ | 15,575,666 | Future Medical & Attendant Care |
| $ | 1,005,232 | Baclofen Pump & Associated Care |
| **$** | **16,762,898** | **Total Future Care** |

IV.    **Non-Economic Damages**

   **9.20.**   While damage awards in the FTCA context are generally reviewed for clear error, the reasonableness of the non-economic awards is within the discretion of the trial judge, subject to abuse of discretion review. *Limone v. United States*, 579 F.3d 79, 86, 102–03 (1st Cir. 2009) ($101,750,000 FTCA bench trial verdict upheld for wrongful incarceration of four individuals). An appellate court will not disturb an award of non-economic damages unless it is grossly disproportionate to the proven injuries or a miscarriage of justice. *Id.* at 103. In this case, the proven and uncontested economic damages are $17,121,608.62. Plaintiff asks this Court to award non-economic damages proportionate to those economic injuries. Further, in attempting to determine non-

―

[309] Exhibit 40 (Summary Tables); Exhibit 73 (Report).

economic damages, the Court can examine awards of damages from analogous scenarios. *See id.* at 106. The Court takes notice of the judgments filed by the Plaintiffs trial brief. *E.g.*, *Oulette v Scott*, No. 11-FJVR-7-13, 2011 WL 2710724 (Fla. Cir. Ct. 2011) (**$15,000,000** past pain and suffering; **$50,000,000** future pain and suffering for a 58-year-old with a severe brain injury and locked-in syndrome); *L.G. v. United States*, No. 8:04-cv-01045 (C.D. Cal. Sept. 5, 2007) (**$31,000,000** in pain and suffering for 31-year life expectancy); *Dodge v. Tezel*, No. 488800, 2007 WL 5433606 (Mass. 2007) (**$13,000,000** in pain and suffering for 42 year old plaintiff with quadriplegia); *Dunn v. City of New York*, No. 389936, 2000 WL 33594818 (N.Y. 2000) (**$25,000,000** in pain and suffering).

**9.21.**     In Mr. Farley's case, the evidence established by a preponderance of the evidence that his physical pain, suffering, mental anguish, impairment, and physical disfigurement is significant. The stroke destroyed Mr. Farley's motor function, but not his nerve fibers that carry pain and other sensation.[310] The evidence on this issue established that even though his brainstem has been injured, he can still feel pain, pressure, numbness, and all other sensations. Mr. Farley knows when he has been in a position too long. Mr. Farley knows when he is going to defecate and urinate—yet he can do nothing about it.[311] There is no more frightening and devastating condition than to suddenly become unable to speak, unable to move arms or legs, to walk, to balance, and to do all the activities that make life enjoyable while maintaining the mental function and ability to be fully aware of it. The loss of function is instantaneous, totally unanticipated,

---

[310] Trial Day 2 PM Session, 100.
[311] Trial Day 2 PM Session, 99–100 (Testimony of Dr. Eilers).

and dehumanizing. Mr. Farley's awareness of his condition while being unable to communicate his thoughts, feelings, pain, and frustrations to those around him make locked-in syndrome one of the most terrible conditions any person could endure.

**9.22.**     Mr. Farley is entitled to damages for past and future disfigurement as a result of his second stroke. Mr. Farley has had to have two feeding tubes installed—a g-tube and a j-tube. He has a tracheostomy so he can breath. When there is build up in his tracheostomy, he regurgitates sputum onto himself.[312] He must always wear a bib or towel around his neck to catch the discharge. His contractures have permanently deformed his hands and legs, as described above. He has injuries to his hands as a result of the contractures causing his nails to dig into them. He has spasticity of his body and deformity of his legs that prevent him from sitting without pain. He has scars as a result of pressure sores he received as a result of confinement to bed.[313] Also as a result of confinement to bed, Mr. Farley has dermatitis and excretions around his ears.[314] The Court was able to see the physical evidence of most of these conditions by viewing the video of Mr. Farley, which was entered into evidence as Exhibit 29.  Finally, the brain injury itself is a significant physical disfigurement of his brainstem. The Court finds, as a matter of fact, that the reasonable value to compensate these deformities is $100,000 per year. For the four years prior to this trial and the 22 years into the future, the Court finds the reasonable compensation for these costs to be **$2,600,000.00**.

**9.23.**     Mr. Farley may also recover for the loss of enjoyment of life, bodily functions, and permanent disability as a non-economic harm. *Bennett v. Lembo*, 761 A.2d

---

[312] Trial Day 2 PM Session, 111.
[313] Trial Day 2 PM Session, 95, 99.
[314] Trial Day 2 PM Session, 115.

494, 496–97 (N.H. 2000). Here, Mr. Farley cannot move independently and is completely reliant on his caregivers. The evidence showed that, in the last four years, Mr. Farley's current providers have not been taken him outside except for transfer to other hospitals for medical care. Even with the future care afforded to Mr. Farley, there are many activities of daily life that Mr. Farley will never be able to participate in. Before the second stroke, Mr. Farley's family testified extensively about Mr. Farley's life and the way in which he enjoyed it. Mr. Farley loved the outdoors. He hiked with his dogs almost daily; he loved to fish; he camped regularly; and more than anything he spent time with his family and especially his children. Mr. Farley's children, Kimberly-Rae Farley and James Farley, testified about how "hands-on" of a father Mr. Farley was with his children. He would drive them to work; pick them up from school; attend their school field trips; cook dinner regularly for them; serve as their den leader in Scouts, even insisting that his daughter be made into an "honorary boy scout;" made Halloween a super-sized holiday occasion; and taught them how to build things, and fix electronics. Michael Farley had the most joy as teacher and mentor to his children. He encouraged his daughter to accomplish whatever she set her mind to and he built his sons into the responsible individuals they are today.

   **9.24.**   In short, the uncontroverted testimony of Jeanice Farley, Kimberly-Rae Farley, and James Farley established that his children and family were and are the most important thing in Mr. Farley's life. And the Court also saw this demonstrated in the video evidence Plaintiff presented. In the video entered as Exhibit 29, the Court viewed Mr. Farley's physical reaction when his wife and son visit, and witnessed his moving reaction when he simply viewed his daughter via Skype on a tablet. Defendant did not

contest the fact that placing Mr. Farley in a suitable home with his family and around the clock nursing care would be better for his health and life expectancy. But it is also uncontroverted that such a placement would provide Mr. Farley with some quality of life, and certainly much more than he currently experiences in a facility. But while moving him into Keene, N.H. will allow him to spend time with his family and provide him with a much better quality of life than he currently endures, Mr. Farley will never be able to hike, fish, or take part in many of the outdoor activities that the State of New Hampshire has to offer. Nor will he ever be able to have the type of enjoyment with his family that he had before this devastating stroke. The Court finds, as a matter of fact, that the reasonable value to compensate Mr. Farley for this loss of enjoyment of life and disability is $300,000 per year for the four years prior to trial and $150,000 per year for the 22 years of remaining life expectancy. Thus, the total reasonable compensation for this element of damage is **$4,500,000.**

**9.25.**     Mr. Farley is entitled to compensation for his pain, suffering, and mental anguish as a result of the Government's negligence. He is entitled to reasonable compensation for any pain, discomfort, fears, anxiety, or other mental or emotional distress suffered. *Bennett v. Lembo*, 761 A.2d 494, 496–97 (N.H. 2000). The trial is rife with evidence of this type of harm. In the years that Mr. Farley has spent in a facility, he has lived at least two hours away from his family. To visit Mr. Farley, his family has to drive through a mountain range. In the winter, the ice and snow make such trips exceedingly difficult. Ms. Farley and James Farley testified that the family cannot afford to stay overnight when they visit Mr. Farley so one trip to visit him is usually a five to six hour trip each time. And the family testified that upon arriving, much of their visit is

devoted to catching up his healthcare providers and filling in gaps in his care. This distance from his family means that Mr. Farley gets very few visitors and his existence is lonely and isolated. He suffers significant pain with his contractures, and spasticity. As a result of lying in bed for the vast majority of his life since his second stroke, Mr. Farley has suffered Grade 4 pressure sores.[315] This type of sore burrows all the way to the bone and is one of the worst pressure sores you can have. The sore eats through skin, fat, muscle, and bone. It is accompanied by unimaginable pain and significant recovery time. Dr. Eilers described this pain as akin to having third degree burns.[316] Beyond that, while the evidence is that he feels every bit of this pain, he cannot communicate these problems.[317] The mental anguish and pain he has suffered and will continue to suffer is significant and should be compensated reasonably. This Court finds as a matter of fact that the reasonable value to attempt to make Mr. Farley whole for this life time of pain and suffering as a result of this stroke is $500,000 per year for the four years between his stroke and trial; and $300,000 per year for the 22 years into the future. The total compensation for pain, suffering, and mental anguish in this case should be **$8,600,000.**

**9.26.**     Finally, the Farley's should be compensated for the loss of consortium that the Government's negligence has caused. As a result of Mr. Farley's second stroke, Mr. Farley has to reside in a facility at least two hours away from Mrs. Farley and his home in Keene, NH. The testimony at trial showed that this family now spends their time in a caregiver role instead of what it should be—that of husband and wife. The Court finds the reasonable compensation to Mr. Farley for loss of consortium is $50,000 per year; and to

—

[315] Trial Day 2 PM Session, 94–95.
[316] Trial Day 2 PM Session, 99.
[317] Trial Day 2 PM Session, 99–100.

Mrs. Farley, individually, for loss of consortium, is also $50,000 per year. The total value of this element of damages over the four years prior to this trial and the 22 years of Mr. Farley's life expectancy is **$1,300,000** to Mr. Farley, and also **$1,300,000** to Ms. Farley.

   **9.27.**    The Court finds that the reasonable value required to compensate Mr. Farley for non-economic harms caused by the Government's negligence is:

|   |   |   |
|---|---|---|
| $ | 2,600,000 | Disfigurement |
| $ | 4,500,000 | Loss of Enjoyment of Life |
| $ | 8,600,000 | Pain, Suffering, Mental Anguish |
| $ | 1,300,000 | Loss of Consortium |
| $ | **17,000,000** | Total Non-Economic Harm to Mr. Farley |

   **9.28.**    The Court finds that the reasonable value required to compensate Ms. Farley for the non-economic harms caused by the Government's negligence is **$1,300,000** for loss of consortium with her husband.

## CONCLUSIONS OF LAW

   **10.1.**    Defendant United States of America was negligent in the care and treatment of Michael Farley, proximately causing Mr. Farley's stroke on December 2, 2010, and leaving him with locked-in syndrome. After adopting the review of damages filed by the Plaintiff in the original findings of fact and conclusions of law and her trial brief on non-economic damages, the Court finds that the reasonable compensation for the harms caused by the Government's negligence is as follows:

| | |
|---|---|
| $ 1,368,710.62 | Upfront or One-time Expenses or Costs |
| $16,762,898.00 | Future Medical Care |
| $17,000,000.00 | Non-economic Compensation |
| $35,131,608.62 | Mr. Farley's Total Damages. |

**10.2.**    The Clerk of the Court is instructed to enter judgment against the United States in favor of Mrs. Farley, on behalf of Mr. Farley, in the amount of $35,131,608.62; and in favor of Ms. Farley, individually, in the amount of $1,300,000.

**10.3.**    Pursuant to 28 U.S.C. § 2674, Plaintiff is not entitled to an award of punitive damages against the United States of America.

**10.4.**    In all other respects, Defendant United States of America is legally liable for Plaintiff's injuries and resulting damages caused by the negligent medical care to Michael Farley at the Manchester VA Medical Center.

**10.5.**    Pursuant to 28 U.S.C. § 2678, Plaintiff's attorneys' fees are limited to 25% of the judgment and the Court finds that to be reasonable fees in this case.

**10.6.**    Plaintiff should recover her taxable costs from the Defendant. The United States is not liable for prejudgment interest. 28 U.S.C. § 2674. However, Plaintiff is entitled to post-judgment interest from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance. 13 U.S.C. § 1304(b)(1).

**10.7.**    Any finding of fact that may also be deemed a conclusion of law is so deemed. Any conclusion of law that may also be deemed a finding of fact is so deemed.

**CERTIFICATE OF SERVICE**

I certify that a copy of this motion has been sent to the following on November

17, 2014 via the Court's CM/ECF notice system:

> T. David Plourde
> Assistant U.S. Attorney
> Chief, Civil Division
> NH Bar No. 2044
> 53 Pleasant Street, 4th Floor
> Concord, NH 03301
> 603-225-1552
> david.plourde@usdoj.gov


> Signed:

> /s/ Tom Jacob